Page 1

1                    UNITED STATES DISTRICT COURT

2                    SOUTHERN DISTRICT OF FLORIDA

3    _____

4    CHARLENE MAJOR,                    )
                                        )
5            Plaintiff,                 )
         vs.                            ) Case No. 18-21914-CIV-SCOLA
6                                       )
     CARNIVAL CORPORATION,              )
7                                       )
             Defendants.                )
8    _____ )

9

10

11           VIDEO DEPOSITION OF EDWARD CARL VANDER CLUTE

12                    San Francisco, California

13                    Tuesday, March 5, 2019

14                         Volume I

15

16

17

18

19

20

21   Reported by:
     JOANNA BROADWELL
22   CSR No. 10959
23   Job No. 3244636
24
25   PAGES 1 - 149

Page 2

```
 1              UNITED STATES DISTRICT COURT
 2              SOUTHERN DISTRICT OF FLORIDA
 3      _____
 4     CHARLENE MAJOR,           )
                                 )
 5          Plaintiff,           )
            vs.          )Case No. 18-21914-CIV-SCOLA
 6                               )
       CARNIVAL CORPORATION,     )
 7                               )
            Defendants.    )
 8      _____ )
 9
10
11
12          Video deposition of EDWARD CARL VANDER
13     CLUTE, Volume I, taken on behalf of Plaintiff, at 4141
14     Geary Street, Mezzanine Conference Room, San Francisco,
15     California, beginning at 2:15 p.m. and ending
16     at 5:58 p.m. on Tuesday, March 5, 2019,
17     before JOANNA BROADWELL, Certified Shorthand
18     Reporter No. 10959.
19
20
21
22
23
24
25
```

Page 3

```
 1   APPEARANCES:
 2
 3   For Plaintiffs:
 4     DIMOND KAPLAN & ROTHSTEIN, P.A.
 5     BY: CHRISTOPHER M. DRURY (Via teleconference)
 6     Attorney at Law
 7     2665 South Bayshore Drive, PH-2B
 8     Miami, Florida 33133
 9     (305) 374-1920
10
11
12   For Defendants:
13     MASE MEBANE & BRIGGS, P.A.
14     BY: VICTOR J. PELAEZ (Via teleconference)
15     Attorney at Law
16     2601 South Bayshore Drive, Ste. 800
17     Miami, Florida 33133
18     (305) 377-3770
19
20   Also Present: Brandon Miller, Videographer.
21
22
23
24
25
```

Page 4

```
 1                    INDEX
 2   WITNESS                 EXAMINATION
 3   EDWARD CARL VANDER CLUTE
 4   Volume I
 5          BY MR. DRURY          6
 6          BY MR. PELAEZ         92
 7          BY MR. DRURY          143
 8
 9         INDEX OF EXHIBITS
10
11   NUMBER          DESCRIPTION       PAGES
12   Exhibit 1       Notice of Videotaped
13                   Deposition        13
14   Exhibit 2       Subpoena          13
15   Exhibit 3       Re-Notice of Videotaped
16                   Deposition        14
17   Exhibit 4       Visit Information Note    32
18   Exhibit 5       Office Visit Note     50
19   Exhibit 6       Scheduled Telephone Note  54
20   Exhibit 7       Clinical Documentation
21                   Notes             56
22   Exhibit 8       Office Visit Note     60
23   Exhibit 9       Office Visit Note     65
24   Exhibit 10      Scheduled Telephone Note  73
25   Exhibit 11      Scheduled Telephone Note  88
```

Page 5

```
 1
 2       San Francisco, California, Tuesday, March 5, 2019
 3            2:15 p.m.
 4            PROCEEDINGS
 5       THE VIDEOGRAPHER:  Good afternoon.  We are going
 6   on the record of 2:15 p.m. on March 5th, 2019.  Please
 7   note the microphones are sensitive and may pick up
 8   whispering, private conversations and cellular
 9   interference.  Please silence all cell phones and place
10   them away from the microphones as they can interfere
11   with deposition audio.  Audio videotaping recording will
12   continue to take place unless all parties agree to go
13   off the record.  Stand by.
14       This is Media number one of the video-recorded
15   deposition of Edward Carl Vander Clute in the matter of
16   Charlene Major versus Carnival Corporation filed in the
17   United States District Court, Southern District of
18   Florida, Case No. 18-21914-CIV-SCOLA.  This deposition
19   is being held at 4141 Geary Boulevard, French campus,
20   Kaiser, San Francisco, California, 94118.
21       My name is Brandon Miller for the firm Veritext
22   Legal Solutions.  I am the videographer.  The court
23   reporter is Joanna Broadwell from the firm Veritext
24   Legal Solutions.  I am not related to any party in this
25   action, nor am I financially interested in the outcome.
```

2 (Pages 2 - 5)

Page 6

1    Counsel and all present in the room will now
2  state their appearances, affiliations for the record.
3    MR. DRURY:  Christopher Drury for the plaintiff.
4  Charlene Major.
5    MR. PELAEZ:  Victor Pelaez on behalf of defendant
6  Carnival Corporation.
7    THE DEPONENT:  Edward Vander Clute.
8    THE VIDEOGRAPHER:  Stand by.  Thank you.  You may
9  now swear in the witness.
10
11  EDWARD CARL VANDER CLUTE,
12  having been administered an oath, was examined and
13  testified as follows:
14
15    THE VIDEOGRAPHER:  Okay.  Counsel, you may now
16  proceed.
17         EXAMINATION
18  BY MR. DRURY:
19    Q  Mr. Vander Clute, if you could please state your
20  full legal name for the record.
21    A  Edward Carl Vander Clute.
22    Q  Thank you.  And where are you located currently?
23    A  4141 Geary Boulevard, Kaiser Permanente, San
24  Francisco, California.
25    Q  Okay.  And is that where you work?

Page 7

1    A  Yeah.  I work at two floors up from this floor
2  that I am on now.  Yeah.
3    Q  Okay.  Great.  And what do you do there?
4    A  I am a licensed clinical social worker.  I do
5  psychotherapy for individuals and groups here and
6  sometimes couples as well.
7    Q  Okay.  And how long have you been employed by
8  Kaiser Permanente as a licensed clinical social worker?
9    A  Nineteen years.
10    Q  Nineteen years.  Okay.  And could you please give
11  us the benefit of your educational background starting
12  with high school and going through your highest level of
13  education.
14    A  Well, I have -- you mean the names of the schools
15  I went to?
16    Q  Yes, please.
17    A  Okay.  For high school I went to Maret high
18  school in Washington, D.C.  For college I went to
19  Hampshire College in Amhurst, Massachussets.  And for
20  graduate school I went to the Smith College School For
21  Social Work in Northampton, Massachusetts.  I've also
22  had subsequent training, if that is interesting to you.
23    Q  Yes.  Please tell us about that.
24    A  I took -- absolutely.  I studied for two years
25  with Dr. David Burns at Stanford University where we

Page 8

1  were studying cognitive behavioral therapy and
2  working -- and doing therapeutic skills in terms of
3  theory and practice.
4    Q  Okay.  When did you graduate from Hampshire
5  College and what was the degree you obtained?
6    A  It was a B.A. in 1987.  And my Major was music
7  and psychology.
8    Q  Okay.  And what year did you graduate from Smith
9  College School For Social Work and what was the degree
10  that you obtained?
11    A  1995 it was a master's in clinical social work.
12  And for those people that don't know, clinical social
13  work is doing psychotherapy.
14    Q  And the two years that you worked with Dr. David
15  Burns at Stanford doing cognitive behavioral therapy, if
16  you could for the benefit of the jury tell us what
17  cognitive behavioral therapy is.
18    A  Cognitive behavioral therapy is a theory that
19  says that our mood, depression or anxiety, is largely
20  created by our thoughts.  That is what we -- what we
21  think.  So it looks at the idea that depression and
22  anxiety are caused by negative, distorted thoughts that
23  we have about ourselves, other people and the world in
24  general.
25    So cognitive behavioral therapy helps people

Page 9

1  recognize that their thoughts are distorted it helps
2  them challenge to change the thoughts.  And Dr. David
3  Burns taught us 50 different techniques to help people
4  challenge and change their thoughts.  And when we change
5  our thoughts our mood improves.  So the idea is that if
6  I tell myself I am not good enough, I'll never get what
7  I want in life I'll be very depressed.  If I can balance
8  that with the reality of my situation and say something
9  like here are my strengths, here are my weak -- here are
10  areas that I can grow in, my mood improves.  So it's
11  about helping people improve their depression and
12  anxiety.
13    Q  Okay.  And when did you do the two-year training
14  with Dr. David Burns?
15    A  That was May of 2000 -- rather, I'm sorry, April
16  of 2015 to -- through to September of 2017.
17    Q  And did you obtain any sort of a certificate or
18  any sort of diploma from that program?
19    A  No.  No.  That was a non-credentialed program.  I
20  did take classes with him for continuing education in
21  other scenarios, in other venues that we needed to get
22  continuing education, credits to maintain our license,
23  but this was not about that.  This is just training that
24  he does out of the goodness of his heart for free.
25    Q  Okay.  Excellent.  Could you please tell us about

3 (Pages 6 - 9)

Page 10

1 the certifications that you have as a licensed clinical
2 social worker and any other certifications that you have
3 as a professional?
4    A   Well, a licensed clinical social worker, you need
5 a master's degree, and then you need to get licensed in
6 clinical social work.  And in California that requires
7 two years of practice, hours plus taking a written and
8 an oral exam that you need to pass.  I have also got a
9 credential in Gestalt therapy that I got in 1995 in
10 Richmond, Massachusetts.  And that's another technique
11 like cognitive behavioral therapy.  It is a different
12 way of working with patients.
13    Q   Okay.  When did you become a licensed clinical
14 social worker in the state of California?
15    A   Nineteen -- April of 1999.
16    Q   Is that a nationwide credential or is that just
17 for the state of California?
18    A   Well, every state has their own licensing
19 systems.  You need -- to practice in any state you need
20 to be licensed in that state, but every state has a
21 different licensing, probably like an attorney, your are
22 credentialed or you have a law license in Florida, but
23 if you moved to California you would have to pass the
24 California Bar.  So it is exactly the same.
25    Q   Okay.  Are there any other states where you have

Page 11

1 credentials as a licensed clinical social worker?
2    A   No.
3    Q   Okay.  And the certificate that you got in
4 Gestalt therapy in 1995, what is the name of that
5 certificate and who gave it to you?  Who conferred it
6 upon you?
7    A   Yeah.  I think it was called the Richmond Therapy
8 Center, I think what it was called.  And what was the
9 other part of that question?
10    Q   Just who conferred it upon you and, yeah, that --
11 I think you answered the question.  I think you answered
12 the question.
13    A   Okay.  Fair enough.
14    Q   The Richmond Therapy Center, and that is in
15 Richmond, Massachusetts, you said?
16    A   That's correct.
17    Q   Okay.  Great.  You said you have been working
18 with Kaiser Permanente for 19 years.  That would take us
19 back to the year 2000; is that right?
20    A   I started in December of 1999, December 27th,
21 1999.
22    Q   December 27, 1999.  Okay.  And before
23 December 27th, 1999, where were you employed?
24    A   Well, I had several employments.  I was at the
25 STARS adolescent center, the STARS adolescent center in

Page 12

1 San Leandro, California.  I was at the Fremont hospital
2 prior to that in Fremont, California.  Prior to that I
3 was at the West Oakland Mental Health Center in Oakland,
4 California.  Prior to that I was at Visitation Valley
5 Middle School in San Francisco, California.  Prior to
6 that I was at the Center For Elders Independence in
7 Oakland.  I have also worked in the public school system
8 in New York City and at a therapeutic high school in
9 Stockton, Massachusetts.
10    Q   Okay.  For how many total years of your career
11 have you been focused on psychology and clinical social
12 work?
13    A   Twenty-five.
14    Q   Twenty-five years.  Okay.  And what do you do on
15 a daily basis for Kaiser Permanente currently?
16    A   I see patients.  I see mostly individual patients
17 and work with them through whatever issues they are
18 dealing with.  It could be anxiety, depression,
19 post-traumatic stress, family problems, marital
20 problems, drug and alcohol issues.  I also run a
21 cognitive behavioral therapy group for depression.  I
22 also run a young adult group for depression.  And that's
23 currently what I do and occasionally couples counseling
24 well.
25    Q   Okay.

Page 13

1    A   Yeah.
2    Q   Excellent.  So we've premarked some exhibits, and
3 I am going to start with Plaintiff's Exhibit 1 which was
4 the original notice of your videotaped deposition.
5    A   Yeah.
6    (Exhibit 1 was marked for identification
7      by the court reporter and is attached hereto.)
8 BY MR. DRURY:
9    Q   Have you seen this -- have you seen this document
10 before?
11    A   No.
12    Q   Okay.  All right.
13      THE VIDEOGRAPHER:  This is the videographer.  He
14 has it in front of him.  And as you go from exhibit to
15 exhibit I will put the exhibits in front of him on the
16 iPad digitally.
17      MR. DRURY:  Excellent.  Okay.
18 BY MR. DRURY:
19    Q   So have you seen Plaintiff's Exhibit 1 which is
20 the notice of videotaped deposition?
21    A   I am now seeing it.  I am seeing it right now for
22 the first time.
23    (Exhibit 2 was marked for identification
24      by the court reporter and is attached hereto.)
25 BY MR. DRURY:

4 (Pages 10 - 13)

Page 14

1    Q  Okay.  All right.  So we'll move on to
2  Plaintiff's Exhibit 2.  Which is a subpoena that was
3  sent with that notice.
4    A  Okay.
5      THE VIDEOGRAPHER:  And like I said, I'll let you
6  know -- sorry, Counsel, this is the Videographer.  I will
7  let you know when I have it open and in front of the
8  witness.
9      MR. DRURY:  Okay.
10     THE VIDEOGRAPHER:  And I now do.
11     THE REPORTER:  Okay.  Let me just take a look at
12  it.  While he's doing that.
13     THE REPORTER:  This is your court reporter.
14  Could you just hold one moment for me?  Thanks,
15  everybody.  Appreciate it.
16     THE VIDEOGRAPHER:  We're still on the record.
17     THE DEPONENT:  Okay.  This is the first time I've
18  seen it, but I have seen it, yes.
19  (Exhibit 3 was marked for identification
20    by the court reporter and is attached hereto.)
21  BY MR. DRURY:
22    Q  Okay.  All right.  Well, then, we will move on to
23  Exhibit 3 which is the re-notice of video-taped
24  deposition.
25     THE VIDEOGRAPHER:  Do you want me to close the

Page 15

1  other exhibits for now?
2      MR. DRURY:  Yes, please.
3      THE VIDEOGRAPHER:  Okay.
4      MR. DRURY:  Yes, please.
5      THE VIDEOGRAPHER:  Okay.
6  BY MR. DRURY:
7    Q  Mr. Vander Clute, have you seen Plaintiff's
8  Exhibit 3, the re-notice of video-taped deposition?
9    A  No.  Not until right now.  But I am looking at it
10  now.
11    Q  Okay.  That's fine.  So now we'll just move right
12  along.  How did you know to come to the room where you
13  are today to have your deposition taken?
14    A  Let me see.  I was at one point in contact with
15  Tonya Meister.  She mentioned that at some point there
16  would be a deposition.  And then I was notified, I
17  think, by Kaiser Permanente that -- the legal team, that
18  this was occurring.
19    Q  Okay.
20    A  So how did I know to come right to this room at
21  this time?  Kaiser Permanente told me, some official
22  here that I have never met before.  In fact, I never met
23  them at all.  I have talked to them on the telephone.
24     MR. DRURY:  All right.  Fair enough.  Fair
25  enough.  Okay.  Have you ever had your deposition taken

Page 16

1  before?
2    A  Well, not a deposition.  Many years ago I was
3  living in Massachusetts, and there was a court hearing
4  in Wisconsin for a patient I had previously worked with.
5  And I did a phone testimony on the -- in court that was
6  broadcast live in court.  But that's not -- that was not
7  a deposition.  So, no.  I have never been deposed
8  before.  This is the first time.
9    Q  Okay.  So have you only provided testimony in a
10  court case that one time that you just described?
11    A  Yes.  But I know -- you are asking me have I ever
12  been in court before?  I did testify in a small claims
13  court for a lawsuit that I initiated.  I don't know if
14  that was relevant, but that was personal.  That was not
15  professional.
16    Q  Yes.  No, I am just asking in a professional
17  capacity.
18    A  Okay.
19    Q  So if you could give us, to the best of your
20  knowledge, the names of the cases if you know them, the
21  rough time period when you gave the testimony in court
22  and where it was, what county and state it was.
23    A  Okay.  It was in July of 1995.  It was taking
24  place in Wisconsin.  I don't know the County.  Do you
25  want the last name of the patient that I was -- that I

Page 17

1  was being asked about?  Is that what you want?
2    Q  Yes, please.
3    A  Hoffman.  Hoffman is the name.  I don't know the
4  name of the case, though, but Hoffman was the name of
5  the patient that I was being asked about, that I had
6  worked with.
7    Q  Okay.  And do you have any publications?
8    A  I have been published.
9    Q  Professional publications.
10    A  Yeah.  Well, I have been published in a Polish
11  magazine called Charaktery twice.  One article was on
12  cognitive behavioral therapy and the other article was
13  on authenticity.  This is a psychologist magazine in
14  Poland.
15    Q  Okay.  And do you recall the approximate dates of
16  those publications?
17    A  Yeah.  One was in June of 2017, and the other was
18  in August of 2017.  That's when the magazines that I was
19  published in came out.
20    Q  Okay.  And do you recall the -- the titles of
21  those two articles?
22    A  Hold on a second.  If I knew you were going to
23  ask me this I would have brought the articles with me.
24  But the first article must have been something like
25  "Seven Ways For Achieving Authenticity."  And the second

Page 18

1  article was "Change Your -- Change Your Thoughts, Change
2  Your Mood" was the second article title.
3      Q   Okay.  And if you could give us once again the
4  spelling of the Polish publication in which you were
5  published?
6      A   Yeah.  C-h-a-r-a-k-t-e-r-y.
7      Q   Okay.  Was there a time when you met a patient by
8  the name of Charlene Major?
9      A   Yeah.  She went by Charlene Major Manning when I
10  met her, so I know you are calling her Major.  Major
11  Manning is what I had her as in my chart notes, Major
12  Manning, but it is the same person, I am sure.
13      Q   Sure.  She's married to Robert Manning.  That's
14  her husband.  So that's her married name.  So when did
15  you meet Charlene Major?
16      A   The first time I met Charlene Major was on
17  June 28th, 2017.
18      Q   Okay.  And what were the circumstances under
19  which she came to you?
20      A   Well, she was coming to receive services,
21  psychotherapy services from me.  Those were the
22  circumstances.
23      Q   Okay.  And had she been referred to you by
24  another physician?
25      A   Let's see.  I am pretty sure it was

Page 19

1  self-referred.  So she reached out to our department and
2  asked to be seen because she was having difficulties.
3      Q   Okay.  And did you assess her clinically in that
4  initial treatment session?
5      A   Absolutely, yes.
6      Q   Okay.  So if you can tell us what does your --
7  your clinical assessment of a new psychotherapy patient
8  entail?
9      A   Well, I -- first of all I read the paperwork that
10  she has filled out, and that includes reading the
11  presenting problem, the history of her being in
12  psychotherapy, symptoms that she's having, depression,
13  anxiety as well as other things, drug and alcohol
14  issues, some of her psychosocial history in terms of
15  profession, family, psychiatric history, who's in her
16  family.  That's what's in the paperwork.
17      In the assessment basically you ask a patient
18  where they are here.  You make sure that you understand
19  the circumstances that bring them here and then the
20  symptoms that they are having related to those
21  circumstances.  You are also getting a history of any
22  psychiatric problems they've had or any psychiatric care
23  that they have received.
24      You are getting information on their drug and
25  alcohol history, including what they currently might

Page 20

1  take all the way back to when they first might have
2  started using substances.  You are getting family
3  history, a psychiatric history of their family.  You are
4  getting their employment history.  You are getting their
5  medical history, and then you are getting, most
6  importantly, what it is that brings them in today.  What
7  is the issue that brings them in today and are there any
8  antecedent factors in that -- in what brings them in
9  today.  In other words, has anything in the past
10  contributed to why they are here today.
11      Q   Okay.  And why was Charlene Major seen by you on
12  June 28th, 2017?
13      A   Well, the presenting problem was that she had
14  been assaulted on a Carnival cruise in May of 2017.  And
15  that had caused her to have symptoms of post-traumatic
16  stress.  Post-traumatic stress in this case includes
17  nightmares, recurrent thoughts of having been abused.
18  She reported having been abused by a man, a drunk man
19  and her daughter -- and his daughter on the cruise ship.
20  She was having flashbacks to this event.
21      She was having what we call increased startle
22  responses where you get startled easily, hypervigilance
23  when you are looking around to see if anybody was after
24  you.  She was having sleeplessness, she was having
25  depression, including depressed mood, anhedonia which

Page 21

1  means the inability to find pleasure.  She was having
2  problems sleeping, feeling worthless, feeling bad about
3  herself, having difficulty focusing, having low energy
4  and moving slowly.  And that's what brought her in at
5  that moment.
6      And I could get into detail as to how she
7  presented the incident that happened.  I don't know if
8  that's what you want, but that was her presenting
9  problem.
10      Q   Okay.  Were there any antecedent factors that you
11  took into consideration in that initial --
12      A   Yeah.  Absolutely.  She had quit her job in May
13  of 2016 to take care of her father who was ill.  She
14  also took care of her brother who lived with her and her
15  father at that time.  She was -- so that was a stressor
16  on her.  In November of 2016 she was involved in a
17  serious car accident and her car was totaled, which
18  caused her to have headaches, backaches.
19      In December of 2016 her brother fell and died at
20  age 53.  He had COPD.  A couple of months later in
21  February 2017 her father died.  So those were all
22  antecedent factors prior to the Carnival cruise.
23      Q   Okay.  And did she tell you what her -- did she
24  describe to you the incident for which she was coming to
25  see you on June 28th, 2017?

6 (Pages 18 - 21)

Page 22

```
 1     A  I mean, the incident on Carnival cruise?
 2     Q  Yes.  Did she describe that for you?
 3     A  Absolutely she did.  And I have it detailed here
 4  in two notes if you would like me to read them.  I mean,
 5  you probably have them in front of you.
 6     Q  Absolutely.
 7     A  Okay.  I'm sorry?
 8     Q  If --
 9     A  She said -- while she was on Carnival cruise she
10  was verbally assaulted and called the "N" word, by which
11  she meant nigger, by a drunk passenger.  When she
12  replied to the man who called her that his daughter and
13  the man himself started assaulting her, kicking her
14  back, putting her face to the ground, kicking and
15  choking her.  She said her eye was blackened.
16        She also described it in a subsequent session.
17  You know, I, myself, might not have gotten the details
18  clear, but in this case she said that a woman jumped on
19  her, apparently unprovoked, and called her a black
20  nigger bitch.  The woman's father then yelled at her
21  saying, "Go back to your country, you black nigger.  Go
22  get your husband so I can beat his back nigger ass."
23        She said this man brutally assaulted her.  She
24  said that both the man and his daughter were drunk and
25  out of control.  And she said that she went to get help
```

Page 23

```
 1  from a doctor, but they wouldn't treat her unless she
 2  gave them $200 which she chose not to do.
 3        She said later in the -- she went back to her
 4  room and she said later in the evening the phone rang in
 5  her room on the cruise ship.  And the voice said, "We're
 6  going to kill you, you nigger."  She said she told the
 7  ship this, and they told her that they would trace the
 8  call.  She said that the next day the man, despite this,
 9  was still allowed on the cruise ship and that he was
10  drunk again, harassing other people.  And she was very
11  upset by this, that given the assault that she had
12  received that the ship still allowed him to be on the
13  cruise.  She felt that was outrageous, and that
14  re-triggered her trauma and destroyed her ability to
15  enjoy the rest of the trip.
16     Q  Was that -- was that history of the incident and
17  her description of it important for you in assessing her
18  current psychological condition?
19     A  Absolutely.
20        MR. PELAEZ:  Objection.  Form.
21        THE DEPONENT:  Absolutely is the answer to your
22  question.
23  BY MR. DRURY:
24     Q  Okay.
25     A  Because that was the presenting problem.  That
```

Page 24

```
 1  was the presenting problem that she came in for.
 2     Q  Okay.  And did you take from her a psychological,
 3  psychiatric history on that first occasion, on June 20th
 4  28th, 2017?
 5     A  Well, I did.  I did to some extent.  Sometimes we
 6  have 45 minutes with a patient, so we don't get the
 7  whole history sometimes in 45 minutes.  Because
 8  oftentimes the patient -- and in this case particularly
 9  they really need to talk about the issue that's going on
10  for them at that moment.  So I did get a history.  Do
11  you want me to share that with you?
12     Q  Sure.  And if you can tell us why it's important
13  to get a psychiatric, psychological history from a new
14  patient.
15     A  Well, first of all, it is important because you
16  want to understand how long have they been having a
17  problem like anxiety, like depression.  Is this a
18  brand-new situation?  Have they been having it their
19  whole lives?  Did they perhaps inherit it genetically
20  from their family members?  So that's extremely
21  relevant, whether it's a brand-new problem that just
22  occurred or if they've been having it before.
23        She said in her case, she said that she
24  previously had been on Diazepam, which is an antianxiety
25  medication for 10 or 20 years due to anxiety, which is
```

Page 25

```
 1  apart from what happened on the ship.  And then the -- I
 2  think all the factors that I raised about her brother
 3  and her father's death and the car accident were
 4  relevant.
 5        Let's see what else I have got here.  Let's see.
 6  Yeah.  She had no previous psychiatric history in terms
 7  of -- oh, no.  I am sorry.  She had seen an individual
 8  therapist at some point.  Yeah.  I think that's about
 9  the history that I got that day.
10     Q  Okay.  And you mentioned that the prior anxiety
11  was separate from what happened on the ship; is that
12  right?
13     A  Yes.  Yes, sir, because she'd been on Diazepam
14  for 10 to 20 years, and obviously the ship incident had
15  happened the month prior to seeing her.
16     Q  Okay.  Did her prior anxiety in any way impact
17  her current condition when she presented on June 28th,
18  2017?
19        MR. PELAEZ:  Objection.  Form.
20        THE DEPONENT:  My sense was that the major
21  factors she was dealing with was the assault on the
22  ship, that that is what really was triggering her.  The
23  fact that she had recent other traumas like the car
24  accident might have -- that trauma might have been
25  exacerbated by this.  But the major focus was definitely
```

1 the assault. I mean, if you could imagine being beat up
2 by two people, called racial names, to the point where
3 your eye is black, you are beat up, and then the -- a
4 man is allowed to stay on the ship. That is really
5 upsetting.
6     She also told me that as a result of that
7 incident she was afraid to go outside. She was afraid
8 of people. And she had never been this way in her life.
9 And I believe she was 52 when I met her. She said that
10 she experienced fear looking at, quote, unquote,
11 "redneck-looking white men." She feared that people
12 were following her. The man that hit her, assaulted her
13 was white. She said she vomited when she thought
14 someone was following her. She was afraid because Trump
15 was president or he still is. She was afraid that his
16 rhetoric and seeing hate crimes on the rise was
17 exacerbating her condition.
18     She said that every time she saw on the news that
19 a police officer killed a black person, particularly
20 getting -- particularly when they got away with it, that
21 really affected her in a way that it had never affected
22 her before. She'd never been a victim of a racial crime
23 before, and this was clearly a racial crime. So it
24 impacted her severely, absolutely.
25   Q  Okay. And if you could please tell us what

1 symptoms Charlene Major had of post-traumatic stress.
2 You mentioned that she had post-traumatic stress on that
3 first date of service. What were the symptoms of
4 post-traumatic stress on that first date of service?
5   A  Nightmares, recurrent thoughts of the abuse,
6 thinking back to being assaulted, flashbacks to the
7 abuse. A flashback is when you feel like you are
8 re-experiencing that as if you are there again. She had
9 what's called increased startle response where you get
10 easily started much more easily than say you would if
11 you hadn't experienced the trauma, hypervigilance when
12 you are looking around to make sure you are safe,
13 difficulty trusting people, sleeplessness. Depression
14 is part of a post-traumatic stress and she had depressed
15 order ever mood. And anhedonia again, difficulty
16 finding pleasure, difficulty sleeping, feeling
17 worthless, badly about herself, difficulty focusing or
18 concentrating, low energy, moving slowly.
19     She also said this severely impacted her
20 relationship with her husband and her daughter. She
21 became distant from her husband. They basically were
22 not having sex at all. She just stayed inside all the
23 time. And her daughter who looked up to her as the
24 stable person in the family, the strong person in the
25 family, sort of began to say, "What's wrong, Mom? I

1 don't understand what is going on with you." And so she
2 began to feel alienated from her family.
3     She wasn't able to work after that. She wasn't
4 able to -- she was a woman in charge of paying the
5 bills, taking care of all of the responsibilities of the
6 home. And she wasn't able to do that, so she began to
7 feel badly about herself, and I think it affected how
8 her family looked at her. So that is another symptom,
9 social symptom of what was going on with her
10 post-traumatic stress.
11   Q  Okay. And if you could tell the jury what
12 exactly post traumatic stress disorder is?
13   A  Post traumatic stress disorder is basically
14 trauma when it's -- it's a disorder in reaction to a
15 trauma. And a trauma can be defined as a near death
16 situation like, you know, somebody points a gun at you,
17 threatens to kill you. You get into a severe car
18 accident, maybe almost dying in the car accident.
19 You're violated in some way. Somebody hits you.
20 Someone gets into a fight with you. Someone cuts you.
21 You have a near death situation from any -- you know,
22 any way that a person could have a near death situation
23 would apply.
24     You got beat up by your family. You got verbally
25 assaulted by anybody or by your family. You have been

1 sexually abused. Sexual abuse survivors often suffer
2 post-traumatic stress.
3     And post traumatic stress, as I am saying, the
4 symptoms of it are nightmares, flashbacks to the event,
5 recurrent thoughts of the event happening. You are
6 easily started. You are hypervigilant. You have
7 problems focusing. You have problems sleeping. You
8 have problems finding joy in life or finding
9 fulfillment. It's difficult to look forward and to be
10 excited about life. A person often becomes hopeless and
11 wonders if life is worth living.
12   Q  Okay. Would a -- would a racial assault, either
13 verbal or physical, fall within the category of the
14 types of trauma that could trigger post-traumatic
15 stress?
16     MR. PELAEZ: Objection, form.
17     THE DEPONENT: Absolutely. Absolutely. That was
18 a severe trauma. I worked with many, many patients and
19 that is one of the most severe traumas that I have heard
20 about, particularly given the physical and the racial
21 component and the component that she felt that Carnival
22 cruise did not support her and did not back her up. So
23 that was, again, feeling traumatized by the cruise ship
24 that she was on.
25 BY MR. DRURY:

8 (Pages 26 - 29)

Page 30

1  Q  Is that your opinion within a reasonable degree
2  of psychological probability?
3     MR. PELAEZ: Objection. Form.
4     THE DEPONENT: What part of that is my opinion?
5     THE VIDEOGRAPHER: Stand by. Microphone. It
6  snaps back in place. It snaps back on your clip.
7     THE DEPONENT: Hold on.
8     THE VIDEOGRAPHER: It happens all the time.
9  Don't worry.
10     THE DEPONENT: Okay. Okay. Can you rephrase --
11  is that good?
12  BY MR. DRURY:
13  Q  Sure.
14  A  Can you rephrase the question?
15  Q  Sure. Sure. Is that your opinion within a
16  reasonable degree of psychological probability? In
17  other words, more likely than not are you saying that --
18  are you making that opinion within your specialty as a
19  psychologist?
20  A  You mean --
21     MR. PELAEZ: Objection to form.
22     THE DEPONENT: Do I have to pay attention to the
23  objection? I am not sure.
24  BY MR. DRURY:
25  Q  No.

Page 31

1  A  So do you mean that is it within my professional
2  opinion that she was severely impacted by what happened
3  to her on Carnival cruise and that her symptoms of
4  post-traumatic stress were related directly to that
5  situation? Is that your question?
6  Q  It is my question, yes.
7  A  Yes. And the answer --
8     MR. PELAEZ: Objection. Move to strike.
9     THE DEPONENT: The answer is absolutely, yes.
10     THE REPORTER: Repeat the objection, please.
11  Repeat the objection, please.
12     MR. PELAEZ: First I moved to strike as
13  none-responsive to the first response by the witness.
14  And then I objected to form.
15  BY MR. DRURY:
16  Q  Mr. Vander Clute, is it important for your course
17  of psychotherapy of a patient to determine the root
18  cause of the patient's symptoms?
19  A  Sure. I mean, yeah. I mean, that's a very --
20  that's a very general question. But, sure, sure. That
21  absolutely is important. And, again, the history plays
22  into it. Has this person had these symptoms before for
23  some other related or unrelated reason or are these
24  symptoms directly related to something that recently
25  happened. So I am not sure I gave you a clear answer,

Page 32

1  but that's -- that's the best answer I can give you to
2  that question.
3  Q  Did you determine the root cause of Charlene
4  Major's psychological problems on June 28th, 2017?
5  A  Well, yes. My -- the root cause was that she'd
6  had a mild unrelated post-traumatic stress disorder
7  based on the car accident and the deaths of her brother
8  and father. But it was mild. And then it became very
9  severe after the assault on the Carnival cruise.
10     So did she have any problems at all before she
11  got on the Carnival cruise? Yes, but they were
12  relatively mild. And then they became severe in
13  reaction directly to the assault that she experienced on
14  the Carnival cruise.
15  Q  Okay. And if the videographer could place
16  Plaintiff's Exhibit 4 in front of Mr. Vander Clute,
17  please.
18     THE VIDEOGRAPHER: Stand by, please.
19     (Exhibit 4 was marked for identification
20      by the court reporter and is attached hereto.
21  BY MR. DRURY:
22  Q  Okay.
23  A  Hold on a second. He is letting me look at this.
24  Okay. That's the first session that I noted, the first
25  session. Yeah. I have got that right in front of me.

Page 33

1  Okay.
2  Q  Perfect. So Plaintiff's Exhibit 4, is that a
3  true and accurate copy of your session notes from
4  June 28th, 2017?
5  A  Yes, it is. It is exactly -- exactly what I have
6  here in front of me that I printed out from the computer
7  today. Absolutely. Exactly the same.
8  Q  Okay. Excellent. And is that a business record
9  of Kaiser Permanente kept in the normal course of
10  business with information recorded at or near the time
11  of the matters described therein by someone with
12  knowledge?
13  A  I am not quite sure I completely understood the
14  way you worded that. But this is a note that I wrote
15  very soon after the session that I had with her on
16  June 28th. It might have -- I might have done it that
17  day or maybe the next day.
18  Q  Okay. And you, of course, had knowledge of the
19  treatment session, right?
20  A  Absolutely, because it was my session.
21  Q  Okay. And this is -- and this document, it is a
22  record of Kaiser Permanente, correct, a business record
23  of Kaiser Permanente?
24  A  Yes, sir, it is. It is in our computer system.
25  Q  Okay. Perfect. So what was your -- what were

9 (Pages 30 - 33)

Page 34

1  your diagnoses of Ms. Major on June 28th, 2017?
2      A   I am pretty sure -- oh, there they are.
3  Post-traumatic stress disorder and the major depressant
4  disorder recurrent, most recent episode severe.
5      Q   Okay.  So what does that second -- you have told
6  us about post-traumatic stress disorder.  That second
7  diagnosis, major depressive disorder, recurrent episode
8  severe, what does that mean?
9      A   Okay.  First of all, a depressive episode
10  includes symptoms like depressed mood, anhedonia, severe
11  changes in appetite, severe changes in sleep, poor
12  concentration, poor memory, difficulty enjoying one's
13  self, low energy, feeling badly about one's self, in
14  severe cases having thoughts of hurting one's self or
15  actually even trying to hurt one's self.
16      In her case -- let me look at the note that --
17  the record that she filled out herself.  In her case she
18  scored a very high score on the depressive level.  She
19  had -- we have the choice.  We have the form here called
20  a PHQ9.  You have a choice of saying you didn't
21  experience this symptom at all.  You experienced it for
22  several days in the last two weeks.  You experienced it
23  more than half the days in the last two weeks or nearly
24  every day in the last two weeks.  So clearly nearly
25  every day is the most severe.

Page 35

1      She said that she had been experiencing to
2  following symptoms nearly every day for the last two
3  weeks: Little interest or pleasure in doing things,
4  feeling down, depressed or hopeless, trouble falling
5  asleep or staying asleep or sleeping too much.  In her
6  case it was trouble sleeping.  Feeling tired or having
7  little energy, poor appetite, feeling badly about
8  herself or that she's a failure or has let herself or
9  her family down, trouble focusing, concentrating.  And
10  she also said that more than half the days in the last
11  two weeks she was moving or speaking so slowly that
12  other people could have noticed.
13      So that's depression, but along with depression
14  goes anxiety.  And she also had been experiencing more
15  than half the days feeling nervous, anxious or on edge.
16  Nearly every day not being able to stop or control her
17  worrying, feeling unproductive and unable to focus
18  nearly every day.  So that's what a depressive episode
19  is.  What recurrent depression means is that you have
20  had more than one episode.  You have had recurrent
21  episodes.  In some cases people have been having them
22  their whole life.  In other cases they have just had
23  more than one.
24      In her case the term "severe" applies because 23
25  is the number that those add up to, and that's -- that's

Page 36

1  very high.  So that's called severe.  Her depressive
2  episode is considered at the high end of severity.  So
3  that's what this means.  Did I answer your question?
4      Q   You did.  You did.
5      A   Okay.
6      Q   Through that history and your initial assessment
7  of Ms. Major, did you come up with a course of treatment
8  for her in that initial session on June 28th, 2017?
9      A   Absolutely.  So her -- let me just read the
10  record and make sure I have got this correctly.  Okay.
11  So she was going to be coming to individual therapy.
12  She was going to go to a group on post-traumatic stress
13  disorder and she was referred for medication.  So that
14  was her treatment plan, a three-pronged individual
15  therapy, group therapy and medication evaluation.
16      Q   Okay.  And how long was that individual therapy
17  suggested?
18      A   You know, I don't actually work like that.  I
19  don't say, "I think you should have therapy for one
20  month or two months or five months."  I don't work that
21  way.  Some other therapists do, but I work with each
22  patient, and I just thought that she should have therapy
23  as long as it would help her.  And in her case looking
24  back on it I would say she needed at least six to twelve
25  months if not more based on what she was going through.

Page 37

1      Q   Okay.  And the group therapy, what exactly does
2  that entail?  I see it has next to group therapy on your
3  notes "CPTSD 2, consider women's group."  So tell us
4  about that.
5      A   CPTSD 2 stands for chronic post traumatic stress
6  disorder group.  That group meets weekly on Monday
7  nights, and it's for people who have suffered from post
8  traumatic stress and in some cases several traumas.  And
9  she had several traumas because of the deaths of her
10  relatives in the car accident as well Carnival cruise.
11  So I don't run that group.  So I can't tell you exactly
12  what happens in that group.  But they are helping giving
13  clients and patients skills to handle the symptoms of
14  post-traumatic stress.
15      Q   Okay.  And do you know whether she participated
16  in the group therapy at all?
17      A   She went to that -- she went to that group on
18  February 5, 2018, February 12th, 2018, March 5th, 2018,
19  April 2nd, 2018, April 30th, 2018.  And -- yeah.  I
20  think that's it.
21      Q   Okay.
22      A   And you know what she also did?  Let me cut you
23  off.  She also attended a PTSD group outside of Kaiser.
24  For some reason she found that more convenient or maybe
25  preferable to her.  But I can't tell you how long she

10 (Pages 34 - 37)

Page 38

1    attended that group. I don't have a record of that. I
2    just know that that's what she reported to me.
3        Q   Okay. And I see also it says "medication
4    evaluation, referred for med eval." What kind of med
5    eval were you sending her for, and what did you think
6    would benefit her in terms of medications?
7        A   A med eval means here -- refers to a
8    psychiatrist. Because I as a licensed clinical social
9    worker, I can't prescribe medication, it is outside of
10   my scope of practice. But a psychiatrist does evaluate
11   for that, and I was sending her there for her major
12   depression disorder as well as the high level over
13   anxiety for post traumatic stress.
14           MR. PELAEZ: Object to form.
15           THE REPORTER: Let me get that objection again,
16   please.
17           MR. PELAEZ: Just form.
18   BY MR. DRURY:
19       Q   Okay. And Mr. Vander Clute, is it important for
20   a licensed clinical social worker to determine, when
21   they first meet a new patient, whether that patient is
22   authentic, whether they are honest, and whether they are
23   straightforward about the symptoms and conditions?
24           THE DEPONENT: Absolutely. Sure. Yeah.
25   Absolutely. I mean, there are patients that come in and

Page 39

1    that are there for secondary reasons, trying to get time
2    off from work, trying to get disability, that may be
3    exacerbating the presentation of their symptoms. But I
4    didn't think that that was the case at all with Charlene
5    Major Manning. No, not in her.
6            MR. PELAEZ: Objection, form.
7            THE REPORTER: Can I get the objection again,
8    please?
9            MR. PELAEZ: Just form.
10   BY MR. DRURY:
11       Q   In your professional opinion, did you find Ms.
12   Major to be authentic or inauthentic?
13           MR. PELAEZ: Objection, form.
14           THE DEPONENT: Authentic.
15   BY MR. DRURY:
16       Q   I'm sorry. Mr. Vander Clute, I believe you said
17   "authentic," but I just want to make sure because I
18   believe the objection was over your answer. So what was
19   your answer?
20       A   Authentic.
21           MR. PELAEZ: Same objection.
22   BY MR. DRURY:
23       Q   Okay. And what factors led you to believe that
24   Charlene Major was authentic?
25           MR. PELAEZ: Objection. Form.

Page 40

1            THE DEPONENT: Because she was clearly upset by
2    the situation. You could see that it -- it had affected
3    her self. It affected her very deeply. And she took it
4    very personally, both the physical trauma and the
5    psychological trauma for having been called a nigger, a
6    black bitch, telling her to go back to Africa. I mean,
7    that is highly offensive, and it was clear that she took
8    it that way. And it was very clear when she said that
9    she had never experienced anything like that in her life
10   and now she didn't feel safe to walk the streets
11   anymore. I mean that was just very authentic and very,
12   very believable.
13           And it was clear that she had lived a relatively
14   safe life in the sense that she hadn't really been, you
15   know, abused or picked on racially like many people are.
16   That wasn't her case, but that this was and that
17   affected her strongly. And that just came through clean
18   and clear. You could tell with the words she used, her
19   tone of voice, the way that her body was sitting. It
20   was just very clear. I sit with a lot of patients and
21   she was very believable, very authentic.
22           MR. PELAEZ: Objection. Move to strike.
23   BY MR. DRURY:
24       Q   Were Charlene Major's symptoms consistent with
25   her complaints or inconsistent with her complaints?

Page 41

1        A   Consistent.
2        Q   What led you to believe that Charlene Major's
3    symptoms were consistent with her complaints?
4            MR. PELAEZ: Objection. Form.
5            THE DEPONENT: Because the symptoms that I
6    outlined earlier of post-traumatic stress are exactly
7    what one would see from a trauma like she was reporting
8    that she had as well as depressive symptoms. So they
9    were in line -- they were in line with exactly what you
10   would imagine somebody going through that would
11   experience. I hope that's a clear answer to your
12   question.
13   BY MR. DRURY:
14       Q   It is. Thank you. Is there anything else about
15   the treatment note on June 28th, 2013 (sic) that you
16   think is important for us to talk about?
17       A   Just on that particular note?
18       Q   Yes.
19       A   Okay. Let me just go through it again. Yes. I
20   think -- I think the fact that she had been a medical
21   coder at the University of California San Francisco,
22   which is a highly respectable job and that fact that she
23   could no longer work that job. It's true that she had
24   given up the job to take care of her father.
25           But her plan was to go back, and as a result of

11 (Pages 38 - 41)

Page 42

1  this incident on the Carnival cruise -- excuse me -- she
2  wasn't able to go back to work.  So her level of
3  functioning had decreased significantly.  And that
4  really affected her self-esteem, her quality of life,
5  her relationships with her family.  I alluded to that
6  before, but I think that's key, that this didn't just
7  affect her physically and her -- the way she felt
8  internally.  It affected how she functioned in the world
9  which in turn exacerbated what she was feeling
10 internally.
11    Q  When was the next time you had the opportunity to
12 see Charlene Major?
13    A  That would have been July 11th, 2017.
14    Q  Okay.  And if I could ask the videographer to
15 place before Mr. Vander Clute his note from July 11th,
16 2017.  It is marked as Plaintiff's Exhibit 5.
17       THE VIDEOGRAPHER:  We can break whenever is a
18 good time, Chris.
19       MR. DRURY:  You want a break, Victor?
20       MR. PELAEZ:  Yeah.  Just two minutes if we can.
21       MR. DRURY:  Yeah.  Sure.  Is that okay with
22 everybody to just take a two-minute break?
23       THE DEPONENT:  That's good for me.  I could use
24 the bathroom myself.
25       THE VIDEOGRAPHER:  Stand by.

Page 43

1       MR. DRURY:  Good.
2       THE VIDEOGRAPHER:  Stand by.  This marks the end
3  of media number one.  Going off the record at 3:13 p.m.
4           (Off the record from 3:13 p.m.
5           to 3:21 p.m.)
6       THE VIDEOGRAPHER:  We're back on the record at
7  3:21 p.m.  And this marks beginning of media number two,
8  deposition of Edward Vander Clute.
9    Q  Okay.  Mr. Vander Clute, you have before you
10 Plaintiff's Exhibit 5.  Is that a true and accurate copy
11 of your July 11th, 2017 treatment note with respect to
12 Charlene Major?
13    A  Yes.  It's exactly the same.  Yeah.
14    Q  Okay.  All right.  And on that date of service
15 did you, again, do a clinical assessment of Charlene
16 Major?
17    A  Let me read this.  It looks like based on this
18 note I wasn't -- at least I didn't note all of her
19 symptoms of post-traumatic stress or depression.  I --
20 I'm looking -- I'm looking at sort of how it's affecting
21 her socially in this particular note because that's what
22 she chose to talk to.  So in that way this wasn't a full
23 clinical assessment, according to the note.
24    Q  Okay.  Okay.  And did she give you any subjective
25 information during that session?

Page 44

1    A  Absolutely.  She said she wanted to go to a
2  family reunion in Florida but was afraid to go.  And
3  that I direct -- I attributed directly to her
4  post-traumatic stress.  She didn't want to get on a
5  plane and travel and be around people.  She also said
6  she didn't want to tell them what happened.  I think she
7  said she had some degree of shame about this.  She
8  explained that she was not eating, she was not doing
9  laundry or housecleaning.  So she wasn't functioning,
10 and she was the person in the house who did those
11 things.  She wasn't going out to buy groceries.
12       She was pointing out that her 20-year-old
13 daughter who always looked up to her as the strong one
14 wasn't respecting her as much now that the patient was
15 having a hard time.  She said that she and her husband
16 hadn't had sex in months, and although she trusts him it
17 sounded like it was affecting her marriage.
18       She said she doesn't trust the world in general,
19 which I believe is directly related to what happened to
20 her on Carnival cruise.  Yeah.  So I think that is the
21 relevant parts of this note.
22    Q  Okay.  Were those subjective complaints on
23 July 11, 2017 consistent or inconsistent with your
24 diagnosis of post-traumatic stress?
25       MR. PELAEZ:  Objection.  Form.

Page 45

1       THE DEPONENT:  They are absolutely consistent
2  with the diagnosis of post-traumatic stress disorder.
3  BY MR. DRURY:
4    Q  Okay.  Were those subjective complaints
5  consistent or inconsistent with your diagnosis of major
6  depressive disorder?
7       MR. PELAEZ:  Objection.  Form.
8       THE DEPONENT:  Consistent.  Absolutely
9  consistent.  If you want an elaboration I can give that
10 to you, but it is up to you.
11 BY MR. DRURY:
12    Q  Yes.  Please, please do.
13    A  Well, not eating and not functioning are symptoms
14 of depression.  Not having interest in sex is a symptom
15 of depression.  Not functioning is a symptom of
16 depression.
17    Q  Okay.  And on July 11th, 2017, did you find
18 Charlene Major to be authentic or inauthentic as a
19 patient?
20       MR. PELAEZ:  Objection.  Form.
21       THE DEPONENT:  Authentic.
22 BY MR. DRURY:
23    Q  Okay.  And what factors led you to believe that
24 Charlene Major was authentic?
25       MR. PELAEZ:  Objection.  Form.

12 (Pages 42 - 45)

Page 46

1  THE DEPONENT:  Because -- because of the way she
2  was presenting herself.  Because of -- this didn't seem
3  like her normal level of functioning, just the way she
4  had talked about her life.  And I could just see that
5  this was a marked decrease in functioning and that it
6  was having a marked effect on her relationship with her
7  daughter and her husband and that she was very unhappy
8  that she couldn't go the Florida to see her family.  So
9  it just seemed very authentic.  It just seemed
10  absolutely consistent with what somebody in her
11  situation would be going through.  And in no way did I
12  think she was fabricating this or exaggerating on any
13  level.
14  Q  Okay.  And did you come up with a plan on
15  July 11, 2017 for future treatment of Charlene Major?
16  A  Well, looks like the plan remained the same, to
17  have individual therapy, to have medication and to
18  attend the post-traumatic stress disorder group.
19  Q  Okay.  It says on that note "RTC yes."  What does
20  that mean, "RTC yes"?
21  A  Return to clinician.  Is she going to come back
22  and see me again, yes, she is.
23  Q  Okay.  Okay.  All right.  Is there anything else
24  about the July 11th, 2017 treatment note that you think
25  is important to point out?

Page 47

1  A  Not related to the incident that we are
2  describing.  There are some relevant factors about her
3  father here, but I don't think that is relevant to the
4  issue at hand about Carnival cruise.
5  Q  Were any of the issues with her father
6  impacting her condition on July 11th, 2017?
7  MR. PELAEZ:  Objection.  Form.
8  THE DEPONENT:  Well, I think -- I think she was
9  continuing to be depressed about the loss of her father
10  and brother.  And according to this note she hasn't --
11  she didn't know her father until she was 17 and her
12  mother had been in and out of her life.  So I think that
13  was impacting her depression, yes.
14  BY MR. DRURY:
15  Q  Okay.  Did you determine at that time, on
16  July 11th, 2017 what the major contributing factor of
17  her major depressive disorder was?
18  MR. PELAEZ:  Objection.  Form.
19  THE DEPONENT:  Well, I think the major factor
20  throughout my treatment with her for both post traumatic
21  stress and major depressive disorder was the assault
22  that she endured on the Carnival cruise line in May of
23  2017.
24  BY MR. DRURY:
25  Q  Okay.  What facts that you received led you to

Page 48

1  believe that the assault on the Carnival cruise ship was
2  the major contributing factor in her post-traumatic
3  stress disorder and major depressive disorder?
4  MR. PELAEZ:  Objection.  Form.
5  THE DEPONENT:  That fact that she -- that that
6  was what she focused on, that that's what was clearly
7  upsetting to her.  That was the content of what she
8  wanted to talk about.  Her affect, her mood affect as
9  well as her the way she moved her body was clearly
10  related to that event.  So that was the evidence that I
11  think you are asking for.  Now granted this was over a
12  year and a half ago.  So -- but that is my memory of it.
13  BY MR. DRURY:
14  Q  Okay.  And the note, the July 11th, 2017 note
15  that is marked at Plaintiff's Exhibit 5, is that a
16  Kaiser Permanente business record?
17  A  Yes.
18  Q  Okay.  And did you record it at or near the time
19  of that session?
20  A  Yeah.  It looks like I wrote it the next day.
21  Q  Okay.  Great.  And you obviously had knowledge of
22  that session, right?
23  A  Yeah, because I was the one conducting that
24  session.  She and I were.
25  MR. DRURY:  Okay.  I am going to ask Mr. Pelaez a

Page 49

1  quick question.
2  When I am going through these treatment notes,
3  obviously I need to authenticate them and get him to say
4  that they are business records.  But if you don't have
5  an objection to their status as authentic business
6  records then we can cut through that and just have a
7  stipulation.  Are you willing to give me a stipulation
8  that the treatment notes are authentic and real business
9  records of Kaiser Permanente?
10  MR. PELAEZ:  As to the specific -- I think you
11  should just continue doing it the way you are doing it
12  as opposed to stipulating.  I mean, I think it is two
13  questions on each one.  I think we have got through 11.
14  I think you should go through it the way we're doing it
15  now.
16  MR. DRURY:  Okay.  All right.
17  BY MR. DRURY:
18  Q  When was the next time that you saw Ms. Major?
19  A  That would have been a phone appointment on the
20  13th of September.  I didn't see her physically, but we
21  talked on the phone.  And Kaiser does that oftentimes.
22  We do phone appointments sometimes.
23  Q  Okay.  Okay.  If I could ask the videographer to
24  place Plaintiff's Exhibit 6 in front of Mr. Vander
25  Clute.

13 (Pages 46 - 49)

Page 50

1       THE VIDEOGRAPHER: Stand by, please. Okay.
2   (Exhibit 6 was marked for identification
3    by the court reporter and is attached hereto.)
4       THE DEPONENT: Okay. Let me just check this out.
5   Yeah. That's exactly the same that I have here. Yes.
6   BY MR. DRURY:
7    Q  Okay. So is Plaintiff's Exhibit 6 a true and
8   accurate copy of your treatment note dated September
9   13th, 2017 regarding Charlene Major?
10   A  Yeah. It is.
11   Q  Okay. And is that a Kaiser Permanente business
12   record?
13   A  Yeah. Absolutely.
14   Q  Okay. And I'm assuming you inputted this
15   information; is that correct?
16   A  Yeah. The sensitive part I did right here, what
17   is called sensitive, and then, yeah, the diagnosis, I
18   would have -- those would have been mine as well. Yes.
19   Q  Okay. And you obviously had knowledge of the
20   treatment session because you conducted it, correct?
21   A  Correct.
22   Q  Okay. So did you perform -- so when you talked
23   to Charlene Major on the phone on September 13th, 2017,
24   what did the two of you talk about?
25   A  Well, she said that in July of that month -- I'm

Page 51

1   sorry, that previously in July of 2017 she had attended
2   a party in which she had been pushed through a glass
3   table by I think the owner of the home. I believe the
4   home was in the Oakland hills. I have that on a -- that
5   information on another note, and that somebody
6   basically -- they were either drunk or out of control or
7   both. And they pushed her through a glass table which
8   was also traumatic.
9       And I wrote that this exacerbated her symptoms of
10   post-traumatic stress. She was put on medication as a
11   result -- well, as a result of this and the other
12   symptom at Carnival cruise. She said she was feeling
13   anxious, panicky, having crying spells, again, not going
14   outside for two weeks. She was then becoming much more
15   fearful than she had been prior to this incident in July
16   of 2017.
17       She was checking doors, T.V. switches, and lights
18   to make sure she was safe. She is saying her family
19   doesn't understand what she's going through which makes
20   it harder. So that is what I got from this note.
21   Q  Okay. During that telephone conversation, did
22   you talk about any ways for her to cope with the
23   post-traumatic stress issues that she was having?
24       MR. PELAEZ: Objection. Form.
25       THE DEPONENT: Well, she was again referred to a

Page 52

1   post-traumatic stress class where that is exactly where
2   they look at the techniques for handling symptoms of
3   post-traumatic stress but did we talk about -- yeah. I
4   think what I was doing was talking about doing some
5   relaxation exercises, trying to do pleasurable
6   activities for herself, trying to get her out of the
7   house to exercise, these types of things. Because she
8   was staying inside all the time and kind of closing in
9   on herself. So I was advocating she do things to get
10   outside of herself and to try to relax. So absolutely.
11       But in terms of more specific symptoms that was
12   going to -- that was going to happen in the class, which
13   according to this note she hadn't yet attended and
14   according to reality she hadn't attended yet.
15       MR. DRURY: Okay. So it looks like the video for
16   Mr. Vander Clute has cut out. I don't know -- Victor,
17   can you see Mr. Vander Clute still or no?
18       MR. PELAEZ: No. He just cut out.
19       THE VIDEOGRAPHER: It might be the wifi. This is
20   the videographer. It might be the wifi issue. Let me
21   try to get it back set up. "Connection lost" it says.
22   You guys can still continue.
23       MR. DRURY: Okay.
24       THE VIDEOGRAPHER: You can still continue on the
25   phone. I am going to get the connection still for the

Page 53

1   video.
2       MR. PELAEZ: Fine by me.
3   BY MR. DRURY:
4    Q  We can take a minute if it's not going to be too
5   long. Do you think it will be long?
6       THE VIDEOGRAPHER: I don't know how long it will
7   take because of the wifi at Kaiser. It depends on that.
8   I just have to re-log in. But you can just keep on
9   going on the record. And once it's ready I will put it
10   back in front of him.
11       MR. DRURY: Okay.
12       THE VIDEOGRAPHER: Thank you.
13   BY MR. DRURY:
14   Q  Mr. Vander Clute, as of September 13th, 2017,
15   what was your professional opinion as to the major
16   contributing cause of Charlene Major's post-traumatic
17   stress disorder.
18       MR. PELAEZ: Objection. Form.
19       THE DEPONENT: Again, I think the main issue was
20   the assault on the cruise ship. I do think that having
21   been pushed through a glass table at a party was also
22   extremely upsetting to her. But if I had to rank I
23   would say that she was still more upset by the Carnival
24   cruise incident.
25   BY MR. DRURY:

14 (Pages 50 - 53)

Page 54

1    Q  Okay.  Did you see her then the following day on
2  September 14th, 2017?
3    A  No.  I think what I -- what that day what I did
4  was I referred -- I put out a referral to the CPTSD
5  group.  I did see her again on the 18th.  I saw her in
6  person on the 18th of September.
7    Q  Okay.  So when -- I think we had put Plaintiff
8  Exhibit 5 in front of you.  If the Videographer could
9  put Plaintiff Exhibit 6 in front of Mr. Vander Clute.
10       THE VIDEOGRAPHER:  Stand by.  I am going to have
11  the video up shortly.  This will just take a second.
12       MR. DRURY:  Okay.
13       THE VIDEOGRAPHER:  I just re-logged into the
14  camera.
15    (Exhibit 6 was marked for identification
16    by the court reporter and is attached hereto.)
17  BY MR. DRURY:
18    Q  You are back.
19       MR. PELAEZ:  We authenticated Exhibit 5, didn't
20  we?
21       MR. DRURY:  No, I don't think he authenticated
22  that one.  I don't know.
23       THE VIDEOGRAPHER:  Okay.  We have him back up,
24  and Exhibit 6 is now in front of the witness.
25  BY MR. DRURY:

Page 55

1    Q  Okay.  And Mr. Videographer, was the last one
2  that you put in front of him was Plaintiff's Exhibit 5,
3  right?  This is the first time that you have put
4  Plaintiff's Exhibit 6 in front of him, correct?
5       THE VIDEOGRAPHER:  I believe so.
6       THE DEPONENT:  This is the same one that I was
7  looking at before.
8  BY MR. DRURY:
9    Q  Right.  Right.  So -- so what is Plaintiff's
10  Exhibit 6?
11    A  This one?  This looks like a note from the 13th
12  of -- the session that took place on the 13th of
13  September, but it looks like I wrote it on the 14th of
14  September.
15    Q  Okay.  And is that a true and accurate copy of
16  your September 13, 2017 scheduled telephone call with
17  Charlene Major?
18    A  Hold on a second.  Yeah.  That's exactly the same
19  thing in terms of what I wrote.  Yes.
20    Q  Okay.  And is that a Kaiser Permanente business
21  record kept in the normal course of business recorded by
22  someone with knowledge at or about the time of the event
23  described therein?
24    A  Yes.
25    Q  Okay.  Great.  So if the videographer could put

Page 56

1  Plaintiff's Exhibit 7 in front of Mr. Vander Clute,
2  please?
3       THE VIDEOGRAPHER:  As we go, do you want me to
4  just take down the other ones?
5       MR. DRURY:  Yes, please.
6       THE VIDEOGRAPHER:  Okay.
7       MR. DRURY:  Yes, please.  That way we can keep
8  track so that, you know, if we don't duplicate work and
9  we don't keep Mr. Vander Clute any longer than he has to
10  be.
11       THE VIDEOGRAPHER:  Great.  One second, please.
12  Exhibit No. 7?
13       MR. DRURY:  Yeah, please.
14    (Exhibit 7 was marked for identification
15    by the court reporter and is attached hereto.)
16       THE VIDEOGRAPHER:  Okay.
17  BY MR. DRURY:
18    Q  Okay.  Mr. Vander Clute, if you could tell us
19  what Plaintiff's Exhibit 7 is.
20    A  This is a referral form to the group therapy I
21  was referring her to for the chronic post-traumatic
22  stress disorder group.  And basically we have to -- for
23  a patient to enter a group we need to send a referral to
24  the group leader to have them accepted into the group.
25  And it looked like the plan was for her to start the

Page 57

1  group on October 2nd, which according to my records she
2  didn't.  And I don't know why she didn't start that day,
3  but she -- but she didn't.
4       And what I am explaining is some of the factors
5  that caused her to have post-traumatic stress here.  I
6  talk about the assault on the cruise ship.  I also talk
7  about the car accident that she experienced.  I also
8  talk about having experienced multiple deaths in the
9  past year, meaning her brother and her father.
10    Q  Okay.  Did you have a professional opinion at
11  that time of the major contributing factor in Charlene
12  Major's post-traumatic stress?
13       MR. PELAEZ:  Objection.  Form.
14       THE DEPONENT:  Yes.  It was that assault on the
15  cruise ship, on the Carnival cruise ship in May 2017.
16  This just went dark.  Okay.  That was definitely the
17  major factor, and that's why I wrote it first in this
18  reason for the referral.
19  BY MR. DRURY:
20    Q  Okay.  And when you say that that was the -- that
21  the assault on the cruise ship was the major
22  contributing factor in her post-traumatic stress, what
23  led you to believe that the Carnival cruise ship itself
24  was the major contributing factor in her post-traumatic
25  stress?

15 (Pages 54 - 57)

1    A  I believe I answered that question two or three
2  times already.  But if you want me to go through it
3  again, because the way that she presented it it was
4  clear that that event was highly traumatic for her both
5  in terms of the physical damage done by this man and his
6  daughter and by the nature -- the racial -- the racial
7  nature of it and by the fact that she felt unsupported
8  by Carnival cruise who apparently she must have given a
9  lot of money to like any person on the cruise ship would
10  give money to the cruise ship.
11      MR. PELAEZ:  Objection.  Move to strike.
12      THE DEPONENT:  Those are the factors that made me
13  think that and just the way she presented her story and
14  her life.
15      THE REPORTER:  Can I have the objection again,
16  please?
17      MR. PELAEZ:  Move to strike as non-responsive.
18  BY MR. DRURY:
19    Q  So Mr. Vander Clute, is Plaintiff's Exhibit 7 a
20  true and accurate copy of your referral to group therapy
21  dated September 14th, 2017?
22    A  Yes.  Yes, it is.
23    Q  Okay.  And is that an authentic Kaiser Permanente
24  business record kept in the normal course of business
25  made by someone with knowledge at or about the time of

1  the events described therein?
2    A  Yes.
3    Q  Let me ask you, we've been going through your
4  notes.  Are all of the opinions that you state in your
5  notes made within a reasonable degree of psychological
6  probability?
7      MR. PELAEZ:  Objection.  Form.
8      THE DEPONENT:  I don't really understand your
9  question.  Can you say that again?
10  BY MR. DRURY:
11    Q  Okay.  Sure.  Let me ask it in a different way.
12  The opinions that you state in your notes, in your
13  treatment notes for Charlene Major, are you reasonably
14  certain of the opinions that you state in your notes?
15      MR. PELAEZ:  Objection.  Form.
16      THE DEPONENT:  Yeah.  I mean, sure.  Absolutely,
17  or I wouldn't have written them, yes.
18  BY MR. DRURY:
19    Q  Okay.  That is really the question, whether you
20  believed these things when you wrote them and whether
21  you -- whether you were certain of the diagnosis and the
22  other information that you are putting in your notes.
23  So I will just ask my question generally as to all of
24  your chart.  Are all of the opinions in your notes made
25  within a reasonable degree of psychological certainty?

1    A  Yes.
2      MR. PELAEZ:  Objection.  Form.
3      THE DEPONENT:  Yes.  And to rephrase -- and to
4  answer your question a different way, I am confident
5  about the accuracy and psychological application of
6  everything I have written here, yes.
7  BY MR. DRURY:
8    Q  Okay.  All right.  So the next note that I would
9  like to talk about is marked as Plaintiff's Exhibit 8.
10  If I could ask the videographer to put that one in front
11  of Mr. Vander Clute.
12      (Exhibit 8 was marked for identification
13       by the court reporter and is attached hereto.)
14      THE VIDEOGRAPHER:  Stand by, please.  Okay.
15  BY MR. DRURY:
16    Q  Okay.  Mr. Vander Clute, was September 18th, 2017
17  the next time that you saw Charlene Major?
18    A  Yes, it was.
19    Q  Okay.  And was that an in-person appointment?
20    A  Yes.  It was.
21    Q  Okay.  And did you do a clinical assessment of
22  Charlene Major on September 18th, 2017?
23    A  Yes.  Yes, I did.
24    Q  Okay.  And what did your clinical assessment of
25  Charlene Major reveal on this date of service,

1  September 18, 2017?
2    A  Let me just read my note and then I will answer
3  that question.
4    Q  Okay.  Great.
5    A  I'm sorry.  Rephrase the question again.
6    Q  Sure.  Madam Court Reporter, if you could read
7  back my question?  I'm sorry.  I forgot what I asked.
8      THE REPORTER:  Yeah.  Give me one second here.
9  Hold on.
10        (The record was read back by
11         the reporter as follows:)
12        "Q.  Okay.  And what did your clinical
13         assessment of Charlene Major reveal on
14         this date of service, September 18,
15         2017?"
16      THE DEPONENT:  Yeah.  The answer to that is she
17  continued to show the symptoms indicating a diagnosis of
18  post-traumatic stress disorder and major depressive
19  disorder.  She -- I guess in this session this is the
20  first time I have seen her personally since she attended
21  that party in the Oakland hills where she had been
22  assaulted yet again.  Yet again meaning the first
23  time -- the first assault was on the Carnival cruise
24  line.
25      So she'd been assaulted again and she was

16 (Pages 58 - 61)

Page 62

1 re-traumatized. The key word there is "re" traumatized.
2 She was already traumatized by the Carnival cruise, and
3 this exacerbated her trauma even further.
4    Q  You mentioned re-traumatization. What does it
5 mean for someone to be re-traumatized?
6    A  So a person can have an initial trauma, say, from
7 an assault. And then subsequent to that initial trauma
8 they can experience another trauma and be
9 re-traumatized. And in some ways the second trauma is
10 worse than it would have been if it came in isolation.
11 So in other words, had she never been assaulted at
12 Carnival cruise, she would be less impacted by what
13 happened at the Oakland hills party than she was. So
14 re-traumatized means that you are traumatized again and
15 it gets even deeper into your psyche and affects you
16 even more severely than it otherwise would have.
17    Q  As of September 18th, 2017, what was your
18 professional opinion of the major contributing factor of
19 Charlene Major's post-traumatic stress disorder and her
20 major depressive disorder?
21    MR. PELAEZ: Objection. Form.
22    THE DEPONENT: The assault on the Carnival cruise
23 line.
24 BY MR. DRURY:
25    Q  And let me ask you, why did it continue to be the

Page 63

1 assault on the Carnival cruise line that was the major
2 contributing factor of those diagnosis?
3    A  Because it was clear that she had this underlying
4 trauma that was impacting her greatly even before this
5 party in Oakland hills happened where she wasn't even
6 able to go outside, she was having problems interacting
7 with her family members, her functioning level had gone
8 way down. So this attempt to go to this party was her
9 attempt to start her life again. In the note it reads
10 here that she'd gotten her nails done. She dressed up
11 nicely. It was her attempt to get out of this initial
12 trauma she was suffering from the assault on the
13 Carnival cruise. And to have this -- that attempt
14 stunted by being assaulted yet again was just further
15 evidence that even when she attended that party she was
16 feeling very poorly.
17    So I -- I don't know how to clearly answer your
18 question, just to say that it was very clear that the
19 underlying trauma was from the Carnival cruise and that
20 this exacerbated that, and that again, if this had
21 happened in isolation without the Carnival cruise I
22 doubt that it would have affected her as severely as it
23 did.
24    Q  Okay. It says on the first page there, "Status
25 of Target Symptoms: According to Charlene, since the

Page 64

1 last visit these symptoms have been worsening." Let me
2 ask you. Based on your clinical assessment of Charlene
3 Major on September 18th, 2017, was Charlene's statement
4 to you that her symptoms were worsening, was that
5 consistent with your clinical evaluation or
6 inconsistent?
7    MR. PELAEZ: Objection. Form.
8    THE DEPONENT: Consistent.
9 BY MR. DRURY:
10    Q  Okay. And what led you to believe that
11 subjective statement by Charlene Major that her symptoms
12 were worsening was consistent with your clinical
13 evaluation?
14    MR. PELAEZ: Objection. Form.
15    THE DEPONENT: Because what normally happens with
16 these sessions is a patient fills out what is called a
17 PHQ9 form which addresses her symptoms of depression and
18 anxiety. And although I didn't mark that on this form,
19 I don't always mark it on the form, it's in our computer
20 system. I could probably go back and look at it from
21 that date. But I don't have a Kaiser computer in front
22 of me. It must have been that her PHQ9 score went along
23 with her saying that her symptoms were worsening.
24 Because -- yeah.
25    Q  Okay.

Page 65

1    A  And I think that's where I got that. I don't
2 think she told me "Hey, Ted or Mr. Vander Clute,
3 Dr. Vander Clute, your symptoms are -- my symptoms are
4 worsening." I think I must have gotten that from the
5 form that she filled out correlating to the symptoms she
6 was experiencing.
7    Q  Okay. Okay. Is Plaintiff's Exhibit 8 an
8 authentic copy, true and accurate copy of the office
9 visit note dated September 18th, 2017?
10    A  Yeah. Yes.
11    Q  Okay. And is it an authentic business record of
12 Kaiser Permanente made by someone with knowledge at or
13 about the time that the events described therein
14 occurred?
15    A  Yes.
16    Q  Okay. So when was the next time that you saw
17 Charlene Major?
18    A  Let's see. It looks like that's going to be
19 January 30th, 2018.
20    Q  Okay. Mr. Videographer, if you could please
21 place before Mr. Vander Clute Plaintiff's Exhibit 9?
22    THE VIDEOGRAPHER: Okay. Stand by, please.
23 Okay.
24    (Exhibit 9 was marked for identification
25    by the court reporter and is attached hereto.)

17 (Pages 62 - 65)

Page 66

1  BY MR. DRURY:
2      Q   All right.  Mr. Vander Clute, is Plaintiff's
3  Exhibit 9 a true and accurate copy of your note of
4  Charlene Major's office visit on January 30th, 2018?
5      A   Yes.
6      Q   Okay.  And is it also a Kaiser Permanente
7  business record kept in the normal course of business
8  recorded by someone with knowledge at or about the time
9  of the events described therein?
10     A   Yes.
11     Q   Okay.  And tell us, did you do a clinical
12  assessment of Charlene Major on January 30th, 2018?
13     A   Yes, I did.  And on this note you will see in the
14  last line of what I wrote in the text, it says, "The
15  patient scores 24 on PHQ9 and 36 on GDS."  That is the
16  clinical record that patients fill out for every
17  session.  And then the last session you asked me about,
18  those numbers were not -- I hadn't written them down,
19  but on this one I did.  So basically what that --
20  what -- this is a self-report of her symptoms in the
21  last two weeks.
22         And those numbers are very severe.  Twenty-four
23  on the PHQ9 and 36 on the GDS are almost as high as a
24  person can get.  The only way to get higher than that is
25  if she had suicidal thoughts.  And she didn't at this

Page 67

1  time.
2      Q   Okay.  What does PHQ9 stand for?
3      A   I think it stands for patient health quotient.
4  But I am not positive, but I think that's what it stands
5  for.
6      Q   And what does GDS stand for?
7      A   Global distress system or standard.  Basically
8  PHQ9 is looking at the symptoms of depression that a
9  patient has, and a GDS is looking at their symptoms of
10  depression and anxiety combined.
11     Q   What were some of the problems in Charlene
12  Major's life that she reported to you on January 30th,
13  2018?
14     A   She said --
15         MR. PELAEZ:  Objection.  Form.
16         THE DEPONENT:  She was still very much afraid of
17  leaving the house.  And she was staying inside most of
18  the time.  I had in previous notes referred to this as
19  agoraphobia.  Agoraphobia means that you are afraid to
20  go outside, which, as you can imagine, would really
21  hinder somebody's life.  Let's see.  She also talked
22  about this being the anniversary of her brother's
23  funeral, which was upsetting her.
24         She was talking about she's used to having it all
25  together to being the one who is in charge of

Page 68

1  everything, to organizing family plans and trips.  And
2  she felt horrible that she -- horribly that she couldn't
3  do that.  So she's, again, used to working, used to
4  being a medical coder at the University of California
5  San Francisco.
6          THE VIDEOGRAPHER:  Stand by, please.
7          THE DEPONENT:  And she hadn't been able to do
8  that, so those factors were making her feel poorly about
9  herself.  Apparently, according to these notes, her
10  marriage was suffering as a result of, I think, the
11  symptoms she was having from the Carnival cruise.  And
12  her husband is rarely home.  And my sense as to why I
13  wrote that was that her husband was probably staying
14  away from her because the marriage wasn't doing well.
15  BY MR. DRURY:
16     Q   And you did a mental status exam of Charlene
17  Major on that date of service, correct?
18     A   Yes.  Every session we do that.
19     Q   Okay.  What did the mental status exam for
20  Charlene Major reveal on January 30th, 2018?
21     A   Well, if I go through all of this, she's alert
22  and oriented times three.  That means she is focused.
23  Oriented times three means she knows where she is, who
24  she is, what the date is, who the president is.  This
25  suggests that she's depressed, that her mood is

Page 69

1  depressed, and that she is expressing herself in a
2  depressed fashion, that her speech is rambling, meaning
3  she's sort of going from one topic to another.  Her
4  thought process is not straight or linear.  It's
5  rambling.
6          Her judgment is fair, which means that she is
7  probably not exhibiting the best judgment that a
8  person -- that she could.  Her memory is fair, which
9  means, again, that she's not remembering things.  She's
10  not able to focus as well.
11     Q   And did -- were the results of the mental status
12  exam consistent with the reported issues in Charlene
13  Major's life?
14         MR. PELAEZ:  Objection.  Form.
15         THE DEPONENT:  Absolutely.  Yes.  Yes, sir.
16  BY MR. DRURY:
17     Q   They were consistent?
18     A   Yes.  They were consistent.
19         MR. PELAEZ:  Objection.  Form.
20         THE REPORTER:  Could I get the objection again,
21  please?
22         MR. PELAEZ:  Just form.
23  BY MR. DRURY:
24     Q   Just from my knowledge, Victor, what is the
25  objection to form to a question where I ask whether

18 (Pages 66 - 69)

Page 70

1   something was inconsistent or consistent?  It is not
2   leading at all.
3       MR. PELAEZ:  It is leading.
4       MR. DRURY:  In what way?
5       MR. PELAEZ:  You are suggesting that it is going
6   to be consistent with what he's indicated and what he's
7   noted.  So it is a leading question.  Not leading would
8   be who, what, when, where, why.
9       THE REPORTER:  I'm sorry, what did you say?  Not
10  leading would be what?
11      MR. PELAEZ:  Who, what, when, where, why.
12      THE VIDEOGRAPHER:  If you could speak closer to
13  the microphone, sir.
14      MR. DRURY:  I don't agree with that.
15      MR. PELAEZ:  What was that?
16      THE VIDEOGRAPHER:  If you could speak closer to
17  the microphone.  The witness is having trouble hearing
18  you.
19      MR. PELAEZ:  Okay.
20      THE VIDEOGRAPHER:  Thank you.
21  BY MR. DRURY:
22      Q  So what was the plan for Charlene Major on
23  January 30th, 2018?
24      A  The same as it had been, individual therapy,
25  medication, and to go to the post-traumatic stress

Page 71

1   disorder group.
2       Q  Okay.  And was Charlene Major following your
3   course of treatment or not following your course of
4   treatment and your plan?
5       A  Well, I think she was.  But the records show that
6   she didn't actually attend the post-traumatic stress
7   disorder group until February 5th.  So -- and I see that
8   I had initially referred to on the 2nd of October.  So
9   that would lead me to believe that perhaps she hadn't
10  been going to the group the way I had wanted her to go
11  until -- until the 5th of February.  And I can't
12  remember.  There might have been extenuating factors for
13  that.  I don't remember.  In her case probably she had a
14  hard time getting out of the house.  But I can't recall.
15  So I hope that clearly answers your question.
16      Q  It does.  Up until this point in time, had
17  Charlene Major come to every session that was scheduled
18  for her to come to see you?
19      A  Yeah.  She had come to see me.  I would have to
20  look at the record.  I haven't seen to see if she made
21  every appointment to see the psychiatrist.  I can't
22  answer that question.  But she had come to every
23  appointment that I had with her.  Yes.
24      Q  Okay.  When you see a patient on a follow-up
25  visit, do you check in with them to see whether they

Page 72

1   are, you know, taking your advice and applying it to
2   their daily life?
3       A  Absolutely.  Yes.
4       Q  And was Charlene -- was Charlene Major applying
5   your advice to her daily life or not applying it to her
6   daily life?
7       A  Well, I think she was doing the best she could,
8   but I think it was very clear that she was suffering.
9   And she wanted to get out of the house, but I think she
10  was having a very hard time doing it.  So I am hesitant
11  to say she wasn't following my advice.  I would say that
12  her symptoms were so severe and acute that she was
13  having difficulty getting herself to do much of
14  anything.
15      MR. PELAEZ:  Move to strike.
16  BY MR. DRURY:
17      Q  Who was the psychiatrist that she was seeing
18  during this course of treatment?
19      A  Dr. Elizabeth Dawes, D-a-w-e-s.
20      Q  Okay.  At any point in time did you speak with
21  Dr. Dawes about Charlene Major?
22      A  You know what, I am sure I did.  But we don't
23  have that -- I don't have a record of that.  We -- I
24  don't record conversations I have with colleagues.  So I
25  probably did.  But bear in mind, we're talking a year --

Page 73

1   this is a year and a half ago, more than a year and a
2   half ago now, close to two years ago right now.  So you
3   will have to forgive me for not remembering every
4   conversation I had with my colleagues.
5       Q  Of course.  Of course.  Understandable.  All
6   right.  And I think you mentioned Plaintiff's Exhibit 9
7   is a true and authentic business record of Kaiser
8   Permanente of your office visit, January 20th, 2018 with
9   Charlene Major, right?
10      A  Yes, sir.
11      Q  Okay.  Great.  So when was the next time after
12  January 30th, 2018 that you saw Charlene Major?
13      A  It's looking like that was on the 5th of
14  November, 2018.
15      MR. DRURY:  Okay.  And I would ask the
16  videographer to place before Mr. Vander Clute
17  Plaintiff's Exhibit 10.
18      THE VIDEOGRAPHER:  Okay.  Stand by.  Okay.
19      (Exhibit 10 was marked for identification
20      by the court reporter and is attached hereto.)
21  BY MR. DRURY:
22      Q  All right.  Mr. Vander Clute, is Plaintiff's
23  Exhibit 10 a true and accurate copy of your telephone
24  appointment with Charlene Major on November 5th, 2018?
25      A  Let me see.  This is what I have in a note.  Let

19 (Pages 70 - 73)

Page 74

1  me see if this is in person or on the telephone. I am
2  not sure.
3     Q  At the top it looks like it says "Schedule
4  telephone 11/5/2018."
5     A  Oh, yes. You are right. You are right. It was
6  on the telephone then. You are correct.
7     Q  Okay.
8     A  So yes, this is an accurate copy of the note that
9  I wrote that day.
10    Q  Okay. And is Plaintiff's Exhibit 10 an authentic
11 business record of Kaiser Permanente kept in the normal
12 course of business made by someone with knowledge at or
13 about the events described therein?
14    A  Yes, sir.
15    Q  Okay. So it seems like some time passed between
16 the last visit and when you talked to Charlene Major on
17 the telephone on November 5th, 2018. Do you know
18 whether Charlene Major was treating in a different
19 facility or seeing a different psychotherapist during
20 those 10 months?
21    A  I don't.
22    MR. PELAEZ: Object to form.
23    THE DEPONENT: I don't know if she was seeing
24 someone individually, but I have in my notes that she
25 attended a post-traumatic stress group outside of

Page 75

1  Kaiser. So she was getting therapy outside of Kaiser in
2  the form of a group. I don't have in my note that she
3  was seeing somebody individually. So I can't say
4  definitively one way or the other except to say that my
5  note doesn't reflect it. So I have no evidence to
6  believe she was seeing somebody individually outside of
7  Kaiser during that time.
8     Q  Okay. And what does your note say about her
9  participation in group therapy?
10    A  It says she's having symptoms of post-traumatic
11 stress disorder for which she attends a PTSD group
12 outside of Kaiser. So it just says that she went to a
13 PTSD group outside of Kaiser. I don't have the number
14 of groups she went to.
15    Q  Okay. And because you had not spoken with -- I
16 shouldn't say that. Did you speak at any point in time
17 with Charlene Major between January 30th, 2018 and
18 November 5th, 2018?
19    A  I don't have any notes suggesting that I do --
20 that I did. So I'd like to say no. But there are times
21 when I talk to patients and I don't notate it. So let
22 me just answer that by saying I have no indication,
23 according to the chart, that I did talk to her between
24 January 30th and November 5th.
25    Q  Okay. So since some time had passed, did you --

Page 76

1  was there any information that you thought was
2  particularly important to gather from her on the
3  telephone on November 5th, 2018 for your course of
4  psychotherapy?
5     A  Absolutely.
6     MR. PELAEZ: Object to form.
7     THE DEPONENT: She was continuing to be afraid to
8  go outside, which is clinically significant. She said,
9  as you can read in the notes and I referred to this
10 before, that she is afraid of redneck -- quote, unquote,
11 "redneck-looking white men." She feared that people
12 were following her. She described that in May of that
13 year she had vomited when she thought somebody was
14 following her. She described having the following
15 symptoms of post traumatic stress disorder: Nightmares,
16 night sweats, being easily startled, having flashbacks,
17 having recurrent thoughts about the assault, having
18 hypervigilance, insomnia, difficulty trusting others,
19 feeling agoraphobic, being afraid to go outside, fears
20 that she is being followed.
21    She's also having the following symptoms of
22 depression: Depressed mood, poor concentration, feeling
23 worthless, having low energy, poor appetite, having lost
24 15 to 20 pounds in the last five months without trying
25 to. Loss of weight is a symptom of depression -- I

Page 77

1  mean, without trying to. She barely showers. That's
2  explaining that her -- barely showering suggests that
3  her level of functioning is very low.
4     She also talks about her increased hamper --
5  being hampered in her relationships with her daughter
6  and her husband. And she talked about, you know, a lot
7  of people of color are very afraid that Donald Trump is
8  president, uses phrases that give people license to
9  commit hate crimes. And she was describing how in her
10 opinion hate crimes had gone up during his
11 administration and that was scaring her a lot given that
12 the incident on the Carnival cruise ship was a racial
13 incident.
14    She then, you know, talked about the very
15 specifics of the Carnival cruise incident which I
16 described earlier. She described a woman jumping on
17 her, apparently unprovoked. So her opinion is that she
18 was -- or her experience was that she was just minding
19 her own business on the ship. A woman jumped on her
20 calling her a black nigger bitch. The woman's father
21 then started yelling, "Go back to your country you black
22 nigger. Go get your husband so I can beat his black
23 nigger ass" and then assaulting her.
24    And then she said that later on in the room she
25 got a call on the phone with a voice telling her, "We're

20 (Pages 74 - 77)

Page 78

1  going to kill you, you nigger." So, yes, those --
2  that's very applicable to the situation. And those just
3  seem terrifying. Anybody who would experience that
4  would be terrified. So, yeah that was all very
5  relevant. This was a very relevant session.
6      Q  Have you treated other patients of hate crimes?
7      MR. PELAEZ: Objection, form.
8      THE DEPONENT: I think so. You know what, off
9  the top of my head, I think so. Yes, I think the answer
10 is yes. But none that's coming to mind that was as --
11 clear cut and severe as this particular crime.
12 BY MR. DRURY:
13     Q  Okay. And how many patients have you treated --
14 over the course of your 25 years as a licensed clinical
15 social worker -- how many patients have you treated with
16 post-traumatic stress?
17     A  Oh, gosh. That is -- a lot. I mean, that is a
18 hard answer to question -- a hard question to answer
19 clearly because I have probably 500 or 600 patients on
20 my caseload at any one time. Multiply that times, I
21 don't know, thirteen. So now we're talking -- I have
22 seen 6500 patients at least. So how many of those
23 patients have had post-traumatic stress? I couldn't
24 give you an accurate answer, but I would say hundreds.
25     Q  Okay. And were Charlene Major's symptoms

Page 79

1  consistent with the clinical presentation of other
2  post-traumatic stress disorder patients that you have
3  seen in your clinical practice?
4      A  Oh, definitely.
5      MR. PELAEZ: Objection, form.
6      THE DEPONENT: Absolutely. Yes, sir.
7  BY MR. DRURY:
8      Q  Okay. And I want to ask you on the -- on
9  Plaintiff's Exhibit 10, is this an authentic copy of
10 your note of your telephone appointment with Charlene
11 Major on November 5th, 2018?
12     A  Yes.
13     Q  Okay. And is it an authentic business record of
14 Kaiser Permanente kept in the normal course of business
15 made with someone with knowledge at or about the time of
16 the events described therein?
17     A  Yes.
18     Q  Okay. Let me ask you. So it seems like the
19 first time you saw Charlene Major was June 28th, 2017;
20 is that right? Do I have that right?
21     A  Yes. You have that right.
22     Q  Okay. And the cruise was in May of 2017, right?
23     A  That's what she told me. Yeah.
24     Q  Okay. And it looks like you treated her until
25 November of 2018. Was this the last -- was

Page 80

1  November 5th, 2018 the last time that you had occasion
2  to treat Charlene Major?
3      A  Yes.
4      Q  Okay. So it looks like you treated her for about
5  a year and a half. Is that accurate?
6      MR. PELAEZ: Object to form.
7      THE DEPONENT: Just a second. Let's see. Yeah.
8  Yeah. But you have to bear in mind that there were
9  several months in that period of time that I wasn't
10 seeing her. But, yeah. From start to finish it was a
11 year and a half.
12 BY MR. DRURY:
13     Q  Okay. And in your professional experience, when
14 a patient has continuing symptoms of post-traumatic
15 stress over a period of longer than a year, is there a
16 likelihood that the post-traumatic stress will be
17 permanent?
18     MR. PELAEZ: Objection. Form.
19     THE DEPONENT: No. No. I wouldn't say that,
20 that it means it would be permanent, no.
21 BY MR. DRURY:
22     Q  Okay. Had Charlene Major's symptoms of
23 post-traumatic stress decreased as of November 5th,
24 2018, or were they still at the same level as when she
25 first saw you?

Page 81

1      MR. PELAEZ: Objection. Form.
2      THE DEPONENT: You know, there is not a PHQ9 on
3  this form. Perhaps in the -- in the computer there is.
4  We have a different system that tracks PHQ9 scores so
5  it's hard to judge. But what I will say is that she's
6  having as many symptoms if not more in November, 2018 as
7  she was in June of 2017.
8  BY MR. DRURY:
9      Q  And as of November 5th, 2018, did you have a
10 professional opinion as to the major contributing factor
11 in Charlene Major's continuing post-traumatic stress
12 disorder and major depressive disorder?
13     MR. PELAEZ: Objection. Form.
14     THE DEPONENT: Yeah. It continued to be the
15 Carnival cruise incident, in my opinion.
16 BY MR. DRURY:
17     Q  Okay. As of November 5th, 2018, was Charlene
18 Major's -- what level of post-traumatic stress -- let me
19 strike that. As of November 5th, 2018, how would you
20 categorize the level of post-traumatic stress that
21 Charlene Major was experiencing?
22     MR. PELAEZ: Objection. Form.
23     THE DEPONENT: As of which date? Give me the
24 date again.
25 BY MR. DRURY:

21 (Pages 78 - 81)

1    Q   November 5th, 2018, the last time you saw her.
2    A   Well, you know, it's -- I would still say it's
3    relatively severe.  It's hard for me to judge just based
4    on looking at these notes how her level of
5    post-traumatic stress from January 30th, 2017 compared
6    to November 5th.  If I had a -- the PHQ9 in front of me
7    I could give you a direct comparison.  But I don't have
8    that in front of me.  So the best answer I can give is
9    that it is severe.  Whether it is more or less severe
10   than when I first started seeing her it's hard to say.
11   Because I just saw her once after 10 months that I
12   hadn't been seeing her.  So it's -- it's hard to make a
13   accurate answer to the question that you are asking.
14       Q   Okay.  And as of November 5th, 2018, in your
15   professional opinion, what was the -- how would you
16   categorize the level of major depressive disorder that
17   Charlene Major was experiencing at that time?
18       MR. PELAEZ:  Objection.  Form.
19       THE DEPONENT:  Again, it is hard to say because I
20   don't have the PHQ9 form in front of me.  But I would
21   say it looks pretty severe.  I mean, it looks like she's
22   got a lot of symptoms and she's barely showering.  So I
23   would say it's very severe.
24   BY MR. DRURY:
25       Q   What was your prognosis for Charlene Major as of

1    November 5th, 2018?
2    A   Well, you know, in black and white terms I would
3    say not very good.  I would say poor.  But if you are
4    asking me do I think she'll be affected for the rest of
5    her life with this, the answer is I sure hope not.  It's
6    hard to -- you know, you asked me is this permanent.  It
7    is hard for me to accurately answer that question
8    because one, I don't have a crystal ball.  Two, I
9    haven't read studies where people are tracked for their
10   entire lives.  So I feel like I am ill-equipped to
11   answer that question.  But I would say her prognosis
12   wasn't great.  I mean, she didn't seem that -- no.  She
13   didn't seem like she had advanced as much as certainly
14   she would have liked to and I would have liked to have
15   seen her.
16       Q   Did Charlene Major make efforts to try to get
17   better during the course of your treatment of her?
18       MR. PELAEZ:  Objection to form.
19       THE DEPONENT:  Well, I think she did attend the
20   PTSD groups at Kaiser and apparently outside of Kaiser.
21   And she was coming to individual sessions, and she was
22   taking her medications.  So I think so.  I think -- I
23   think she was trying in those ways.  Could she have
24   pushed herself to get outside of the house more?
25   Possibly.  So -- but you know what?  That is hard to

1    say.  I am not in her shoes and I wasn't -- I didn't see
2    her for 10 months.  So -- but, yeah.  I mean, she was
3    following all the treatment that we gave her.  She was
4    following what we recommended.
5    BY MR. DRURY:
6        Q   And was there ever a time when you felt that
7    Charlene Major was not being honest with you or was
8    presenting in an inauthentic way?
9        MR. PELAEZ:  Objection.  Form.
10       THE DEPONENT:  No.  I wouldn't say that.  No.  I
11   would say that based on the 10 months of not seeing her
12   it seems as if this last session on the fifth of
13   November probably had something to do with the fact that
14   she knew I was going to be deposed and she -- you know,
15   I wanted to make sure that I understood her situation.
16       So in that way she might have been coming to
17   therapy for her -- the purposes of her legal case,
18   possibly.  So in that way was she being inauthentic?
19   Possibly.  It's hard to say.  I certainly was doing the
20   best I could to treat her when she came back.  And I
21   thought she was sincere in what she was telling me.
22       But, you know, it does raise a flag when a
23   patient misses -- is out of contact with her therapist
24   for 10 months.  So does that mean she was inauthentic?
25   I don't know.  But it meant that she wasn't as attentive

1    as she could have been to therapy at Kaiser Permanente
2    where I worked.
3    BY MR. DRURY:
4        Q   Was there anything about her clinical
5    presentation on November 5th, 2018 that would indicate
6    to you that she was not being truthful, honest and
7    authentic?
8        A   No.  No.  No.  I wouldn't say that.  Not at all.
9        Q   Okay.  Was Charlene Major's clinical presentation
10   on November 5th, 2018 consistent with the diagnosis that
11   you gave her of major depressive disorder and
12   post-traumatic stress disorder?
13       A   Yes.
14       MR. PELAEZ:  Objection.  Form.
15   BY MR. DRURY:
16       Q   Okay.  And what facts support the diagnosis that
17   you gave her on November 5th, 2018?
18       A   Well, the symptoms that I outlined earlier in
19   discussion of this note answers that question.  But
20   those symptoms for post-traumatic stress are nightmares,
21   night sweats, being easily startled, having flashbacks
22   to the assault, having recurrent thoughts about the
23   assault, hypervigilance, insomnia, difficulty trusting
24   others, feeling agoraphobic and panicky.  Those are all
25   classic symptoms of post-traumatic stress disorder.

22 (Pages 82 - 85)

Page 86

1     The following are classic symptoms of major
2  depressive disorder: Depressed mood, poor
3  concentration, feeling worthless, low energy, poor
4  appetite, severe weight loss without wanting to lose
5  weight, barely showering, barely functioning, and having
6  the relationships with her family hampered.  That is
7  also a symptom of depression.
8  BY MR. DRURY:
9    Q  Is there anything else about Plaintiff's Exhibit
10  10, the note of your telephone conversation with
11  Charlene Major on November 5th, 2018, that you think is
12  important to highlight?
13    A  Well --
14    MR. PELAEZ: Objection.  Form.
15    THE DEPONENT:  We discussed it, but I think when
16  you look at the quotes that the people who assaulted her
17  said, "Go back to your country you black nigger, you
18  black nigger bitch, go get your husband so I can beat
19  his black nigger ass," I mean, that is particularly
20  brutal language.
21    And the other point -- so I think that is
22  important to see.  And the other point is that when she
23  got this call in her cabin, saying, "We're going to kill
24  you, you nigger," it sounds if the ship -- the Carnival
25  cruise told her they would trace the call.  But my sense

Page 87

1  is that they didn't do nearly as much as she would have
2  liked to track that down and to protect her.  So I think
3  throughout the treatment it is very clear that she felt
4  unprotected by Carnival cruise.
5    MR. PELAEZ: Move to strike as nonresponsive.
6  BY MR. DRURY:
7    Q  And Mr. Vander Clute, Plaintiff's Exhibit 10 is a
8  true and authentic copy of Kaiser Permanente's note for
9  that date of service, correct?
10    A  Yes, sir.
11    Q  And it's an authentic business record made at or
12  about the time of the event described therein by someone
13  with knowledge; is that right?
14    A  Yes.
15    Q  Okay.  The next and final note that I have in
16  your chart is a telephone call on November 7th, 2018.
17  Do you have a note of that?
18    A  Give me the date again.
19    Q  November 7th, 2018?
20    A  Yes.  Yes.  This is a note about a phone call
21  with the attorney from your law firm; is that correct?
22    Q  Yes.  Plaintiff's Exhibit 11, I think you
23  mentioned this before, that Tonya Meister, my
24  co-counsel, had contacted you about -- to find out about
25  your opinions.  And you spoke with her on November 7th,

Page 88

1  2018; is that correct?
2    A  That is correct.
3    Q  Okay.
4    THE VIDEOGRAPHER:  Stand by, Counsel.  Want me to
5  put Exhibit 11 in front of him?  Is that the one we're
6  talking about?
7    MR. DRURY:  Sure.  Yeah, you can.  Absolutely.
8  (Exhibit 11 was marked for identification
9    by the court reporter and is attached hereto.)
10    THE VIDEOGRAPHER:  Okay.
11  BY MR. DRURY:
12    Q  All right.  Mr. Vander Clute, do you have
13  Plaintiff's Exhibit 11 in front of you?
14    A  Yeah.  Uh-huh.
15    Q  Okay.  And is this a true and accurate copy of
16  your -- of the record of your scheduled telephone
17  conversation with Tonya Meister on November 7th, 2018?
18    A  Yes.
19    Q  Okay.  And how -- how long did you speak with
20  Ms. Meister?
21    A  You know, I would have to -- I can't remember,
22  but I would have to -- if I had to guess I would say
23  maybe 20 to 30 minutes, maybe more.  But I would say 20
24  to 30 minutes if I had to guess.
25    Q  Okay.  And do you recall what you and Ms. Meister

Page 89

1  discussed on that telephone call?
2    A  Yes.
3    Q  What did you -- what did the two of you talk
4  about?
5    A  Well, basically she was asking me questions about
6  the incident and the symptoms that Ms. Major Manning was
7  having.  And I pretty much read my notes, similar to
8  what I am doing today.  And she -- she heard that and
9  then she said, "Well, I have the notes in front of me."
10  So she seemed a little upset that I wasn't giving her
11  more information than what was in the notes.  But, you
12  know, the fact of the matter is I see 500 patients.
13  This was over a year ago.  So I don't think I could
14  remember it off the top of my head without reading it
15  off my note.  So that's my memory.  You know, it was a
16  cordial conversation.  I think she got the information,
17  but I think she wished I could have told her more than
18  what were in the notes.
19    Q  And throughout this deposition you have been
20  referring to your notes.  And have they assisted you in
21  refreshing your memory about the dates of service that
22  you saw Charlene Major?
23    A  Oh, absolutely.  And I wrote it down all of the
24  dates of service right here individually and the group
25  sessions.  So it's been -- it was very important.  If I

23 (Pages 86 - 89)

1  hadn't been able to --
2      THE VIDEOGRAPHER: Microphone.
3      THE DEPONENT: If I hadn't been able to look at
4  the notes before our session, which I did, I probably
5  would have not been able to do this very well. But
6  because I read through all the notes and actually have
7  them in front of me, they assisted me greatly.
8  BY MR. DRURY:
9    Q  Okay. You mentioned that you see 500 to 600
10  patients at any given time; is that right?
11    A  That is correct.
12    Q  Okay. Did Charlene Major's case and her
13  condition stand out to you as a severe case amongst the
14  cases that you were handling throughout 2017 and 2018?
15    A  Yes.
16      MR. PELAEZ: Objection. Form.
17  BY MR. DRURY:
18    Q  Why did you see it as a severe case, Charlene
19  Major's case?
20      MR. PELAEZ: Objection. Form.
21      THE DEPONENT: Because, A, the severity of the
22  assault and the way that it clearly impacted her, the
23  way that it impacted her functioning, the way that she
24  had all the classic symptoms of post-traumatic stress
25  and major depressive disorder. Her authenticity and

1  sincerity in her presentation struck me, and, yeah, just
2  how disappointed she was at the effect that this had had
3  on her life and her functioning and her interactions
4  with her family and her work. Yeah, it was profound,
5  and it stands out among the patients. Not number one
6  necessarily, but it stands out as very relevant among the
7  patients that I have seen.
8  BY MR. DRURY:
9    Q  Okay. Thank you very much for your time,
10  Mr. Vander Clute. I am sure that Mr. Pelaez is going to
11  have some questions for you. Actually, one more thing
12  before I hand it over to Mr. Pelaez. Have all of the
13  opinions that you have stated here in your deposition
14  been within a reasonable degree of psychological
15  probability?
16    A  Yes.
17      MR. PELAEZ: Objection. Form.
18      THE DEPONENT: Yes.
19  BY MR. DRURY:
20    Q  Okay. And everything that you noted in your
21  records, were you reasonably certain of the facts and
22  the information that you put in your records?
23    A  Yes.
24      MR. PELAEZ: Objection. Form.
25      MR. DRURY: Okay. Mr. Pelaez.

1      THE DEPONENT: Mr. Pelaez, before you start, how
2  long is this going to take? Because, again, I have a
3  patient at 5:00, and it is now 4:34 here in California.
4      MR. PELAEZ: So Mr. Vander Clute, I have an
5  opportunity now to cross-examine you based on the
6  questions that you were just asked over the past a
7  little bit over two hours.
8      THE DEPONENT: I understand. I am asking you how
9  long it's -- how long you estimate that taking.
10      MR. PELAEZ: Twenty to thirty minutes on my part.
11  And then I think Plaintiff's counsel, Mr. Drury, may
12  have follow-up questions as well.
13      THE DEPONENT: All right. Well, I just wish you
14  guys had been clear with Kaiser when you gave me two
15  hours because I have got a lot of patients to see. So I
16  am trying to debate whether I should tell my 5:00 that
17  I'm going to be late for them too. 5:15?
18      MR. PELAEZ: It's 7:30 at night here in Florida.
19  If it's 4:30 in California, I would say yes.
20      THE DEPONENT: Okay. Go for it. Let's go.
21      EXAMINATION
22  BY MR. PELAEZ:
23    Q  Okay. Mr. Vander Clute, what's the highest level
24  of education or degree that you received?
25    A  A master's degree in clinical social work.

1    Q  You do not hold a Ph.D. or doctorate, correct?
2    A  Correct.
3    Q  What's the difference between what you do as a
4  social worker and what a psychologist does?
5    A  You mean a Ph.D. psychologist?
6    Q  Yes.
7    A  In terms of psychotherapy, exactly the same.
8  What some psychologists do here at Kaiser that I cannot
9  do is conduct neuropsychological testing that I am not
10  able to do. Although no -- no neuropsychological
11  testing was performed on this particular patient,
12  Charlene Manning -- or Major rather.
13    Q  Are you required to a hold a license to practice
14  as a clinical social worker in the state of California?
15    A  Yes.
16    Q  How long have you had that license for?
17    A  Since April of 1999.
18    Q  Has your license ever been suspended for any
19  reason since 1999?
20    A  No.
21    Q  In the beginning of your examination by Mr. Drury
22  you discussed some paperwork that was filled out by
23  Ms. Major. What exactly -- what paperwork were you
24  describing for that initial June 2017 visit?
25    A  This is intake paperwork that every patient

24 (Pages 90 - 93)

Page 94

1  conducts -- every patient fills out.  It has their name,
2  their phone number, their address, their reasons for
3  seeking help at this time, what have you tried for the
4  above problem, past psychiatric history.  Past -- have
5  they ever been hospitalized before, symptoms of
6  depression, symptoms of anxiety, family history, drug
7  and alcohol information, employment history, religious
8  history, that type of thing.  Every patient fills it
9  out.
10    Q   And you mentioned that it included symptoms of
11  anxiety and symptoms of depression on that paperwork,
12  correct?
13    A   Yes, sir.
14    Q   Okay.  Are those fill in the blanks or is it kind
15  of a prefilled option that a patient like Ms. Major
16  could go through and check off certain symptoms that
17  apply to her?
18    A   Yeah.  I mean, it is a standard form where it
19  lists one, two, three, four, five, six, seven, eight,
20  nine symptoms of depression.  And then the patient fills
21  in that in the last two weeks have I had these symptoms,
22  not at all, for several days, for more than half the
23  days or nearly every day.  And then there are four
24  symptoms of anxiety and they have the same options.
25    Q   Okay.  And in Ms. Major's case what did she

Page 95

1  respond to on all of those questionnaires, specifically
2  the nine questions regarding the symptoms for depression
3  and the four symptoms of anxiety?
4    A   Severe.  Severe depression and severe anxiety.
5    MR. DRURY:  Objection --
6    THE REPORTER:  The objection, again, please.
7    MR. DRURY:  I was just making an objection
8  because I don't think Mr. Pelaez was clear on what date
9  of service he was referring to.  That was my objection.
10  BY MR. PELAEZ:
11    Q   This is all referring to the June 28th, 2017
12  initial intake.  Is that what you understand we are
13  speaking about, Doctor?
14    A   Yes, sir.
15    Q   Okay.  So Ms. Major filled out that questionnaire
16  regarding the symptoms of anxiety and symptoms of
17  depression.  She responded severe category for all of
18  those symptoms, correct?
19    A   Yes.  Correct.
20    Q   Okay.  And I believe when you were discussing
21  that initial consultation on June 28th, 2017, you listed
22  out several of what you said were symptoms of
23  post-traumatic distress disorder that you found in
24  Ms. Major.  And that included flashbacks, increased
25  startle response, symptoms of depression, sleepless,

Page 96

1  anhedonia, low energy, problems focusing and a few
2  others, correct?
3    A   You are saying on the note of June 28th, 2017?
4  Is that your question?
5    Q   Correct.  Those are all in the history of present
6  illness, symptoms present, correct?
7    A   Yeah.  On that date, absolutely.  Yes, sir.
8    Q   Okay.  Now how would the patient report each of
9  those symptoms that are included there that you found
10  that she had?  Is that something where you asked
11  specifically, you know, for instance, "Are you
12  experiencing flashbacks?  Are you experiencing
13  nightmares?  Are you experiencing these things?"  And
14  then the patient responds yes or no to that?
15    A   Oftentimes that is the way it's done.  Sometimes
16  the patient just volunteers that information so you
17  don't need to ask that question.  But oftentimes,
18  particularly with, you know, symptoms of post-traumatic
19  stress, generally the therapist does need to ask, "Are
20  you having this?  Are you having that?"
21    Q   And then as part of the history that you took
22  that day, June 28th, 2017 through your initial
23  consultation with Ms. Major, she recounts in some detail
24  this incident on the Carnival cruise.  For purposes of
25  your treatment, you have to rely on the history as

Page 97

1  relayed to you by your patient, correct?
2    A   Yes.  In this case that's right.  You mean the
3  history of the incident?  Yes.  In other cases -- in
4  some cases the psychiatric history, maybe we have
5  previous records.  In her case we didn't.
6    Q   And what I am trying to get at is you as a
7  treater, you are relying on the patient's reporting of
8  how the incident took place because you weren't there
9  and you didn't see exactly how or what happened,
10  correct?
11    A   That's correct.
12    Q   Now, did Ms. Major ever treat with you or any
13  other psychologist or psychiatrist at Kaiser Permanente
14  prior to June 28th, 2017 that you are aware of?
15    A   You know what?  I -- yes.  Actually, prior to me,
16  yes, she did.  She had contact with other therapists.  I
17  don't have that in front of me because I didn't know
18  that was relevant.  But when I was looking through the
19  chart to get these records I noticed that she had
20  interactions with other people including Dr. Dawes, her
21  psychiatrist prior to seeing me.  So, yes.  The answer
22  is yes.  But the specifics of that I can't tell you
23  because I don't have that in front of me.
24    Q   Okay.  Do you know whether any of those prior
25  interactions with psychiatrists or psychologists were in

25 (Pages 94 - 97)

Page 98

1  relation to the death of her father, her brother or that
2  car accident that she had prior to the cruise?
3     A  I would encourage you to get the records.  You
4  have obviously subpoenaed her records.  I'd go through
5  them yourself because I don't have those records in
6  front of me.  And you could probably answer that
7  question very well.  Because I wasn't treating her I am
8  not the one to answer those questions.  But another
9  therapist or provider might be.
10    Q  Okay.  Okay.  It's all right.  If you don't know
11 the answer to that -- to a question regarding prior
12 treatment you can say you don't know and that's it.  I
13 will move on.  So as it relates to any prior treatment
14 that she had at Kaiser Permanente from any other mental
15 health practitioner if it is a psychologist or a
16 psychiatrist, it would be fair to say that you are not
17 specifically familiar with the details of any such
18 treatment, right?
19    A  Yes.  That would be fair to say.
20    Q  Okay.  Now going through the history that you
21 took on June 28th, 2017, you noted that Ms. Major had
22 been on Diazapam for 10 to 20 years prior due to
23 anxiety, correct?
24    A  Yes.
25    Q  Diazapam is Valium, right?

Page 99

1     A  I believe so.  Again, medication is outside my
2  scope of practice, but I believe that's right.
3     Q  And Valium is a pretty strong medication for a
4  patient to use for such a long period of time for
5  anxiety.  Would you agree with that?
6     A  I am not going to give an answer to that.  I
7  don't know the answer.
8     Q  You used an exam called the PHQ9 that was
9  administered to Ms. Major when she came on June 28th,
10 2017, correct?
11    A  Yes.
12    Q  Okay.  And I feel like before when you were
13 discussing it you weren't able to tell us exactly what
14 that PHQ stands for.  Do you know what the specific
15 name, the full name of the test is?
16    A  I think it's patient health questionnaire,
17 actually.  Yeah, I don't know what I said before but
18 patient health questionnaire is the answer.
19    Q  And that is a questionnaire that you stated is
20 something used to try and gauge the severity of the
21 patient's symptoms of depression, correct?
22    A  Yes, exactly.
23    Q  Okay.  And that is a questionnaire that includes
24 a series of questions that the patient, Charlene Major
25 in this case, would simply respond to yes or no,

Page 100

1  correct?
2     A  No, no, no.  Not at all, sir.  You haven't been
3  listening.  The patient health questionnaire is a form
4  that lists nine depressed symptoms.  And the patient has
5  a choice of saying in the last two weeks I have
6  experienced this not at all, several days, more than
7  half the days, or nearly every day.  So it's not yes or
8  no at all.  It gives a number indicating the severity
9  and the length of time that they have been having that.
10    Q  Okay.  I'm sorry.  Repeat the question, please.
11 BY MR. PELAEZ:
12    Q  Sure.  What is the highest score possible that a
13 patient can score on the PHQ9?
14    A  27.
15    Q  So Ms. Major scored 23 out of a possible 27,
16 correct?
17    A  That's right.
18    Q  The PHQ9, well, let me ask you.  Do you know what
19 validity measurements are in reference to exams?
20    A  I do but -- I do know what that means, but that
21 is more a psychologist, they do a lot more studying
22 validity of testing so -- and metrics.  So that is not
23 my field of expertise, but I do know what the term
24 means, yes.
25    Q  Can you explain to us what the term "validity

Page 101

1  measures" in reference to psychological testing, what
2  does that mean?
3     A  It means how valid is this test.  Is it -- has it
4  been proven to be valid, a valid reflection of what a
5  patient is going through or not.
6     Q  Okay.  The PHQ9, does that include any validity
7  measures?
8     A  If it does, I don't know what they are.
9     Q  The GDS, do you know if that test includes any
10 type of validity measures built in to determine the
11 truthfulness of the responses?
12    A  I am sure it does, but I don't know what it is.
13    Q  You are sure it does, but you don't know what
14 they are?
15    A  That is correct.  It's unlikely -- it's unlikely
16 that Kaiser would use these if they didn't have a degree
17 of validity.  But what that degree of validity is I
18 don't know.
19    Q  I don't want you to testify about things that you
20 don't know, Doctor, respectfully.  I want to know if you
21 know specifically if either of these tests, the PHQ9 or
22 the GDS contain any type of validity measures built into
23 them?
24       MR. DRURY:  Objection.
25       THE DEPONENT:  I think I answered your question.

26 (Pages 98 - 101)

Page 102

1  Do you want me to try again and give you the same
2  answer?
3  BY MR. PELAEZ:
4    Q.  Sure.  If you don't know if they do or they
5  don't, I would like you to respond that way.  Do you
6  know specifically whether the PHQ9 or the GDS test
7  referred to her in your report, either of those have any
8  built-in validity measures.
9      MR. DRURY:  Objection.
10     THE DEPONENT:  The answer is I don't know.  But I
11 assume that they do.  You take that however you want.
12 BY MR. PELAEZ:
13   Q.  Okay.  Mr. Vander Clute, as far as that initial
14 June 28th note, under Social History there, you notice
15 that Ms. Major's employment status, she was an
16 independent contractor who had not worked in a year due
17 to family circumstances.  That was your note, correct?
18   A.  Yes.
19   Q.  So at the time she came to you on June 28th,
20 2017, Ms. Major reported to you that she had not worked
21 in at least a year since before that visit with you,
22 correct?
23   A.  Yes, because she was taking care of her sick
24 family members.
25   Q.  And then below that under "legal problems," on

Page 103

1  social history from your very first note, from
2  June 28th, 2017 with Ms. Major, it indicates that the
3  patient is suing Carnival cruise and the individual who
4  assaulted her, correct?
5    A.  That's what it says.  Yes, sir.
6    Q.  Okay.  So as of that very first time that
7  Ms. Major went to see you back in June of 2017 she
8  already told you she was suing Carnival cruise line way
9  back then, correct?
10   A.  Apparently so.
11     THE VIDEOGRAPHER:  Counsel, this is the
12 videographer.  I have to change the media in one minute,
13 and it will take about a minute to do.
14     MR. PELAEZ:  Okay.  Then I think that this is a
15 pretty good time to take that minute then and take a
16 restroom break.
17     THE VIDEOGRAPHER:  Stand by.
18     MR. PELAEZ:  Go off the record for the second.
19     THE VIDEOGRAPHER:  This marks the end of video
20 number two.  Going off the record another 4:50 p.m.
21         (Off the record from 4:50 p.m.
22         to 4:55 p.m.)
23     THE VIDEOGRAPHER:  Were back on the record at
24 4:55 p.m., and this marks the beginning of media number
25 three in the deposition of Edward Carl Vander Clute.

Page 104

1  BY MR. PELAEZ:
2    Q.  Okay.  Mr. Vander Clute, at the conclusion of
3  your initial meeting or consultation with Ms. Major on
4  June 28th, 2017, you came up with a diagnosis of
5  post-traumatic stress disorder and major depressive
6  disorder, correct?
7    A.  Right.
8    Q.  Are you familiar with the DSM-V?
9    A.  Yes.
10   Q.  What is the DSM-V?
11   A.  It's a diagnostic manual that therapists and
12 mental health clinicians use to diagnose the patients
13 that they work with.
14   Q.  Did you use the DSM-V criteria in order to come
15 up with a diagnosis of post-traumatic stress disorder?
16   A.  Yes.
17   Q.  Okay.  So what exactly was the traumatic incident
18 that led to your diagnosis of post-traumatic stress
19 disorder as it related to Ms. Major?
20   A.  It was that she was on the Carnival cruise in May
21 2017, and she was assaulted in the fashion that I
22 previously explained to the other attorney, but that she
23 was assaulted by a drunk man and his daughter.  And she
24 was called racially offensive terms, and she had her eye
25 blackened.  She was hit in the head.  She was verbally

Page 105

1  assaulted.  Let's see.  She was kicked and choked.  She
2  had her face put to the ground.  She was called a nigger
3  bitch.  She was told to go back to Africa.  That --
4  basically that.
5    Q.  Are you familiar with Criteria A of the
6  post-traumatic stress disorder diagnostic criteria under
7  the DSM-V?
8    A.  I don't have the DSM-V in front of me, so I am
9  not sure what A means.  But I know the symptoms of
10 post-traumatic stress.
11   Q.  Well, let me read to you from the DSM-V which I
12 have here with me.  Criteria A, what it requires is
13 exposure to actual or threatened death, serious injury
14 or as sexual violence.  Are you familiar with that
15 Criteria A?
16   A.  Yes.
17   Q.  For post-traumatic stress disorder?
18   A.  Yes.
19   Q.  Okay.  Ms. Major wasn't exposed to actual threat
20 of death in this case, correct?
21     MR. DRURY:  Objection to the form of the
22 question.
23     THE DEPONENT:  She was exposed to serious injury.
24 BY MR. PELAEZ:
25   Q.  What is your basis for believing that Ms. Major

27 (Pages 102 - 105)

Page 106

1  was exposed to serious injury on the Carnival cruise
2  line she had in the incident that took place in May of
3  2017?
4      A  She self-reported that she was kicked in the
5  back, her face was put to the ground, she was kicked and
6  she was choked and her eye was blackened. She also
7  talked about numerous racial slurs directed at her which
8  are also emotionally traumatic.
9  BY MR. PELAEZ:
10     Q  I don't see under Criteria A for the DSM-V for
11 post-traumatic stress disorder anywhere where it
12 includes anything about racial slurs or verbal assaults
13 or derogatory slurs or anything of that nature. Is it
14 your testimony in your opinion that simply racial slurs
15 and offensive language in and of themselves are
16 sufficient to qualify for a traumatic incident under the
17 DSM-V?
18     MR. DRURY: Object. Object to the form of the
19 question.
20     THE DEPONENT: The answer to your question is no.
21 And the answer is that I didn't base the diagnosis just
22 on that. That was a factor in it as well as the
23 physical assault that she -- that Ms. Major Manning went
24 through.
25 BY MR. PELAEZ:

Page 107

1      Q  Okay. So offensive language or racially
2  derogatory or insensitive language in and of itself is
3  not enough to qualify for PTSD under the DSM-V, correct?
4      MR. DRURY: Object to the form of the question.
5      THE DEPONENT: Well, you know what, actually --
6  I -- you know, prolonged verbal abuse that often people
7  go through could create post-traumatic stress,
8  absolutely. But this was only a small part of what she
9  went through. What this patient apparently went through
10 was a physical trauma.
11 BY MR. PELAEZ:
12     Q  And your understanding of that physical trauma is
13 based on Ms. Major's history that she provided to you,
14 her recounting of the incident itself on the cruise
15 ship, correct?
16     A  Correct. Although she did -- I am sure she saw
17 some medical doctors. And maybe you could talk with
18 them. But I am not a medical doctor and didn't evaluate
19 her medically.
20     Q  Sure. Since you mentioned it, she actually went
21 to Kaiser Permanente, I believe on May 22nd, 2017, soon
22 after she returned from the cruise and was evaluated by
23 a doctor there. You haven't seen those medical records
24 or the photographs taken of her and her injuries on that
25 day?

Page 108

1      A  Well, I certainly haven't seen any photographs,
2  but I probably did read the medical record back when I
3  saw her in June. But off the top of my head I am not
4  remembering that. That was over a year and a half ago.
5  BY MR. PELAEZ:
6      Q  You don't recall seeing the actual photographs of
7  her injuries?
8      A  No. I don't believe I ever did see them.
9      Q  I previously asked you a little bit about the
10 Valium that Ms. Major had been taking for 10 to 20
11 years. Do you know whether Valium is a type of
12 medication that is okay to be taken with alcohol?
13     MR. DRURY: Object to the form of the question.
14     THE DEPONENT: I would -- I don't know the answer
15 to that question, but I would suggest probably not.
16 BY MR. PELAEZ:
17     Q  Do you know whether there is any specific risks
18 associated with consuming alcohol while taking Valium?
19     A  No. That is a medical question. I am not going
20 to answer that.
21     Q  So you don't know what the effect, then, would be
22 specifically if Valium is mixed with alcohol, correct?
23     A  That's right.
24     Q  Ms. Major expressed to you during your
25 consultations with her that she had a fear of white men

Page 109

1  after the incident on the Carnival cruise ship, correct?
2      A  Yeah. I don't think she said that in her first
3  session. She probably said it in her last session. But
4  she did say that, yes.
5      Q  I ask that because you are a white male, and I
6  was just curious to know whether Ms. Major ever
7  expressed to you specifically any concerns or uneasiness
8  or discomfort in being treated by a while male following
9  that incident?
10     A  I think I surely asked her that question, and my
11 sense is that she felt comfortable with me. But the
12 quote in my note is "redneck-looking white men," and
13 I -- my assumption is that she didn't think I was a
14 redneck-looking white man.
15     Q  Okay. So then it's only redneck-looking white
16 men that Ms. Major has this fear of after the incident?
17     A  My notes says --
18     MR. DRURY: Objection.
19     THE DEPONENT: -- she especially fears
20 redneck-looking white men. I didn't delve into what
21 kind of white men she did or didn't get afraid of. That
22 didn't seem like the relevant issue for our work. But I
23 did write down her quote about redneck-looking white
24 men.
25 BY MR. PELAEZ:

28 (Pages 106 - 109)

Page 110

1    Q  So it was especially redneck-looking right men
2  that made her uneasy or uncomfortable, correct?
3       THE DEPONENT:  According to my note, yes, sir.
4       MR. DRURY:  Objection.
5  BY MR. PELAEZ:
6    Q  Okay.  In any of your meetings with her did she
7  ever appear uneasy or uncomfortable in your presence?
8    A  You mean because I am a white man?
9    Q  Just because you are a white man, yes.
10   A  No.
11   Q  Okay.  I believe during your direct examination
12  when you were being asked questions by Ms. Major's
13  counsel, I have in my notes you said that Ms. Major had
14  a mild PTSD or post-traumatic stress disorder reaction
15  before the cruise due to earlier problems that she had;
16  is that correct?
17   A  Yeah.  I mean, that is my estimate.  I hadn't
18  seen her prior to that, but it appeared -- it would
19  appear that based on the experience she had that that
20  was the case.  I didn't assess her before she came to me
21  to tell you, yes, she had mild PTSD.  But that was my
22  assumption, yes.
23   Q  Okay.  And then again when you go over the
24  symptoms of PTSD with Ms. Major and you asked her
25  whether she is suffering from nightmares, flashbacks,

Page 111

1  startling responses, hypervigilance, trust issues,
2  depression, anhedonia, sleeplessness, lack of focus, low
3  energy, all these issues, you are relying on her being
4  truthful in her responses to whether she is experiencing
5  or suffering from any of those conditions; isn't that
6  true?
7    A  That is true with almost every patient you see,
8  yes.
9    Q  If your patient, for whatever reason, was not
10  being completely honest with you as a treater, as a
11  therapist, that would call into question your entire
12  assessment of the patient, wouldn't it?
13   A  You know, part of our professional expertise is
14  to make that judgment, whether -- just like you as an
15  attorney, I'm sure, have to do the same thing as to
16  whether or not this person is trustworthy or not.  And
17  you make that judgment based upon facial expression,
18  tone of voice, the way they hold their body, their word
19  choice.  So, yes, I have to do that every day.  And
20  absolutely, I have to do that.  And my -- as I responded
21  to the other counsel, my sense is that she was
22  completely trustworthy throughout.
23   Q  What did you note in her facial expression that
24  led you to believe that?
25   A  Well, I am until looking at her face right now,

Page 112

1  but just that she seemed quite credible.  She -- she
2  seemed appropriately upset when she talked about the
3  things that she was talking about and, you know, calm
4  when she was talking about calmer things.  So it seemed
5  completely -- completely believable.
6    Q  Is it possible for a patient or an individual to
7  look up what the symptoms of post-traumatic stress
8  disorder are on, say, the Internet or any given number
9  of websites?
10   A  Of course that is possible.
11      MR. DRURY:  Objection.
12      THE DEPONENT:  Of course that is possible.  But
13  then again, anything is possible, right?
14  BY MR. PELAEZ:
15   Q  It is also possible for a patient to look up what
16  the symptoms of depression are on the Internet, correct?
17      MR. DRURY:  Objection.
18      THE DEPONENT:  It is possible, but let me respond
19  to that.  It's not possible to describe a life in which
20  you are talking about your level of functioning, the
21  interaction that you are having with other people, that
22  you are not able to do certain things in your life and
23  present yourself, you know, in front of a therapist time
24  after time.  You would have to be an extremely good
25  actor to do that, an extremely well-trained actor.  But,

Page 113

1  yes, it's possible.
2  BY MR. PELAEZ:
3    Q  Okay.  I'm moving on to what was marked by
4  Plaintiff's counsel Exhibit No. 5, your July 11, 2017
5  note from your encounter with Ms. Major then.  Ms. Major
6  recounted to you during that session that she had missed
7  a family reunion in Florida because she was afraid to
8  travel, correct?
9    A  Yes.
10   Q  So it's your understanding that Ms. Major was
11  unable to travel as a result of this incident and her
12  fear of just going out in public, pretty much, correct?
13   A  Yeah.  That she was afraid to go out in public,
14  exactly, and leave the house.
15   Q  So if Ms. Major -- if it turned out that
16  Ms. Major was actually able to travel and did go visit
17  family in Florida and did go on vacation to the
18  Dominican Republic with her family, how would that
19  affect your opinions and your impressions of her?
20   A  What would the timeframe be for that trip to the
21  Dominican Republic?
22   Q  Well, if while under your care and receiving
23  treatment with you she was able to do those things, you
24  would agree with me then that she wouldn't have been
25  completely honest with you when she said she was afraid

29 (Pages 110 - 113)

1  to travel, correct?
2       MR. DRURY: Objection.
3       THE DEPONENT: Well, let me answer that question.
4  So I am reading this note from July 11th. She told me
5  that she was afraid to travel at that time, you know,
6  between the 28th of June and the 11th of -- I'm sorry,
7  the 28th of June and the 11th of July. So I don't
8  know -- that doesn't mean that she could never travel
9  again. So I'm not sure -- you know, this is the first
10  time I am hearing about a trip to the Dominican
11  Republic. And I am not sure what the time frame is, but
12  I am not saying that she could never travel again. And
13  just -- the mere fact that she traveled doesn't mean
14  that this is inaccurate, what's written here on this
15  note. So let's just be clear about that.
16  BY MR. PELAEZ:
17       Q  My question to you was if your patient told you
18  they were afraid and unable to travel but, in fact, they
19  were able to travel during the time that you were
20  treating them and after telling you these things, how
21  would that affect your impressions, your diagnosis, and
22  your treatment of them?
23       THE DEPONENT: I won't --
24       MR. DRURY: Objection.
25       THE DEPONENT: Again, I tried to answer your

1  question, sir. If they told me that they couldn't
2  travel between the 28th of June and the 11th of July,
3  but then subsequent to that they traveled, well, that
4  wouldn't necessarily affect my assessment. It just
5  meant that they could travel. We always hope our
6  patients will get more functional.
7  BY MR. PELAEZ:
8       Q  On that note dated June -- July 11, 2017, I am
9  looking at the bottom. It seems like you performed a
10  mental status exam on her, correct?
11       A  Yes.
12       Q  And you found that at that time her judgment was
13  good, correct?
14       A  Yes.
15       Q  You found that her memory was good at that time
16  as well, correct?
17       A  Yes.
18       Q  I believe you said earlier as well that you had
19  recommended these group therapy sessions, counseling
20  sessions --
21       THE DEPONENT: Counselor, time out. How much
22  more time is this going to take? I had a 5:00 o'clock
23  appointment. You told me we'd get out by 5:15. I am
24  doing you guys -- I'm trying to help your case, both of
25  your cases. You owe me a certain amount of respect,

1  though. When is this going to end? Because I have a
2  patient waiting up there, and I take my professional
3  relationship with my patients very seriously. So let me
4  know how much longer this is going to take. Is it
5  as you said or is it longer?
6  BY MR. PELAEZ:
7       Q  I didn't tell you 5:15.
8       A  Yes, you did.
9       Q  I said you should move back an appointment.
10       A  No. You said 5:15.
11       Q  I didn't say that.
12       A  How much longer is it going to take?
13       Q  I may have another 15 minutes of questions.
14       A  That may be unacceptable to me. I am sorry.
15       Q  Then we are going to have to continue the
16  deposition for another date and time. Because
17  Plaintiff's counsel took over two hours' worth of
18  questioning. I have a right to ask you questions and
19  follow-up. He covered a lot of ground --
20       A  Sir, you do. So we may have to do it another
21  time. You have all the right in the world, but I have a
22  responsibility to my patients. And if it's you guys or
23  Kaiser, you guys got to be straight with me. I am not
24  going to get jerked around like this. Okay. So tell me
25  what you want to do.

1       Q  Mr. Vander Clute --
2       A  Yes.
3       Q  I never represented how long this entire
4  deposition would be taking. If Plaintiff's counsel is
5  fine with suspending it and resuming it on another date
6  that is fine with me if he'll stipulate to it on the
7  record, sir.
8       MR. DRURY: Mr. Vander Clute?
9       THE DEPONENT: Yes, sir.
10       MR. DRURY: We will -- we will pay you for your
11  time. You are entitled to a fee for your time.
12       THE DEPONENT: Well, that is great, sir. That is
13  great. But let's do it another time, because I have a
14  patient who also is a paying customer who's doing it
15  now. But if you want to pay me that is fine.
16       MR. DRURY: I understand that. And we do respect
17  you and we respect your time, and we're not trying to
18  jerk you around, believe me. And we appreciate that you
19  are here for us. We have a discovery cutoff on
20  March 8th, which is the end of this week. So that's why
21  we really needed to get your deposition in today.
22       A  All right. Let me call my patient. You are
23  offering to pay me some money? How much are you going
24  to pay me?
25       MR. DRURY: However many hours the deposition

Page 118

1 takes, we're willing to pay your hourly fee. That's
2 what was agreed upon before the deposition with Kaiser.
3 So we're going to pay -- do you know what your hourly
4 fee is? We are willing to pay whatever it is on an
5 hourly basis.
6      THE DEPONENT: I don't know if Kaiser works this
7 way. I get paid by Kaiser. But are you talking about
8 my hourly fee at Kaiser or outside of Kaiser? Because I
9 have a job outside of Kaiser too.
10      MR. PELAEZ: Chris, I think we should stipulate,
11 you know, to continue this deposition, to postpone it
12 for right now. And we can continue it -- I am open to
13 continue it beyond the discovery cutoff, whatever is
14 most convenient -- excuse me, not most convenient but
15 least inconvenient for Mr. Vander Clute to not take up
16 any more of his time that he hasn't planned on taking
17 today. That is fine with me, and I think that's the way
18 Counsel should accommodate that.
19      MR. DRURY: Well, Victor, I think you said that
20 you think that you have 15 minutes left. Would that be
21 acceptable to Mr. Vander Clute? Because I don't have
22 any other questions other than I was going to ask you
23 what your fee was, and that was it.
24      So I will ask that question right now.
25 Mr. Vander Clute, what is your hourly fee typically?

Page 119

1      THE DEPONENT: At Kaiser or in my private
2 practice?
3      MR. PELAEZ: Object to the line of questioning.
4 It is out of turn. It is not your examination right
5 now, Chris.
6      THE DEPONENT: I don't know. Kaiser pays me
7 something like 55 an hour. In private practice I make
8 150 an hour.
9      MR. DRURY: Okay. So Victor, do you want to --
10 if Vander Clute is okay, and I would please ask
11 Mr. Vander Clute to continue it if it's possible for
12 him.
13      THE DEPONENT: Let me call up the receptionist
14 and see if my patient has arrived. Just a minute.
15      MR. DRURY: Thank you.
16      MR. PELAEZ: My issue is I don't think it is fair
17 to rush Mr. Vander Clute. And I don't think it is fair
18 to rush me after you got your two hours time with Vander
19 Clute.
20      THE REPORTER: Can I go off the record?
21 Gentlemen, can I go off the record?
22      THE VIDEOGRAPHER: Going off the record at
23 5:16 p.m.
24           (Off the record from 5:16 p.m.
25           to 5:19 p.m.)

Page 120

1      THE VIDEOGRAPHER: We're back on the record at
2 5:19 p.m. continuing media number three.
3      You may proceed, Counsel.
4 BY MR. PELAEZ:
5   Q  Mr. Vander Clute, back in June 28th, 2017 when
6 you first evaluated Ms. Major, you recommended that she
7 attend group therapy for her PTSD, correct?
8   A  That's right.
9   Q  And I believe under examination by Counsel you
10 mentioned that according to your records Ms. Major
11 didn't actually attend any of that group therapy that
12 you recommended she undergo until February 5th, 2018,
13 correct?
14   A  That is correct.
15 BY MR. DRURY: Objection.
16   Q  Okay. Do you know --
17      THE REPORTER: I'm sorry. Repeat that question,
18 please.
19      MR. DRURY: I just said objection. That was it.
20 BY MR. PELAEZ:
21   Q  Mr. Vander Clute, do you know why Ms. Major went
22 from June 28th, 2017 when you recommended that she
23 undergo group therapy, all the way until February 5th,
24 2018 before she actually followed your advice?
25      MR. DRURY: Objection.

Page 121

1      THE DEPONENT: Part of it is because, according
2 to the referral that I put in, I hadn't put in the
3 referral until September suggesting that she start
4 October 2nd. So it's not fair to attribute the delay
5 from the 28th of June to October 2nd to her. However,
6 why she didn't go October 2nd I don't know, except I --
7 as I was talking to the other counsel, it might have
8 been --
9      THE VIDEOGRAPHER: Let me fix that. Excuse me
10 can I just grab that and retape it? There you go.
11      THE DEPONENT: It may have been because she had a
12 problem getting out of the house. But I don't know. I
13 don't know the answer to your question as to why she
14 didn't do that.
15 BY MR. PELAEZ:
16   Q  Okay. You are speculating that it may have been
17 because she was having issues getting out of the house,
18 but you don't know that for certain, do you?
19      MR. DRURY: Objection.
20      THE DEPONENT: No. I don't -- I don't know that
21 for certain. But I know a lot of patients have the best
22 intention of following a treatment plan. But when they
23 are severely depressed they have a hard time getting
24 themselves to do it. So is that a character problem?
25 No. Is it a problem that it is difficult when a person

31 (Pages 118 - 121)

Page 122

1  is depressed to get themselves out of the house and
2  functioning? I think that is more likely it.
3  BY MR. PELAEZ:
4     Q   Okay. Ms. Major never --
5     A   So I think she was an extremely depressed person
6  who probably had a hard time getting herself to the
7  clinic to come to the group. And some people are afraid
8  of groups so -- Go ahead.
9     Q   Ms. Major never told you specifically that she
10  wasn't going to the group therapy because she was having
11  trouble getting out of the house, though, correct?
12     A   Not that I recall. I don't have that down in my
13  notes. I can't remember. No.
14     Q   You'd agree with me that Ms. Major had anxiety
15  issues that predated the incident on the Carnival
16  cruise, correct?
17     A   Yes.
18     Q   You would agree with me that Ms. Major had
19  symptoms regarding depression that arose when her father
20  and brother passed away that predated the cruise,
21  correct?
22     A   Sure. Yes.
23     Q   In your September 13, 2017 note, Ms. Major
24  reported to you that she attended a party and was pushed
25  through a glass table, correct?

Page 123

1     A   Yes.
2     Q   Did she tell you anything more about how that
3  incident came to be, how exactly it was she came to get
4  pushed through a glass table while at a party?
5     A   Yeah. She said she got terribly drunk and
6  that she tried to leave to party and called her husband
7  to pick her up. Her friends talked her back into going
8  into the party where she was assaulted by the host. She
9  fell through a glass table, and her body was cut in many
10  places. So my sense is that there was a very
11  domineering, aggressive drunk host who fell down drunk
12  and pushed her -- or I guess she fell down. I am not
13  sure exactly. I would have to reread my nets.
14     Q   Well, your notes -- your notes says that party
15  was at a man's home in the Oakland hills, correct?
16     A   Yes, sir.
17     Q   The host who pushed her through that glass table
18  was a man, correct?
19     A   Correct.
20     Q   Do you know if it was a black man or if it was a
21  white man? Do you know any specifics about the host or
22  his race?
23     A   I don't know but I want to say -- I am not sure,
24  but if I had to guess and it is only a guess I would say
25  it was a black man.

Page 124

1     Q   Do you know what, if anything, Ms. Major did
2  to -- strike that. Do you know if Ms. Major did or said
3  anything at that party that may have led to her getting
4  pushed through that table by that host?
5     A   My sense is that she didn't say anything to led
6  to it, that it was merely sort of an unjust or
7  unfortunate reaction from a drunk person.
8     Q   Why is that your sense of it?
9     A   Because that's what she said. I obviously wasn't
10  at the party, but that's what she reported.
11     Q   Okay. And you noted in your September 14th, 2017
12  note that that incident where she got pushed through a
13  glass table by another drunk man at a party exacerbated
14  her symptoms of post-traumatic stress disorder, correct?
15     A   That's right.
16     Q   How would that incident where she got pushed by
17  what you believe was a black man at a party that she
18  went to has exacerbated her symptoms of post-traumatic
19  stress disorder?
20     A   Because she was assaulted again, and she was
21  physically injured again. And in both cases she was an
22  innocent bystander. So it seems quite logical that it
23  would exacerbate her symptoms again. So that's how
24  it -- that's how it occurs to me.
25     Q   Your belief that Ms. Major was an innocent

Page 125

1  bystander in both of those incidents was just based on
2  her history of the incidents to you, correct?
3     A   Absolutely. I wasn't at either of these
4  incidents.
5     Q   Okay.
6     A   And I am sure you will ask eyewitnesses to get a
7  better sense of that, but I am not an eyewitness.
8     Q   Lets me ask you, Mr. Vander Clute, when you are
9  treating a patient for post-traumatic stress disorder
10  does your treatment of that patient change at all based
11  on the cause or alleged cause of the specific patient's
12  symptoms of post-traumatic stress disorder?
13     A   Can you repeat that question?
14     Q   Sure. When you are treating a patient who has
15  post-traumatic stress disorder or symptoms of
16  post-traumatic stress disorder, does your treatment of
17  that patient or your recommendation, do they change at
18  all based on the given cause from one case to another
19  and/or the alleged cause of those symptoms?
20     A   I wouldn't say my treatment changes, but I would
21  say my empathy and the way I talk with them certainly
22  would, yeah. Because therapists are human beings, and
23  they get affected by what a patient is going through.
24  Yeah. And what was particularly noticeable in her case
25  was the racial element and the fact that she had not

32 (Pages 122 - 125)

1  experienced that previously, according to her report, in
2  her life, and that this really affected her sense of
3  safety in the world.  So that was -- that was very
4  relevant and very unique in this situation.
5      Q  If I understand your response you said that your
6  treatment wouldn't change, really, but your relation and
7  the way you relate to the patient might.  Is that
8  accurate?
9      A  Sure.
10     Q  So in other words, if you had somebody who was a
11 combat veteran who was suffering symptoms from
12 post-traumatic stress disorder and another patient who
13 was a sexual assault victim who was also suffering
14 symptoms of post-traumatic stress disorder, the ultimate
15 treatment that you would give them or the
16 recommendations of treatment really wouldn't vary too
17 much.  What would vary is your handling of the patient;
18 is that fair?
19     MR. DRURY:  Objection.
20     THE DEPONENT:  The answer to your question is
21 yes.  Although with a sexual abuse patient, we might
22 look for a different group than our regular
23 post-traumatic stress group, because sometimes sexual
24 abuse survivors have different circumstances.
25 Unfortunately right now at Kaiser we don't have one of

1  those, but I would look for one outside of Kaiser for
2  that particular patient, who was a victim of sexual
3  trauma.
4  BY MR. PELAEZ:
5      Q  In the case of victims of sexual trauma, you
6  would just tailor the group therapy sessions that you
7  would be sending that patients to based on the nature of
8  the incident or the offending incident, correct?
9      A  Yes.
10     Q  Let me ask you, then, why would it make any
11 difference of your treatment of Ms. Major whether her
12 symptoms or alleged symptoms of her post-traumatic
13 stress disorder was caused either by the death of loved
14 ones, a car accident that she suffered before the
15 incident on the cruise, the incident on the cruise
16 itself or the incident where she got pushed through the
17 glass table after the cruise?
18     A  Ask that question again.  I am not sure what you
19 are getting at.
20     Q  Sure.  My question was I wanted to understand why
21 or would it make any difference -- strike that.  You'd
22 agree with me then that it wouldn't make any difference
23 in terms of your treatment and your recommendations of
24 Ms. Major specifically whether you decided or believed
25 that her post-traumatic stress disorder symptoms were

1  being caused by the death of her loved ones or the car
2  accident or the incident on the cruise ship or the
3  incident where she got pushed through the table.  Your
4  treatment recommendations wouldn't change no matter
5  which of those incidents was the one that originated any
6  of her symptoms, correct?
7      A  For the purposes of this deposition I think it's
8  important to recognize that although she had all of
9  those other traumas, the main one, in my clinical
10 opinion, was the assault on the Carnival cruise ship.  I
11 think that is an important factor.  But regardless of
12 what caused symptoms of trauma, yeah, you would -- you
13 might treat the patient the same.  But in this
14 particular case, the most severe trauma and the one that
15 presented the most problems for our treatment was the
16 Carnival cruise ship.
17     Q  In your opinion that it was the incident on the
18 Carnival cruise ship was the most severe trauma, is that
19 based on the fact that that is the incident that Ms.
20 Major spent most of her time talking about in your
21 sessions with her?
22     A  No.  That was just my sense of the traumas that
23 she presented and the time that those traumas occurred
24 that makes me think that.
25     Q  And you agreed from before that from the very

1  first time she visited you June 28th, 2017 she was
2  already actively in the process of suing Carnival cruise
3  line for that accident incident, correct?
4      A  According to my notes that must be true, yes.
5      Q  Okay.  Is there any methodology that you employed
6  in order to determine what the major trauma for a
7  patient like Ms. Major is in terms of your treatment of
8  them?
9      A  I don't think there is a methodology per se.  But
10 that was my sense as both a therapist and a human being
11 sitting with her.
12     Q  Okay.  Did you say it was basically just common
13 sense, based on --
14     A  That was my -- I said that was my sense as both a
15 clinical professional and a human being.  But we don't
16 have -- I don't have paperwork and charts and scales
17 that allow me to measure each trauma that she
18 experienced and say, well, this one is an eight and this
19 one is a six; therefore that is more severe.  I don't
20 have those types of tools.  So, yeah, it was a
21 subjective impression that I had.
22     Q  Okay.  Almost getting there, Doc.  Sorry about
23 that.  Now you confirmed earlier that there is kind of a
24 large gap in Ms. Major's treatment with you where she
25 went from, I believe, January 30th, 2018 all the way

Page 130

1  until November 5th, 2018 without visiting with you; is
2  that correct?
3      A  That is correct.
4      Q  Do you know why it was that Ms. Major went for
5  that long a period of time in between visits with you?
6      A  The answer is I don't know.  I don't know for
7  sure.  I might have asked her at the time, but I didn't
8  note that in my chart, so I don't remember, you know,
9  off the top of my head what that would have been without
10  having written it down.  So, no, I don't know.
11      Q  And Ms. Major reported to you, I believe it was
12  in the note when she did return to you in November --
13  November 5th, 2018, she described to you that she was
14  brutally assaulted by a man on the Carnival cruise,
15  correct?
16      A  Yes.
17      Q  Okay.  I lost you on the video, but I am fine
18  proceeding with it.
19      Is that okay with you, Chris?
20      MR. DRURY:  It is fine with me.  Let's just power
21  through.
22      MR. PELAEZ:  I don't -- okay.
23  BY MR. PELAEZ:
24      Q  So that was a "yes" to my last question, right,
25  sir?

Page 131

1      A  Yeah.  Repeat the question so I remember what I
2  said yes to.
3      Q  Sure.  My questions was in your November 5th,
4  2018 encounter note with Ms. Major when she returned to
5  you after that nine-month hiatus, she recounted to you
6  again the incident on the Carnival cruise that she told
7  you that she had been brutally assaulted by a man on the
8  cruise, correct?
9      A  Yeah.  Yes.  That's right, and apparently by his
10  daughter as well.
11      Q  If Ms. Major had not been assaulted by a man at
12  all on that cruise, would that affect your impressions
13  or your opinions at all?
14      MR. DRURY:  Objection.
15      THE DEPONENT:  I don't understand.  You mean if I
16  somehow could go back and time and be there and saw that
17  she wasn't assaulted would that affect my opinion?  Is
18  that the question?
19  BY MR. PELAEZ:
20      Q  If it turned out to be false that she had been
21  brutally assaulted by a man, how, if at all, would that
22  affect your opinions of her in this matter?
23      MR. DRURY:  Objection.
24      THE DEPONENT:  You know, that is a totally
25  speculative question.  I don't understand why you are

Page 132

1  even asking that question.  But I don't know.  That
2  doesn't make any sense to me, that question.  Obviously
3  --
4  BY MR. PELAEZ:
5      Q  Why doesn't it make any sense?
6      A  If the facts were totally different than what she
7  told me, would that change it?  Of course.  But there is
8  no way for me to know whether the facts were different.
9      Q  Okay.  But if they were, then that would change
10  your assessment and your opinions, correct?
11      MR. DRURY:  Objection.
12      THE DEPONENT:  I really don't like that question.
13  I don't want to answer that question because my job is
14  to work with a patient and work with her experience.
15  Her experience was that she was assaulted.  Somebody
16  else might have witnessed it and had a different
17  experience.  But what is valid to me is my patient's
18  experience.  So I am a little hesitant to go there in
19  this answer.  I -- that seems irrelevant to me, your
20  question.
21  BY MR. PELAEZ:
22      Q  But the relevance is, and I will explain it to
23  you, is Ms. Major is recounting to you she has a fear of
24  redneck-looking white men now, correct?
25      A  Yes.

Page 133

1      Q  So if it turned out that in actually she was
2  never actually physically assaulted by a redneck-looking
3  white man, how, if at all, would that change your
4  assessment and your opinion?
5      MR. DRURY:  Objection.
6      THE DEPONENT:  I mean, you know, if the sun
7  hadn't come up that day, then obviously it would have
8  been different.  So I am -- it doesn't make any sense
9  why you are asking this question.  This is not a
10  clinical question that you are asking me.  So it doesn't
11  make any sense.  I don't see the point of answering
12  that.
13  BY MR. PELAEZ:
14      Q  Okay.  Let me ask you a different question then.
15  Did Ms. Major ever recount to you any fear of white
16  women after this incident?
17      A  Not that I recall.  But she was afraid in general
18  to go out.  She thought that the world was not safe.  So
19  that -- that applies to everybody and everything in the
20  world.  But I don't particularly -- I don't remember her
21  ever saying that she's really afraid of white women.
22  No.
23      Q  She got assaulted by a black man at the party
24  after the incident on the cruise as well, correct?
25      A  I am not sure.  I don't -- I am not positive of

34 (Pages 130 - 133)

Page 134

1 the race of that person. I would -- if I had to guess I
2 would say it was a black man, but I am not sure. But go
3 ahead.
4     Q   After that incident did she ever recount any
5 feelings of fear towards black males?
6     A   I think -- I think she began to question of who
7 she should be hanging out with and what kind of friends
8 she should keep. I think she was very wary about who
9 she would spend time with. But did she make comments,
10 derogatory comments about black men, not that are in my
11 notes and not that I recall.
12    Q   You would agree with me that PTSD, post traumatic
13 stress disorder is a condition, correct?
14        THE REPORTER: Is what? I'm sorry. Repeat that.
15 BY MR. PELAEZ:
16    Q   Sure. I said you would agree with me that PTSD
17 or post-traumatic stress disorder is a treatable
18 condition, correct?
19    A   Yes.
20    Q   And if patients follow the recommendations of
21 their doctors and therapists such as going to group
22 therapy and going to individual therapy and taking
23 whatever medications their doctors recommend to them
24 there is usually a good prognosis if you follow the
25 treatment plans for PTSD, correct?

Page 135

1        MR. DRURY: Objection.
2        THE DEPONENT: I am not sure about that,
3 actually. I can't say that that is true. We hope it's
4 true, but, you know, trauma is so insidious,
5 particularly when there are multiple traumas. So it's
6 not as if a patient follows X, Y and Z we know they are
7 going to get better. It is not as black and white as
8 that, in my opinion. If you talk to another clinician
9 that clinician might have a different opinion. So it is
10 hard for me to say yes to your question because it's not
11 black and white.
12    Q   Do you know what protective factors are in terms
13 of post-traumatic stress disorder?
14    A   Protective factors?
15    Q   Yes. Have you ever heard of protective factors?
16 Do you know what those are?
17    A   No. I don't.
18    Q   So you don't know whether there is certain social
19 factors for any given patient such as whether they
20 graduated college, whether they belong to a church,
21 whether they have a strong family environment or they
22 are married, things of that nature, whether they have a
23 lot of friends that would help or provide a better
24 prognosis for a patient in terms of recovering from
25 post-traumatic stress disorder?

Page 136

1        MR. DRURY: Objection.
2        THE DEPONENT: I think that all of the things --
3 I think that all of the things you mentioned contribute
4 to increased mental health for most individuals. I am
5 not sure how that specifically applies to post-traumatic
6 stress. But I think for any individual that family
7 structure, social ties, educational background,
8 increases the quality of one's life in general, not in
9 all cases but in general. But what does this have to do
10 with this patient we are discussing?
11 BY MR. PELAEZ:
12    Q   I was asking if you know whether she had any of
13 these protective factors that would generally, as you
14 said, increase the chances of her recovery?
15    A   Oh, I see your point.
16        MR. DRURY: Objection.
17        THE DEPONENT: Well, she had a good job. She had
18 some good family support. Off the top of my head I
19 would have to go back and see -- let's see what her
20 educational background is. Hold on a second. Okay.
21 Well, apparently she graduated college and then some
22 education. So that -- that -- along the lines of what
23 you are saying, in theory that would be a good
24 protective factor. But it doesn't always apply to every
25 individual. Individuals are very complex.

Page 137

1     Q   Plaintiff's counsel asked you some questions
2 about your prognosis for Ms. Major. I didn't see an
3 actual prognosis anywhere in your medical records or any
4 of your notes. Did you actually come up with a
5 prognosis as part of your treatment of Ms. Major?
6     A   Yeah. We don't -- I don't usually have that in
7 my template, in my chart template. So I don't usually
8 write that down for my patients. So I just was coming
9 up with that prognosis off the top of my head. But,
10 yes, you are not going to find it in my chart records.
11 But you wouldn't find that for any of my patients.
12    Q   Okay. Now you said that you had 5- to 600
13 current patients, correct?
14    A   Yeah. What happens is we see five new patients
15 every week, and we keep patients for two years. So if
16 you do the math that adds up to about 500.
17    Q   Okay. How many patients do you see on a given
18 day?
19    A   Well, it depends on the day, but anywhere from 4
20 to 10.
21    Q   So how many actual patient interactions or
22 consultations would you have in a given year, as best
23 you can estimate for us.
24    A   You mean total, the total number of patient
25 interactions?

35 (Pages 134 - 137)

Page 138

1    Q   Right.  In a given year.
2    A   Oh, gosh.  You know what?  I have never figured
3    that out.  If I had to guess I would say -- let's see.
4    I would say 30 a week times whatever number of weeks I
5    work.  So maybe you want to do 30 times 48, something
6    like that.  And, you know, if you have got a calculator
7    you can figure that out.  I also see group members.  I
8    see lots of patients in groups who I am not seeing
9    individually.
10   Q   30 times 48 gives you 1440.  So that sounds about
11   right to you in terms of how many patients you would
12   meet with in any given year?
13   A   It could be right.  It could be right.  I would
14   give you a better answer if I went through my actual
15   chart in my computer.  But let's say that is right off
16   the top -- for guestimate's sake.  Sure.
17   Q   And during the time you were treating Ms. Major
18   from June 28th of 2017 through November 28th -- excuse
19   me, November 5th, 2018, so it's over a year and a half,
20   you had one, two, three, four, five, six, seven
21   interactions with her in almost a year and a half,
22   correct?
23   A   Let me look at my note to answer that question,
24   about seven.  I am sorry.  My notes have gotten a little
25   bit disorganized here.  Hold on a second.  Give me a

Page 139

1    minute.  I'm sorry.  Here it is.  I had one, two, three,
2    four, five, six -- six -- I personally had six
3    interactions with her.
4    Q   Okay.  And that was in just a little over a year
5    and a few months, right?
6    A   Yeah.  A year and five months, four or five
7    months.  So call it --
8    Q   During that time -- so during the time you would
9    have had interactions with well over 1500 other
10   patients, correct?
11   A   Absolutely.  A lot of patients.  Whether it is
12   1500, but yes, many patients.
13   Q   Okay.  And you went over a consultation note.
14   There is a note in your records of a phone call with
15   Ms. Tonya Meister, one of Ms. Major's attorneys, back on
16   November 7th, 2018, correct?
17   A   Yes.
18   Q   Okay.  Was that the first time you were contacted
19   by any of Ms. Major's attorneys?
20   A   I think I was contacted by her office, and it
21   took a while to actually get that phone call in place.
22   So whether -- whether she -- I think there was a contact
23   from her or her office to set up a phone call.  So I
24   don't know how many phone calls it took to set that
25   phone call up, but there was just one phone call with

Page 140

1    her.
2    Q   Okay.  You have never had any phone calls with me
3    personally or anyone in my office, correct?
4    A   That is correct.
5        MR. DRURY:  Objection.
6    BY MR. PELAEZ:
7    Q   What was the answer?
8    A   The answer --
9        MR. DRURY:  Objection.
10       THE DEPONENT:  Okay.  Well, he is objecting.  But
11   my answer is that is right.
12   BY MR. PELAEZ:
13   Q   Okay.  And when you spoke with Ms. Major's
14   counsel, her attorneys, did they advise you that, you
15   know, that you should be paid for your time here today
16   at this deposition?
17   A   Nobody has talked to me about payment except for
18   you gentlemen here.  Let me just say it's five minutes
19   of 6:00.  I have a patient at 6:00.  I will go before
20   then.  So please wrap this up.
21   Q   We're on it.  So there has been no discussion
22   previously about compensation for your time her today,
23   correct?
24   A   I was unaware of compensation for my time.  Of
25   course, like anybody, I would love to be compensated for

Page 141

1    this.  I don't know if Kaiser operates like that for a
2    deposition.
3    Q   Have you heard -- do you know what a personality
4    assessment inventory is?
5    A   Say it again.
6    Q   Do you know what a personality assessment
7    inventory is?
8    A   Yes.
9    Q   What is your understanding of what that is?
10   A   It's a personality -- it's a psychological test.
11   Q   Are you -- strike that.  Are you qualified to
12   administer the personality assessment inventory to
13   patients?
14   A   No.
15   Q   Do you know what the personality assessment
16   inventory tests for specifically?
17   A   No.
18   Q   Do you know what the Trauma Symptom Inventory 2
19   is?
20       THE REPORTER:  One more time, please.
21   BY MR. PELAEZ:
22   Q   The Trauma Symptom Inventory 2.
23   A   No.
24   Q   Do you know what that is?
25   A   No.

36 (Pages 138 - 141)

Page 142

1    Q   Okay. Do you know what the SIMS test is?
2    A   SIMS?
3    Q   Yes.
4    A   No. SIMS?
5    BY THE REPORTER: S-I-M-M-S?
6    Q   Do you know what the Beck Depression Inventory 2
7    is?
8    A   Yes.
9    Q   What is that?
10    A   That's a depression scale. It's -- it's like
11    the -- it measures like what the PHQ9 measures, but it
12    is a slightly different measurement tool.
13    Q   Are you qualified to administer the Beck
14    Depression Inventory 2 test?
15    A   Yes.
16    Q   Did you administer the Beck Depression Inventory
17    2 test to Ms. Major at any point in time?
18    A   We don't use that here. We use the PHQ9.
19    Q   So you never administered that test to her,
20    correct?
21    A   No. We don't use that at Kaiser. But that's not
22    about me and -- or this patient. It's about Kaiser, the
23    employer that I work with.
24    Q   Okay. Do you know what the Beck Anxiety
25    Inventory test is?

Page 143

1    A   No, but I could imagine what it is. I mean, I
2    haven't seen that particularly, but I imagine. And I
3    use other ones by David Burns. I told you I work with
4    David Burns. He makes some as well, but I haven't used
5    that one. But there are lots of tools a therapist can
6    use.
7    Q   But you don't use that specific one, correct?
8    A   No. I don't.
9        MR. PELAEZ: Making sure, I think I am done, sir.
10    I have nothing further for you.
11              RE-EXAMINATION
12    BY MR. DRURY:
13    Q   Okay. Mr. Vander Clute?
14    A   Yes, sir.
15    Q   I have two very quick questions. Do you have any
16    recommendation for the future for Charlene Major?
17        MR. PELAEZ: Objection. Form.
18        THE DEPONENT: Well, what is today, the 19th? My
19    recommendation, she's not in treatment right now. My
20    recommendation is for her to get back into treatment, or
21    maybe she is in treatment with somebody, but it's to be
22    in treatment with somebody, not me. It's not with me
23    right now. So that would be my recommendation for that.
24    BY MR. DRURY:
25    Q   How long do you think she would need that

Page 144

1    treatment in the future?
2    A   You know, I haven't seen her in a while, so it's
3    hard to say, but I would say -- I would say six months,
4    at least six months, depending on how she's doing.
5    Q   Okay. And Mr. Pelaez had asked you some
6    questions about your opinions and your prognosis. Do
7    you base your -- let me just ask it about this
8    deposition. Have all of the opinions that you have
9    given in this deposition been based on your experience,
10    training and knowledge as a licensed clinical social
11    worker?
12    A   Yes.
13        MR. PELAEZ: Object to form.
14    BY MR. DRURY:
15    Q   Okay. Does that include your opinion regarding
16    the prognosis for Charlene Major?
17        MR. PELAEZ: Objection. Form.
18        THE DEPONENT: Yes. I think the answer to that
19    is yes, yeah.
20        MR. DRURY: Okay. I have no further questions.
21        Mr. Pelaez, I assume you don't have any more
22    either, right?
23        MR. PELAEZ: No, we're done.
24        MR. DRURY: Okay. So, Mr. Vander Clute, you have
25    the right to read and sign your deposition. It just

Page 145

1    means that if you want to take a look at it to make sure
2    that the court reporter typed up all your answers
3    correctly then you have the right to do that. You can
4    waive that right. A lot of doctors and psychologists
5    and so forth, they waive that. But it's your right to
6    read it if you want to and to make sure that it's all
7    accurate. What would you like to do? It is entirely up
8    to you.
9    A   Sure, I'd like the read it. Why not?
10    Q   Okay. So I am going to order an expedited
11    transcript, Madam Court Reporter. Do you have my
12    information?
13        THE REPORTER: Yes, I do.
14        MR. DRURY: Excellent. So if I could get -- if I
15    could get it by the day after tomorrow, that would be
16    great. And I'll also order the video.
17        THE REPORTER: And did you need a copy as well,
18    Mr. Drury?
19        MR. PELAEZ: That was Mr. Drury.
20        THE REPORTER: I'm sorry. I meant Mr. Pelaez, of
21    course. Victor, did you need a copy?
22        MR. PELAEZ: Yes. We'll take a copy.
23        THE REPORTER: Did you need the expedite?
24        MR. DRURY: All right. Thanks, everybody, and
25    thank you very much for your time, Mr. Vander Clute, we

Veritext Legal Solutions

800-726-7007                                                    305-376-8800

Page 146

1  appreciate it.
2      THE DEPONENT:  Let me ask you a question.
3      THE REPORTER:  Are we on the record?
4      THE DEPONENT:  You guys mentioned compensation.
5  Are you -- is that something that you normally do for
6  doctors at Kaiser?
7      MR. PELAEZ:  Yes.  So we have made arrangements
8  with Kaiser, obviously, for your deposition to be taken.
9  And you are entitled to the fee that Kaiser charges for
10  your time.  I think you mentioned that you don't know
11  exactly what Kaiser charges for your time.
12      THE DEPONENT:  Well, I know what Kaiser pays me.
13  I know what Kaiser pays me.  But I didn't know I was
14  supposed to get any money besides what I am already
15  getting paid by Kaiser.
16      MR. DRURY:  We'll be making the payment to Kaiser
17  because that is who the arrangements were made with.
18      THE DEPONENT:  Okay.
19      MR. DRURY:  So it looks like it will be -- looks
20  like it will be approximately four hours of time.  And
21  it's almost 9:00 p.m. here.  So I think we are here on
22  the record for four hours.  So it will be four hours of
23  time paid to Kaiser Permanente for your time.
24      THE DEPONENT:  I got it.  So they'll just pay me
25  what they always pay me anyway.  So this is between you

Page 147

1  and Kaiser.  Okay.  That is fine.  I got it.  Well, good
2  luck with the case to both of you, and let's hope that
3  she's okay.
4      THE REPORTER:  Victor, do you need an expedite?
5      MR. PELAEZ:  Yes.
6      THE VIDEOGRAPHER:  Thank you.  Conclude?
7      MR. PELAEZ:  Signing off.
8      THE VIDEOGRAPHER:  This concludes today's
9  deposition of Edward Carl Vander Clute.  Total number of
10  media used is three.  Going off the record at 5:58 p.m.
11
12          (TIME NOTED: 5:58 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 148

1
2
3      I, CARL EDWARD VANDER CLUTE, do hereby declare
4  under penalty of perjury that I have read the foregoing
5  transcript; that I have made any corrections as appear
6  noted, in ink, initialed by me, or attached hereto; that
7  my testimony as contained herein, as corrected, is true
8  and correct.
9      EXECUTED this _____ day of _____,
10  2019, at _____, _____.
11      (City)              (State)
12
13
14
15      _____
16      CARL EDWARD VANDER CLUTE
17      VOLUME I
18
19
20
21
22
23
24
25

Page 149

1      I, the undersigned, a Certified Shorthand
2  Reporter of the State of California, do hereby
3  certify:
4          That the foregoing proceedings were taken
5  before me at the time and place herein set forth;
6  that any witnesses in the foregoing proceedings,
7  prior to testifying, were administered an oath; that
8  a record of the proceedings was made by me using
9  machine shorthand which was thereafter transcribed
10  under my direction; that the foregoing transcript is
11  a true record of the testimony given.
12          Further, that if the foregoing pertains to
13  the original transcript of a deposition in a Federal
14  Case, before completion of the proceedings, review
15  of the transcript [ ] was [ ] was not requested.
16          I further certify I am neither financially
17  interested in the action nor a relative or employee
18  of any attorney or any party to this action.
19          IN WITNESS WHEREOF, I have this date
20  subscribed my name.
21
22  Dated: _____
23          <%signature%>
24          JOANNA BROADWELL
25          CSR No. 10959

38 (Pages 146 - 149)

Page 150

```
 1        VERITEXT LEGAL SOLUTIONS
            One Biscayne Tower, Suite 2250
 2          2 South Biscayne Boulevard
              Miami, Florida 33131
 3              305-376-8800
 4  3/6/2019
 5  VICTOR J. PELAEZ
    MASE MEBANE & BRIGGS, P.A.
 6  2601 South Bayshore Drive, Ste. 800
    Miami, Florida  33133
 7  vpelaez@maselaw.com
 8  RE: Charlene Major -vs- Carnival Corporation
 9  Dear Mr. Pelaez,
10  With reference to the deposition of Edward C. Vander Clute
    taken on 3/5/2019 in connection with the above-captioned
11  case, please be advised that the transcript of the
    deposition has been completed and is awaiting
12  signature.
13  Please have your client read the transcript and complete
    the errata page. Upon completion, please send the signed
14  errata to our office at Two South Biscayne Blvd., Ste. 2250,
    Miami, FL, 33131, or email it to litsup-fla@veritext.com.
15
    If this is not taken care of, however, within the
16  next 30 days, we shall conclude that the reading
    and signing of the deposition has been waived and
17  the original, which has already been forwarded to
    the ordering attorney, may be filed with the Clerk
18  of the Court without further notice.
19  Sincerely,
20
21  Production Department
    Veritext Florida
22
23
24
25
```

Page 151

```
 1        ERRATA SHEET
 2  RE    : Major, Charlene v. Carnival Corporation
    DEPO OF: Edward Carl Vander Clute , LCSW
 3  TAKEN : 3/5/2019
    JOB# 3244636
 4  DO NOT WRITE ON TRANSCRIPT, ENTER ANY CHANGES HERE
 5  Page #| Line #|  Change        |  Reason
 6  _____|_____|_____|_____
 7  _____|_____|_____|_____
 8  _____|_____|_____|_____
 9  _____|_____|_____|_____
10  _____|_____|_____|_____
11  _____|_____|_____|_____
12  _____|_____|_____|_____
13  _____|_____|_____|_____
14  _____|_____|_____|_____
15  _____|_____|_____|_____
16  _____|_____|_____|_____
17  _____|_____|_____|_____
18  _____|_____|_____|_____
19  _____|_____|_____|_____
20  _____|_____|_____|_____
21  State of Florida    )
    County of Dade      )
22
    Under penalties of perjury, I declare that I have
23  read my deposition transcript, and it is true and
    correct subject to any changes in form or
24  substance entered here.

25  Date        WITNESS NAME
```

39 (Pages 150 - 151)

**&**

**&**   3:4,13 150:5

**1**

**1**   1:25 4:12 13:3,6
  13:19
**10**   4:24 24:25 25:14
  73:17,19,23 74:10
  74:20 79:9 82:11
  84:2,11,24 86:10
  87:7 98:22 108:10
  137:20
**10959**   1:22 2:18
  149:25
**11**   4:25 44:23 46:15
  49:13 87:22 88:5,8
  88:13 113:4 115:8
**11/5/2018**   74:4
**11th**   42:13,15
  43:11 45:17 46:24
  47:6,16 48:14
  114:4,6,7 115:2
**12th**   37:18
**13**   4:13,14 55:16
  122:23
**13th**   49:20 50:9,23
  53:14 55:11,12
**14**   4:16
**143**   4:7
**1440**   138:10
**149**   1:25
**14th**   54:2 55:13
  58:21 124:11
**15**   76:24 116:13
  118:20
**150**   119:8
**1500**   139:9,12
**17**   47:11
**18**   61:1,14
**18-21914**   1:5 2:5
  5:18

**18th**   54:5,6 60:16
  60:22 62:17 64:3
  65:9
**19**   11:18
**1987**   8:6
**1995**   8:11 10:9 11:4
  16:23
**1999**   10:15 11:20
  11:21,22,23 93:17
  93:19
**19th**   143:18

**2**

**2**   4:14 13:23 14:2
  37:3,5 141:18,22
  142:6,14,17 150:2
**20**   24:25 25:14
  44:12 76:24 88:23
  88:23 98:22 108:10
**200**   23:2
**2000**   9:15 11:19
**2013**   41:15
**2015**   9:16
**2016**   21:13,16,19
**2017**   9:16 17:17,18
  18:17 20:12,14
  21:21,25 24:4
  25:18 32:4 33:4
  34:1 36:8 42:13,16
  43:11 44:23 45:17
  46:15,24 47:6,16
  47:23 48:14 50:9
  50:23 51:1,16
  53:14 54:2 55:16
  57:15 58:21 60:16
  60:22 61:1,15
  62:17 64:3 65:9
  79:19,22 81:7 82:5
  90:14 93:24 95:11
  95:21 96:3,22
  97:14 98:21 99:10
  102:20 103:2,7

**104:**4,21 106:3
  107:21 113:4 115:8
  120:5,22 122:23
  124:11 129:1
  138:18
**2018**   37:18,18,18
  37:19,19 65:19
  66:4,12 67:13
  68:20 70:23 73:8
  73:12,14,24 74:17
  75:17,18 76:3
  79:11,25 80:1,24
  81:6,9,17,19 82:1
  82:14 83:1 85:5,10
  85:17 86:11 87:16
  87:19 88:1,17
  90:14 120:12,24
  129:25 130:1,13
  131:4 138:19
  139:16
**2019**   1:13 2:16 5:2
  5:6 148:10
**20th**   24:3 73:8
**2250**   150:1,14
**22nd**   107:21
**23**   35:24 100:15
**24**   66:15
**25**   78:14
**2601**   3:16 150:6
**2665**   3:7
**27**   11:22 100:14,15
**27th**   11:20,23
**28th**   18:17 20:12
  21:25 24:4 25:17
  32:4 33:4,16 34:1
  36:8 41:15 79:19
  95:11,21 96:3,22
  97:14 98:21 99:9
  102:14,19 103:2
  104:4 114:6,7
  115:2 120:5,22

**121:**5 129:1 138:18
  138:18
**2:15**   2:15 5:3,6
**2b**   3:7
**2nd**   37:19 57:1
  71:8 121:4,5,6

**3**

**3**   4:15 14:19,23
  15:8
**3/5/2019**   150:10
  151:3
**3/6/2019**   150:4
**30**   88:23,24 138:4,5
  138:10 150:16
**305**   3:9,18
**305-376-8800**
  150:3
**30th**   37:19 65:19
  66:4,12 67:12
  68:20 70:23 73:12
  75:17,24 82:5
  129:25
**32**   4:17
**3244636**   1:23 151:3
**33131**   150:2,14
**33133**   3:8,17 150:6
**36**   66:15,23
**374-1920**   3:9
**377-3770**   3:18
**3:13**   43:3,4
**3:21**   43:5,7

**4**

**4**   4:17 32:16,19
  33:2 137:19
**4141**   2:13 5:19 6:23
**45**   24:6,7
**48**   138:5,10
**4:30**   92:19
**4:34**   92:3

**4:50**   103:20,21
**4:55**   103:22,24

**5**

**5**   1:13 2:16 4:18 5:2
   37:18 42:16 43:10
   48:15 54:8,19 55:2
   113:4 137:12
**50**   4:18 9:3
**500**   78:19 89:12
   90:9 137:16
**52**   26:9
**53**   21:20
**54**   4:19
**55**   119:7
**56**   4:21
**5:00**   92:3,16 115:22
**5:15**   92:17 115:23
   116:7,10
**5:16**   119:23,24
**5:19**   119:25 120:2
**5:58**   2:16 147:10,12
**5th**   5:6 37:18 71:7
   71:11 73:13,24
   74:17 75:18,24
   76:3 79:11 80:1,23
   81:9,17,19 82:1,6
   82:14 83:1 85:5,10
   85:17 86:11 120:12
   120:23 130:1,13
   131:3 138:19

**6**

**6**   4:5,19 49:24 50:2
   50:7 54:9,15,24
   55:4,10
**60**   4:22
**600**   78:19 90:9
   137:12
**65**   4:23
**6500**   78:22

**6:00**   140:19,19

**7**

**7**   4:20 56:1,12,14
   56:19 58:19
**73**   4:24
**7:30**   92:18
**7th**   87:16,19,25
   88:17 139:16

**8**

**8**   4:22 60:9,12 65:7
**800**   3:16 150:6
**88**   4:25
**8th**   117:20

**9**

**9**   4:23 65:21,24
   66:3 73:6
**92**   4:6
**94118**   5:20
**9:00**   146:21

**a**

**ability**   23:14
**able**   28:3,4,6 35:16
   42:2 63:6 68:7
   69:10 90:1,3,5
   93:10 99:13 112:22
   113:16,23 114:19
**absolutely**   7:24
   19:5 21:12 22:3,6
   23:19,21 26:24
   29:17,17 31:9,21
   33:7,20 36:9 38:24
   38:25 44:1 45:1,8
   46:10 50:13 52:10
   59:16 69:15 72:3
   76:5 79:6 88:7
   89:23 96:7 107:8
   111:20 125:3
   139:11

**abuse**   27:5,7 29:1
   107:6 126:21,24
**abused**   20:17,18
   29:1 40:15
**acceptable**   118:21
**accepted**   56:24
**accident**   21:17 25:3
   25:24 28:18,18
   32:7 37:10 57:7
   98:2 127:14 128:2
   129:3
**accommodate**
   118:18
**accuracy**   60:5
**accurate**   33:3
   43:10 50:8 55:15
   58:20 65:8 66:3
   73:23 74:8 78:24
   80:5 82:13 88:15
   126:8 145:7
**accurately**   83:7
**achieving**   17:25
**action**   5:25 149:17
   149:18
**actively**   129:2
**activities**   52:6
**actor**   112:25,25
**actual**   105:13,19
   108:6 137:3,21
   138:14
**acute**   72:12
**add**   35:25
**address**   94:2
**addresses**   64:17
**adds**   137:16
**administer**   141:12
   142:13,16
**administered**   6:12
   99:9 142:19 149:7
**administration**
   77:11

**adolescent**   11:25
   11:25
**adult**   12:22
**advanced**   83:13
**advice**   72:1,5,11
   120:24
**advise**   140:14
**advised**   150:11
**advocating**   52:9
**affect**   42:7 48:8,8
   113:19 114:21
   115:4 131:12,17,22
**affiliations**   6:2
**afraid**   26:7,7,14,15
   44:2 67:16,19 76:7
   76:10,19 77:7
   109:21 113:7,13,25
   114:5,18 122:7
   133:17,21
**africa**   40:6 105:3
**afternoon**   5:5
**age**   21:20
**aggressive**   123:11
**ago**   16:2 48:12 73:1
   73:2,2 89:13 108:4
**agoraphobia**   67:19
   67:19
**agoraphobic**   76:19
   85:24
**agree**   5:12 70:14
   99:5 113:24 122:14
   122:18 127:22
   134:12,16
**agreed**   118:2
   128:25
**ahead**   122:8 134:3
**alcohol**   12:20 19:13
   19:25 94:7 108:12
   108:18,22
**alert**   68:21

[alienated - attributed]                                        Page 154

alienated  28:2
alleged  125:11,19
  127:12
allow  129:17
allowed  23:9,12
  26:4
alluded  42:5
amhurst  7:19
amount  115:25
anhedonia  20:25
  27:15 34:10 96:1
  111:2
anniversary  67:22
answer  23:21 31:7
  31:9,25 32:1 36:3
  39:18,19 41:11
  60:4 61:2,16 63:17
  71:22 75:22 78:9
  78:18,18,24 82:8
  82:13 83:5,7,11
  97:21 98:6,8,11
  99:6,7,18 102:2,10
  106:20,21 108:14
  108:20 114:3,25
  121:13 126:20
  130:6 132:13,19
  138:14,23 140:7,8
  140:11 144:18
answered  11:11,11
  58:1 101:25
answering  133:11
answers  71:15
  85:19 145:2
antecedent  20:8
  21:10,22
antianxiety  24:24
anxiety  8:19,22
  9:12 12:18 19:13
  24:17,25 25:10,16
  35:14 38:13 64:18
  67:10 94:6,11,24

95:3,4,16 98:23
  99:5 122:14 142:24
anxious  35:15
  51:13
anybody  20:23
  28:25 78:3 140:25
anymore  40:11
anyway  146:25
apart  25:1
apparently  22:19
  58:8 68:9 77:17
  83:20 103:10 107:9
  131:9 136:21
appear  110:7,19
  148:5
appearances  3:1
  6:2
appeared  110:18
appetite  34:11 35:7
  76:23 86:4
applicable  78:2
application  60:5
applies  35:24
  133:19 136:5
apply  28:23 94:17
  136:24
applying  72:1,4,5
appointment  49:19
  60:19 71:21,23
  73:24 79:10 115:23
  116:9
appointments
  49:22
appreciate  14:15
  117:18 146:1
appropriately
  112:2
approximate  17:15
approximately
  146:20

april  9:15 10:15
  37:19,19 93:17
areas  9:10
arose  122:19
arrangements
  146:7,17
arrived  119:14
article  17:11,12,14
  18:1,2
articles  17:21,23
asked  17:1,5 19:2
  61:7 66:17 83:6
  92:6 96:10 108:9
  109:10 110:12,24
  130:7 137:1 144:5
asking  16:11,16
  48:11 82:13 83:4
  89:5 92:8 132:1
  133:9,10 136:12
asleep  35:5,5
ass  22:22 77:23
  86:19
assault  23:11 25:21
  26:1 29:12 32:9,13
  47:21 48:1 53:20
  57:6,14,21 61:23
  62:7,22 63:1,12
  76:17 85:22,23
  90:22 106:23
  126:13 128:10
assaulted  20:14
  22:10,23 26:12
  27:6 28:25 61:22
  61:25 62:11 63:14
  86:16 103:4 104:21
  104:23 105:1 123:8
  124:20 130:14
  131:7,11,17,21
  132:15 133:2,23
assaulting  22:13
  77:23

assaults  106:12
assess  19:3 110:20
assessing  23:17
assessment  19:7,17
  36:6 43:15,23
  60:21,24 61:13
  64:2 66:12 111:12
  115:4 132:10 133:4
  141:4,6,12,15
assisted  89:20 90:7
associated  108:18
assume  102:11
  144:21
assuming  50:14
assumption  109:13
  110:22
attached  13:7,24
  14:20 32:20 50:3
  54:16 56:15 60:13
  65:25 73:20 88:9
  148:6
attempt  63:8,9,11
  63:13
attend  46:18 71:6
  83:19 120:7,11
attended  37:23
  38:1 51:1 52:13,14
  61:20 63:15 74:25
  122:24
attends  75:11
attention  30:22
attentive  84:25
attorney  3:6,15
  10:21 87:21 104:22
  111:15 149:18
  150:17
attorneys  139:15
  139:19 140:14
attribute  121:4
attributed  44:3

**audio**  5:11,11
**august**  17:18
**authentic**  38:22
  39:12,14,17,20,24
  40:11,21 45:18,21
  45:24 46:9 49:5,8
  58:23 65:8,11 73:7
  74:10 79:9,13 85:7
  87:8,11
**authenticate**  49:3
**authenticated**
  54:19,21
**authenticity**  17:13
  17:25 90:25
**awaiting**  150:11
**aware**  97:14

**b**

**b.a.**  8:6
**back**  11:19 20:1
  22:14,21,22 23:3
  27:6 29:22 30:6,6
  36:24 40:6 41:25
  42:2 43:6 46:21
  52:21 53:10 54:18
  54:23 61:7,10
  64:20 77:21 84:20
  86:17 103:7,9,23
  105:3 106:5 108:2
  116:9 120:1,5
  123:7 131:16
  136:19 139:15
  143:20
**backaches**  21:18
**background**  7:11
  136:7,20
**bad**  21:2
**badly**  27:17 28:7
  34:13 35:7
**balance**  9:7
**ball**  83:8

**bar**  10:24
**barely**  77:1,2 82:22
  86:5,5
**base**  106:21 144:7
**based**  32:7 36:25
  43:17 64:2 82:3
  84:11 92:5 107:13
  110:19 111:17
  125:1,10,18 127:7
  128:19 129:13
  144:9
**basically**  19:17
  27:21 28:13 51:6
  56:22 66:19 67:7
  89:5 105:4 129:12
**basis**  12:15 105:25
  118:5
**bathroom**  42:24
**bayshore**  3:7,16
  150:6
**bear**  72:25 80:8
**beat**  22:22 26:1,3
  28:24 77:22 86:18
**beck**  142:6,13,16
  142:24
**becoming**  51:14
**began**  27:25 28:2,6
  134:6
**beginning**  2:15
  43:7 93:21 103:24
**behalf**  2:13 6:5
**behavioral**  8:1,15
  8:17,18,25 10:11
  12:21 17:12
**beings**  125:22
**belief**  124:25
**believable**  40:12,21
  112:5
**believe**  26:9 39:16
  39:18,23 41:2
  44:19 45:23 48:1

  51:3 55:5 57:23
  58:1 64:10 71:9
  75:6 95:20 99:1,2
  107:21 108:8
  110:11 111:24
  115:18 117:18
  120:9 124:17
  129:25 130:11
**believed**  59:20
  127:24
**believing**  105:25
**belong**  135:20
**benefit**  7:11 8:16
  38:6
**best**  16:19 32:1
  69:7 72:7 82:8
  84:20 121:21
  137:22
**better**  83:17 125:7
  135:7,23 138:14
**beyond**  118:13
**bills**  28:5
**biscayne**  150:1,2
  150:14
**bit**  92:7 108:9
  138:25
**bitch**  22:20 40:6
  77:20 86:18 105:3
**black**  22:19,21 26:3
  26:19 40:6 77:20
  77:21,22 83:2
  86:17,18,19 123:20
  123:25 124:17
  133:23 134:2,5,10
  135:7,11
**blackened**  22:15
  104:25 106:6
**blanks**  94:14
**blvd**  150:14
**body**  40:19 48:9
  111:18 123:9

**bottom**  115:9
**boulevard**  5:19
  6:23 150:2
**brand**  24:18,21
**brandon**  3:20 5:21
**break**  42:17,19,22
  103:16
**briggs**  3:13 150:5
**bring**  19:19
**brings**  20:6,7,8
**broadcast**  16:6
**broadwell**  1:21
  2:17 5:23 149:24
**brother**  21:14,19
  25:2 32:7 47:10
  57:9 98:1 122:20
**brother's**  67:22
**brought**  17:23 21:4
**brutal**  86:20
**brutally**  22:23
  130:14 131:7,21
**built**  101:10,22
  102:8
**burns**  7:25 8:15 9:3
  9:14 143:3,4
**business**  33:8,10,22
  48:16 49:4,5,8
  50:11 55:20,21
  58:24,24 65:11
  66:7,7 73:7 74:11
  74:12 77:19 79:13
  79:14 87:11
**buy**  44:11
**bystander**  124:22
  125:1

**c**

**c**  18:6 150:10
**cabin**  86:23
**calculator**  138:6
**california**  1:12
  2:15 5:2,20 6:24

10:6,14,17,23,24
12:1,2,4,5 41:21
68:4 92:3,19 93:14
149:2
**call** 20:21 23:8
55:16 77:25 86:23
86:25 87:16,20
89:1 111:11 117:22
119:13 139:7,14,21
139:23,25,25
**called** 11:7,8 17:11
22:10,12,19 26:2
27:9 34:19 36:1
40:5 50:17 64:16
99:8 104:24 105:2
123:6
**calling** 18:10 77:20
**calls** 139:24 140:2
**calm** 112:3
**calmer** 112:4
**camera** 54:14
**campus** 5:19
**capacity** 16:17
**captioned** 150:10
**car** 21:17,17 25:3
25:23 28:17,18
32:7 37:10 57:7
98:2 127:14 128:1
**care** 19:22 21:13,14
28:5 41:24 102:23
113:22 150:15
**career** 12:10
**carl** 1:11 2:12 4:3
5:15 6:11,21
103:25 147:9 148:3
148:16 151:2
**carnival** 1:6 2:6
5:16 6:6 20:14
21:22 22:1,9 29:21
31:3 32:9,11,14
37:10 42:1 44:20

47:4,22 48:1 51:12
53:23 57:15,23
58:8 61:23 62:2,12
62:22 63:1,13,19
63:21 68:11 77:12
77:15 81:15 86:24
87:4 96:24 103:3,8
104:20 106:1 109:1
122:15 128:10,16
128:18 129:2
130:14 131:6 150:8
151:2
**case** 1:5 2:5 5:18
16:10 17:4 20:16
22:18 24:8,23
34:16,17 35:6,24
36:23 39:4 40:16
71:13 84:17 90:12
90:13,18,19 94:25
97:2,5 99:25
105:20 110:20
115:24 125:18,24
127:5 128:14 147:2
149:14 150:11
**caseload** 78:20
**cases** 16:20 34:14
35:21,22 37:8
90:14 97:3,4
115:25 124:21
136:9
**categorize** 81:20
82:16
**category** 29:13
95:17
**cause** 31:18 32:3,5
53:16 125:11,11,18
125:19
**caused** 8:22 20:15
21:18 57:5 127:13
128:1,12

**cell** 5:9
**cellular** 5:8
**center** 11:8,14,25
11:25 12:3,6
**certain** 59:14,21
91:21 94:16 112:22
115:25 121:18,21
135:18
**certainly** 83:13
84:19 108:1 125:21
**certainty** 59:25
**certificate** 9:17
11:3,5
**certifications** 10:1
10:2
**certified** 2:17 149:1
**certify** 149:3,16
**challenge** 9:2,4
**chances** 136:14
**change** 9:2,4,4 18:1
18:1,1 103:12
125:10,17 126:6
128:4 132:7,9
133:3 151:5
**changes** 34:11,11
125:20 151:4,23
**character** 121:24
**charaktery** 17:11
**charge** 28:4 67:25
**charges** 146:9,11
**charlene** 1:4 2:4
5:16 6:4 18:8,9,15
18:16 20:11 27:1
32:3 39:4,24 40:24
41:2 42:12 43:12
43:15 45:18,24
46:15 50:9,23
53:16 55:17 57:11
59:13 60:17,22,25
61:13 62:19 63:25
64:2,11 65:17 66:4

66:12 67:11 68:16
68:20 69:12 70:22
71:2,17 72:4,4,21
73:9,12,24 74:16
74:18 75:17 78:25
79:10,19 80:2,22
81:11,17,21 82:17
82:25 83:16 84:7
85:9 86:11 89:22
90:12,18 93:12
99:24 143:16
144:16 150:8 151:2
**charlene's** 64:3
**chart** 18:11 59:24
75:23 87:16 97:19
130:8 137:7,10
138:15
**charts** 129:16
**check** 50:4 71:25
94:16
**checking** 51:17
**choice** 34:19,20
100:5 111:19
**choked** 105:1 106:5
**choking** 22:15
**chose** 23:2 43:22
**chris** 42:18 118:10
119:5 130:19
**christopher** 3:5 6:3
**chronic** 37:5 56:21
**church** 135:20
**circumstances**
18:18,22 19:19,21
102:17 126:24
**city** 12:8 148:11
**civ** 1:5 2:5 5:18
**claims** 16:12
**class** 52:1,12
**classes** 9:20
**classic** 85:25 86:1
90:24

**clean** 40:17
**clear** 22:18 31:25
40:7,8,13,18,20
41:11 58:4 63:3,18
72:8 78:11 87:3
92:14 95:8 114:15
**clearly** 26:23 34:24
40:1 48:6,9 63:17
71:15 78:19 90:22
**clerk** 150:17
**client** 150:13
**clients** 37:13
**clinic** 122:7
**clinical** 4:20 7:4,8
8:11,12 10:1,4,6,13
11:1 12:11 19:7
38:8,20 43:15,23
60:21,24 61:12
64:2,5,12 66:11,16
78:14 79:1,3 85:4,9
92:25 93:14 128:9
129:15 133:10
144:10
**clinically** 19:3 76:8
**clinician** 46:21
135:8,9
**clinicians** 104:12
**clip** 30:6
**close** 14:25 73:2
**closer** 70:12,16
**closing** 52:8
**clute** 1:11 2:13 4:3
5:15 6:7,11,19,21
15:7 31:16 32:16
38:19 39:16 42:15
43:8,9 49:25 52:16
52:17 53:14 54:9
56:1,9,18 58:19
60:11,16 65:2,3,21
66:2 73:16,22 87:7
88:12 91:10 92:4

92:23 102:13
103:25 104:2 117:1
117:8 118:15,21,25
119:10,11,17,19
120:5,21 125:8
143:13 144:24
145:25 147:9 148:3
148:16 150:10
151:2
**coder** 41:21 68:4
**cognitive** 8:1,15,17
8:18,25 10:11
12:21 17:12
**colleagues** 72:24
73:4
**college** 7:18,19,20
8:5,9 135:20
136:21
**color** 77:7
**combat** 126:11
**combined** 67:10
**come** 15:12,20 36:7
38:25 46:14,21
71:17,18,19,22
104:14 122:7 133:7
137:4
**comfortable**
109:11
**coming** 18:20 21:24
36:11 78:10 83:21
84:16 137:8
**comments** 134:9,10
**commit** 77:9
**common** 129:12
**compared** 82:5
**comparison** 82:7
**compensated**
140:25
**compensation**
140:22,24 146:4

**complaints** 40:25
40:25 41:3 44:22
45:4
**complete** 150:13
**completed** 150:11
**completely** 33:13
111:10,22 112:5,5
113:25
**completion** 149:14
150:13
**complex** 136:25
**component** 29:21
29:21
**computer** 33:6,24
64:19,21 81:3
138:15
**concentrating**
27:18 35:9
**concentration**
34:12 76:22 86:3
**concerns** 109:7
**conclude** 147:6
150:16
**concludes** 147:8
**conclusion** 104:2
**condition** 23:18
25:17 26:17 47:6
90:13 134:13,18
**conditions** 38:23
111:5
**conduct** 93:9
**conducted** 50:20
**conducting** 48:23
**conducts** 94:1
**conference** 2:14
**conferred** 11:5,10
**confident** 60:4
**confirmed** 129:23
**connection** 52:21
52:25 150:10

**consider** 37:3
**consideration**
21:11
**considered** 36:2
**consistent** 40:24
41:1,3 44:23 45:1,5
45:8,9 46:10 64:5,8
64:12 69:12,17,18
70:1,6 79:1 85:10
**consultation** 95:21
96:23 104:3 139:13
**consultations**
108:25 137:22
**consuming** 108:18
**contact** 15:14
84:23 97:16 139:22
**contacted** 87:24
139:18,20
**contain** 101:22
**contained** 148:7
**content** 48:7
**continue** 5:12
49:11 52:22,24
62:25 116:15
118:11,12,13
119:11
**continued** 61:17
81:14
**continuing** 9:20,22
47:9 76:7 80:14
81:11 120:2
**contractor** 102:16
**contribute** 136:3
**contributed** 20:10
**contributing** 47:16
48:2 53:16 57:11
57:22,24 62:18
63:2 81:10
**control** 22:25 35:16
51:6

convenient  37:24
  118:14,14
conversation  51:21
  73:4 86:10 88:17
  89:16
conversations  5:8
  72:24
copd  21:20
cope  51:22
copy  33:3 43:10
  50:8 55:15 58:20
  65:8,8 66:3 73:23
  74:8 79:9 87:8
  88:15 145:17,21,22
cordial  89:16
corporation  1:6 2:6
  5:16 6:6 150:8
  151:2
correct  11:16 33:22
  50:15,20,21 55:4
  68:17 74:6 87:9,21
  88:1,2 90:11 93:1,2
  94:12 95:18,19
  96:2,5,6 97:1,10,11
  98:23 99:10,21
  100:1,16 101:15
  102:17,22 103:4,9
  104:6 105:20 107:3
  107:15,16 108:22
  109:1 110:2,16
  112:16 113:8,12
  114:1 115:10,13,16
  120:7,13,14 122:11
  122:16,21,25
  123:15,18,19
  124:14 125:2 127:8
  128:6 129:3 130:2
  130:3,15 131:8
  132:10,24 133:24
  134:13,18,25
  137:13 138:22

139:10,16 140:3,4
  140:23 142:20
  143:7 148:8 151:23
corrected  148:7
corrections  148:5
correctly  36:10
  145:3
correlating  65:5
counsel  6:1,15 14:6
  87:24 88:4 92:11
  103:11 110:13
  111:21 113:4
  116:17 117:4
  118:18 120:3,9
  121:7 137:1 140:14
counseling  12:23
  115:19
counselor  115:21
country  22:21
  77:21 86:17
county  16:22,24
  151:21
couple  21:20
couples  7:6 12:23
course  31:16 33:9
  33:18 36:7 55:21
  58:24 66:7 71:3,3
  72:18 73:5,5 74:12
  76:3 78:14 79:14
  83:17 112:10,12
  132:7 140:25
  145:21
court  1:1 2:1 5:17
  5:22 13:7,24 14:13
  14:20 16:3,5,6,10
  16:12,13,21 32:20
  50:3 54:16 56:15
  60:13 61:6 65:25
  73:20 88:9 145:2
  145:11 150:18

covered  116:19
cptsd  37:3,5 54:4
create  107:7
created  8:20
credential  10:9,16
credentialed  9:19
  10:22
credentials  11:1
credible  112:1
credits  9:22
crime  26:22,23
  78:11
crimes  26:16 77:9
  77:10 78:6
criteria  104:14
  105:5,6,12,15
  106:10
cross  92:5
cruise  20:14,19
  21:22 22:1,9 23:5,9
  23:13 29:22,23
  31:3 32:9,11,14
  37:10 42:1 44:20
  47:4,22 48:1 51:12
  53:20,24 57:6,15
  57:15,21,23 58:8,9
  58:10 61:23 62:2
  62:12,22 63:1,13
  63:19,21 68:11
  77:12,15 79:22
  81:15 86:25 87:4
  96:24 98:2 103:3,8
  104:20 106:1
  107:14,22 109:1
  110:15 122:16,20
  127:15,15,17 128:2
  128:10,16,18 129:2
  130:14 131:6,8,12
  133:24
crying  51:13

crystal  83:8
csr  1:22 149:25
curious  109:6
current  23:18
  25:17 137:13
currently  6:22
  12:15,23 19:25
customer  117:14
cut  37:22 49:6
  52:16,18 78:11
  123:9
cutoff  117:19
  118:13
cuts  28:20

**d**

d  72:19
d.c.  7:18
dade  151:21
daily  12:15 72:2,5
  72:6
damage  58:5
dark  57:16
date  27:3,4 43:14
  60:25 61:14 64:21
  68:17,24 81:23,24
  87:9,18 95:8 96:7
  116:16 117:5
  149:19 151:25
dated  50:8 58:21
  65:9 115:8 149:22
dates  17:15 89:21
  89:24
daughter  20:19,19
  22:12,24 27:20,23
  44:13 46:7 58:6
  77:5 104:23 131:10
david  7:25 8:14 9:2
  9:14 143:3,4
dawes  72:19,21
  97:20

day   23:8 25:9 33:17
  33:17 34:24,25
  35:2,16,18 48:20
  54:1,3 57:2 74:9
  94:23 96:22 100:7
  107:25 111:19
  133:7 137:18,19
  145:15 148:9
days   34:22,23
  35:10,15 94:22,23
  100:6,7 150:16
dealing   12:18
  25:21
dear   150:9
death   25:3 28:15
  28:21,22 98:1
  105:13,20 127:13
  128:1
deaths   32:7 37:9
  57:8
debate   92:16
december   11:20,20
  11:22,23 21:19
decided   127:24
declare   148:3
  151:22
decrease   46:5
decreased   42:3
  80:23
deeper   62:15
deeply   40:3
defendant   6:5
defendants   1:7 2:7
  3:12
defined   28:15
definitely   25:25
  57:16 79:4
definitively   75:4
degree   8:5,9 10:5
  30:1,16 44:7 59:5
  59:25 91:14 92:24

92:25 101:16,17
delay   121:4
delve   109:20
department   19:1
  150:21
depending   144:4
depends   53:7
  137:19
depo   151:2
deponent   6:7 14:17
  23:21 25:20 29:17
  30:4,7,10,22 31:9
  38:24 39:14 40:1
  41:5 42:23 45:1,8
  45:21 46:1 47:8,19
  48:5 50:4 51:25
  53:19 55:6 57:14
  58:12 59:8,16 60:3
  61:16 62:22 64:8
  64:15 67:16 68:7
  69:15 74:23 76:7
  78:8 79:6 80:7,19
  81:2,14,23 82:19
  83:19 84:10 86:15
  90:3,21 91:18 92:1
  92:8,13,20 101:25
  102:10 105:23
  106:20 107:5
  108:14 109:19
  110:3 112:12,18
  114:3,23,25 115:21
  117:9,12 118:6
  119:1,6,13 121:1
  121:11,20 126:20
  131:15,24 132:12
  133:6 135:2 136:2
  136:17 140:10
  143:18 144:18
  146:2,4,12,18,24
deposed   16:7 84:14

deposition   1:11
  2:12 4:13,16 5:11
  5:15,18 13:4,20
  14:24 15:8,13,16
  15:25 16:2,7 43:8
  89:19 91:13 103:25
  116:16 117:4,21,25
  118:2,11 128:7
  140:16 141:2 144:8
  144:9,25 146:8
  147:9 149:13
  150:10,11,16
  151:23
depressant   34:3
depressed   9:7
  20:25 27:14 34:10
  35:4 47:9 68:25
  69:1,2 76:22 86:2
  100:4 121:23 122:1
  122:5
depression   8:19,21
  9:11 12:18,21,22
  19:12 20:25 24:17
  27:13 35:13,13,19
  38:12 43:19 45:14
  45:15,16 47:13
  64:17 67:8,10
  76:22,25 86:7 94:6
  94:11,20 95:2,4,17
  95:25 99:21 111:2
  112:16 122:19
  142:6,10,14,16
depressive   34:7,9
  34:18 35:18 36:1
  41:8 45:6 47:17,21
  48:3 61:18 62:20
  81:12 82:16 85:11
  86:2 90:25 104:5
derogatory   106:13
  107:2 134:10

describe   21:24 22:2
  112:19
described   16:10
  22:16 33:11 55:23
  59:1 65:13 66:9
  74:13 76:12,14
  77:16,16 79:16
  87:12 130:13
describing   47:2
  77:9 93:24
description   4:11
  23:17
despite   23:8
destroyed   23:14
detail   21:6 96:23
detailed   22:3
details   22:17 98:17
determine   31:17
  32:3 38:20 47:15
  101:10 129:6
diagnose   104:12
diagnoses   34:1
diagnosis   34:7
  44:24 45:2,5 50:17
  59:21 61:17 63:2
  85:10,16 104:4,15
  104:18 106:21
  114:21
diagnostic   104:11
  105:6
diazapam   24:24
  25:13 98:22,25
died   21:19,21
difference   93:3
  127:11,21,22
different   9:3 10:11
  10:21 59:11 60:4
  74:18,19 81:4
  126:22,24 132:6,8
  132:16 133:8,14
  135:9 142:12

[difficult – either]

**difficult**  29:9
  121:25
**difficulties**  19:2
**difficulty**  21:3
  27:13,15,16,17
  34:12 72:13 76:18
  85:23
**digitally**  13:16
**dimond**  3:4
**diploma**  9:18
**direct**  44:3 82:7
  110:11
**directed**  106:7
**direction**  149:10
**directly**  31:4,24
  32:13 44:3,19
**disability**  39:2
**disappointed**  91:2
**discomfort**  109:8
**discovery**  117:19
  118:13
**discussed**  86:15
  89:1 93:22
**discussing**  95:20
  99:13 136:10
**discussion**  85:19
  140:21
**disorder**  28:12,13
  28:14 32:6 34:3,4,6
  34:7 36:13 37:6
  38:12 45:2,6 46:18
  47:17,21 48:3,3
  53:17 56:22 61:18
  61:19 62:19,20
  71:1,7 75:11 76:15
  79:2 81:12,12
  82:16 85:11,12,25
  86:2 90:25 95:23
  104:5,6,15,19
  105:6,17 106:11
  110:14 112:8

124:14,19 125:9,12
  125:15,16 126:12
  126:14 127:13,25
  134:13,17 135:13
  135:25
**disorganized**
  138:25
**distant**  27:21
**distorted**  8:22 9:1
**distress**  67:7 95:23
**district**  1:1,2 2:1,2
  5:17,17
**doc**  129:22
**doctor**  23:1 95:13
  101:20 107:18,23
**doctorate**  93:1
**doctors**  107:17
  134:21,23 145:4
  146:6
**document**  13:9
  33:21
**documentation**
  4:20
**doing**  8:2,13,15
  14:12 35:3 44:8
  49:11,11,14 52:4,4
  68:14 72:7,10
  84:19 89:8 115:24
  117:14 144:4
**domineering**
  123:11
**dominican**  113:18
  113:21 114:10
**donald**  77:7
**doors**  51:17
**doubt**  63:22
**dr**  7:25 8:14 9:2,14
  65:3 72:19,21
  97:20
**dressed**  63:10

**drive**  3:7,16 150:6
**drug**  12:20 19:13
  19:24 94:6
**drunk**  20:18 22:11
  22:24 23:10 51:6
  104:23 123:5,11,11
  124:7,13
**drury**  3:5 4:5,7 6:3
  6:3,18 13:8,17,18
  13:25 14:9,21 15:2
  15:4,6,24 23:23
  29:25 30:12,24
  31:15 32:21 38:18
  39:10,15,22 40:23
  41:13 42:19,21
  43:1 45:3,11,22
  47:14,24 48:13,25
  49:16,17 50:6
  52:15,23 53:3,11
  53:13,25 54:12,17
  54:21,25 55:8 56:5
  56:7,13,17 57:19
  58:18 59:10,18
  60:7,15 62:24 64:9
  66:1 68:15 69:16
  69:23 70:4,14,21
  72:16 73:15,21
  78:12 79:7 80:12
  80:21 81:8,16,25
  82:24 84:5 85:3,15
  86:8 87:6 88:7,11
  90:8,17 91:8,19,25
  92:11 93:21 95:5,7
  101:24 102:9
  105:21 106:18
  107:4 108:13
  109:18 110:4
  112:11,17 114:2,24
  117:8,10,16,25
  118:19 119:9,15
  120:15,19,25

121:19 126:19
  130:20 131:14,23
  132:11 133:5 135:1
  136:1,16 140:5,9
  143:12,24 144:14
  144:20,24 145:14
  145:18,19,24
  146:16,19
**dsm**  104:8,10,14
  105:7,8,11 106:10
  106:17 107:3
**due**  24:25 98:22
  102:16 110:15
**duplicate**  56:8
**dying**  28:18

**e**

**e**  18:6 72:19
**earlier**  41:6 77:16
  85:18 110:15
  115:18 129:23
**easily**  20:22 27:10
  27:10 29:6 76:16
  85:21
**eating**  44:8 45:13
**edge**  35:15
**education**  7:13
  9:20,22 92:24
  136:22
**educational**  7:11
  136:7,20
**edward**  1:11 2:12
  4:3 5:15 6:7,11,21
  43:8 103:25 147:9
  148:3,16 150:10
  151:2
**effect**  46:6 91:2
  108:21
**efforts**  83:16
**eight**  94:19 129:18
**either**  29:12 51:6
  101:21 102:7 125:3

127:13 144:22
**elaboration** 45:9
**elders** 12:6
**element** 125:25
**elizabeth** 72:19
**email** 150:14
**emotionally** 106:8
**empathy** 125:21
**employed** 7:7
11:23 129:5
**employee** 149:17
**employer** 142:23
**employment** 20:4
94:7 102:15
**employments**
11:24
**encounter** 113:5
131:4
**encourage** 98:3
**endured** 47:22
**energy** 21:3 27:18
34:13 35:7 76:23
86:3 96:1 111:3
**enjoy** 23:15
**enjoying** 34:12
**entail** 19:8 37:2
**enter** 56:23 151:4
**entered** 151:24
**entire** 83:10 111:11
117:3
**entirely** 145:7
**entitled** 117:11
146:9
**environment**
135:21
**episode** 34:4,7,9
35:18,20 36:2
**episodes** 35:21
**equipped** 83:10
**errata** 150:13,14
151:1

**especially** 109:19
110:1
**esteem** 42:4
**estimate** 92:9
110:17 137:23
**eval** 38:4,5,7
**evaluate** 38:10
107:18
**evaluated** 107:22
120:6
**evaluation** 36:15
38:4 64:5,13
**evening** 23:4
**event** 20:20 29:4,5
48:10 55:22 58:4
87:12
**events** 59:1 65:13
66:9 74:13 79:16
**everybody** 14:15
42:22 133:19
145:24
**evidence** 48:10
63:15 75:5
**exacerbate** 124:23
**exacerbated** 25:25
42:9 51:9 62:3
63:20 124:13,18
**exacerbating** 26:17
39:3
**exactly** 10:24 28:12
33:5,5,7 37:1,11
41:6,9 43:13 50:5
52:1 55:18 93:7,23
97:9 99:13,22
104:17 113:14
123:3,13 146:11
**exaggerating** 46:12
**exam** 10:8 68:16,19
69:12 99:8 115:10
**examination** 4:2
6:17 92:21 93:21

110:11 119:4 120:9
143:11
**examine** 92:5
**examined** 6:12
**exams** 100:19
**excellent** 9:25 13:2
13:17 33:8 145:14
**excited** 29:10
**excuse** 42:1 118:14
121:9 138:18
**executed** 148:9
**exercise** 52:7
**exercises** 52:5
**exhibit** 4:12,14,15
4:17,18,19,20,22
4:23,24,25 13:3,6
13:14,15,19,23
14:2,19,23 15:8
32:16,19 33:2
42:16 43:10 48:15
49:24 50:2,7 54:8,9
54:15,19,24 55:2,4
55:10 56:1,12,14
56:19 58:19 60:9
60:12 65:7,21,24
66:3 73:6,17,19,23
74:10 79:9 86:9
87:7,22 88:5,8,13
113:4
**exhibiting** 69:7
**exhibits** 4:9 13:2,15
15:1
**expedite** 145:23
147:4
**expedited** 145:10
**experience** 34:21
41:11 62:8 77:18
78:3 80:13 110:19
132:14,15,17,18
144:9

**experienced** 26:10
27:11 32:13 34:21
34:22 40:9 57:7,8
100:6 126:1 129:18
**experiencing** 27:8
35:1,14 65:6 81:21
82:17 96:12,12,13
111:4
**expertise** 100:23
111:13
**explain** 100:25
132:22
**explained** 44:8
104:22
**explaining** 57:4
77:2
**exposed** 105:19,23
106:1
**exposure** 105:13
**expressed** 108:24
109:7
**expressing** 69:1
**expression** 111:17
111:23
**extending** 71:12
**extent** 24:5
**extremely** 24:20
53:22 112:24,25
122:5
**eye** 22:15 26:3
104:24 106:6
**eyewitness** 125:7
**eyewitnesses** 125:6

**f**

**fabricating** 46:12
**face** 22:14 105:2
106:5 111:25
**facial** 111:17,23
**facility** 74:19
**fact** 15:22 25:23
41:20,22 48:5 58:7

[fact - form]

84:13 89:12 114:13
114:18 125:25
128:19
**factor** 47:16,19
48:2 57:11,17,22
57:24 62:18 63:2
81:10 106:22
128:11 136:24
**factors** 20:8 21:10
21:22 25:2,21
39:23 45:23 47:2
57:4 58:12 68:8
71:12 135:12,14,15
135:19 136:13
**facts** 47:25 85:16
91:21 132:6,8
**failure** 35:8
**fair** 11:13 15:24,24
69:6,8 98:16,19
119:16,17 121:4
126:18
**fall** 29:13
**falling** 35:4
**false** 131:20
**familiar** 98:17
104:8 105:5,14
**family** 12:19 19:15
19:16 20:2,3 24:20
27:24,25 28:2,8,24
28:25 35:9 42:5
44:2 46:8 51:18
63:7 68:1 86:6 91:4
94:6 102:17,24
113:7,17,18 135:21
136:6,18
**far** 102:13
**fashion** 69:2
104:21
**father** 21:13,15,21
22:20 32:8 41:24
47:3,5,9,11 57:9

77:20 98:1 122:19
**father's** 25:3
**fear** 26:10 108:25
109:16 113:12
132:23 133:15
134:5
**feared** 26:11 76:11
**fearful** 51:15
**fears** 76:19 109:19
**february** 21:21
37:18,18 71:7,11
120:12,23
**federal** 149:13
**fee** 117:11 118:1,4
118:8,23,25 146:9
**feel** 27:7 28:2,7
40:10 68:8 83:10
99:12
**feeling** 21:2,2 27:16
29:23 34:13 35:4,6
35:7,15,17 42:9
51:12 63:16 76:19
76:22 85:24 86:3
**feelings** 134:5
**fell** 21:19 123:9,11
123:12
**felt** 23:13 29:21
42:7 58:7 68:2 84:6
87:3 109:11
**field** 100:23
**fifth** 84:12
**fight** 28:20
**figure** 138:7
**figured** 138:2
**filed** 5:16 150:17
**fill** 66:16 94:14
**filled** 19:10 34:17
65:5 93:22 95:15
**fills** 64:16 94:1,8,20
**final** 87:15

**financially** 5:25
149:16
**find** 21:1 39:11
45:17 87:24 137:10
137:11
**finding** 27:16 29:8
29:8
**fine** 15:11 53:2
117:5,6,15 118:17
130:17,20 147:1
**finish** 80:10
**firm** 5:21,23 87:21
**first** 13:22 14:17
16:8 17:24 18:16
19:9 20:1 24:3,15
27:3,4 31:12,13
32:24,24 34:9
38:21 55:3 57:17
61:20,22,23 63:24
79:19 80:25 82:10
103:1,6 109:2
114:9 120:6 129:1
139:18
**five** 12:13,14 36:20
76:24 94:19 137:14
138:20 139:2,6,6
140:18
**fix** 121:9
**fl** 150:14
**fla** 150:14
**flag** 84:22
**flashback** 27:7
**flashbacks** 20:20
27:6 29:4 76:16
85:21 95:24 96:12
110:25
**floor** 7:1
**floors** 7:1
**florida** 1:2 2:2 3:8
3:17 5:18 10:22
44:2 46:8 92:18

113:7,17 150:2,6
150:21 151:21
**focus** 25:25 35:17
69:10 111:2
**focused** 12:11 48:6
68:22
**focusing** 21:3 27:17
29:7 35:9 96:1
**follow** 71:24 92:12
116:19 134:20,24
**followed** 76:20
120:24
**following** 26:12,14
35:2 54:1 71:2,3
72:11 76:12,14,14
76:21 84:3,4 86:1
109:8 121:22
**follows** 6:13 61:11
135:6
**foregoing** 148:4
149:4,6,10,12
**forgive** 73:3
**forgot** 61:7
**form** 23:20 25:19
29:16 30:3,21
31:14 34:19 38:14
38:17 39:6,9,13,25
41:4 44:25 45:7,20
45:25 47:7,18 48:4
51:24 53:18 56:20
57:13 59:7,15 60:2
62:21 64:7,14,17
64:18,19 65:5
67:15 69:14,19,22
69:25 74:22 75:2
76:6 78:7 79:5 80:6
80:18 81:1,3,13,22
82:18,20 83:18
84:9 85:14 86:14
90:16,20 91:17,24
94:18 100:3 105:21

[form - groups]                                                                 Page 163

106:18 107:4
108:13 143:17
144:13,17 151:23
**forth**  145:5 149:5
**forward**  29:9
**forwarded**  150:17
**found**  37:24 95:23
96:9 115:12,15
**four**  66:22 94:19,23
95:3 138:20 139:2
139:6 146:20,22,22
**frame**  114:11
**francisco**  1:12 2:14
5:2,20 6:24 12:5
41:21 68:5
**free**  9:24
**fremont**  12:1,2
**french**  5:19
**friends**  123:7 134:7
135:23
**front**  13:14,15 14:7
22:5 32:16,25 33:6
49:24 53:10 54:8,9
54:24 55:2,4 56:1
60:10 64:21 82:6,8
82:20 88:5,13 89:9
90:7 97:17,23 98:6
105:8 112:23
**fulfillment**  29:9
**full**  6:20 43:22
99:15
**functional**  115:6
**functioned**  42:8
**functioning**  42:3
44:9 45:13,15 46:3
46:5 63:7 77:3 86:5
90:23 91:3 112:20
122:2
**funeral**  67:23
**further**  62:3 63:14
143:10 144:20

149:12,16 150:18
**future**  46:15
143:16 144:1

**g**

**gap**  129:24
**gather**  76:2
**gauge**  99:20
**gds**  66:15,23 67:6,9
101:9,22 102:6
**geary**  2:14 5:19
6:23
**general**  8:24 31:20
44:18 133:17 136:8
136:9
**generally**  59:23
96:19 136:13
**genetically**  24:19
**gentlemen**  119:21
140:18
**gestalt**  10:9 11:4
**getting**  19:21,24
20:2,4,4,5 26:20
71:14 72:13 75:1
121:12,17,23 122:6
122:11 124:3
127:19 129:22
146:15
**give**  7:10 16:19
18:3 32:1 43:24
45:9 49:7 58:10
61:8 77:8 78:24
81:23 82:7,8 87:18
99:6 102:1 126:15
138:14,25
**given**  23:11 29:20
41:24 58:8 77:11
90:10 112:8 125:18
135:19 137:17,22
138:1,12 144:9
149:11

**gives**  100:8 138:10
**giving**  37:12 89:10
**glass**  51:2,7 53:21
122:25 123:4,9,17
124:13 127:17
**global**  67:7
**go**  5:12 13:14 22:21
22:21 26:7 36:12
40:6 41:19,25 42:2
44:1,2 46:8 49:14
56:3 58:2 63:6,8
64:20 67:20 68:21
70:25 71:10 76:8
76:19 77:21,22
86:17,18 92:20,20
94:16 98:4 103:18
105:3 107:7 110:23
113:13,16,17
119:20,21 121:6,10
122:8 131:16
132:18 133:18
134:2 136:19
140:19
**goes**  35:14
**going**  5:5 7:12 13:3
17:22 23:6 24:9
28:1,9 36:11,12,25
41:10 43:3 44:11
46:11,21 48:25
49:2 51:13,19
52:12,12,25 53:4,9
54:10 59:3 65:18
69:3 70:5 71:10
78:1 84:14 86:23
91:10 92:2,17
98:20 99:6 101:5
103:20 108:19
113:12 115:22
116:1,4,12,15,24
117:23 118:3,22
119:22 122:10

123:7 125:23
134:21,22 135:7
137:10 145:10
147:10
**good**  5:5 9:6 30:11
42:18,23 43:1 83:3
103:15 112:24
115:13,15 134:24
136:17,18,23 147:1
**goodness**  9:24
**gosh**  78:17 138:2
**gotten**  22:17 63:10
65:4 138:24
**grab**  121:10
**graduate**  7:20 8:4,8
**graduated**  135:20
136:21
**granted**  48:11
**great**  7:3 11:17
48:21 55:25 56:11
61:4 73:11 83:12
117:12,13 145:16
**greatly**  63:4 90:7
**groceries**  44:11
**ground**  22:14
105:2 106:5 116:19
**group**  12:21,22
36:12,15 37:1,2,3,6
37:6,11,12,16,17
37:23 38:1 46:18
54:5 56:20,22,23
56:24,24 57:1
58:20 71:1,7,10
74:25 75:2,9,11,13
89:24 115:19 120:7
120:11,23 122:7,10
126:22,23 127:6
134:21 138:7
**groups**  7:5 75:14
83:20 122:8 138:8

grow   9:10
guess   61:19 88:22
   88:24 123:12,24,24
   134:1 138:3
guestimate's
   138:16
gun   28:16
guys   52:22 92:14
   115:24 116:22,23
   146:4

**h**

h   18:6
half   34:23 35:10,15
   48:12 73:1,2 80:5
   80:11 94:22 100:7
   108:4 138:19,21
hamper   77:4
hampered   77:5
   86:6
hampshire   7:19 8:4
hand   47:4 91:12
handle   37:13
handling   52:2
   90:14 126:17
hanging   134:7
happen   52:12
happened   21:7
   25:1,11,15 31:2,25
   44:6,19 62:13 63:5
   63:21 97:9
happening   29:5
happens   30:8 37:12
   64:15 137:14
harassing   23:10
hard   44:15 71:14
   72:10 78:18,18
   81:5 82:3,10,12,19
   83:6,7,25 84:19
   121:23 122:6
   135:10 144:3

harder   51:20
hate   26:16 77:9,10
   78:6
he'll   117:6
head   78:9 89:14
   104:25 108:3 130:9
   136:18 137:9
headaches   21:18
health   12:3 67:3
   98:15 99:16,18
   100:3 104:12 136:4
heard   29:19 89:8
   135:15 141:3
hearing   16:3 70:17
   114:10
heart   9:24
held   5:19
help   9:3 22:25
   36:23 94:3 115:24
   135:23
helping   9:11 37:12
helps   8:25 9:1
hereto   13:7,24
   14:20 32:20 50:3
   54:16 56:15 60:13
   65:25 73:20 88:9
   148:6
hesitant   72:10
   132:18
hey   65:2
hiatus   131:5
high   7:12,17,17
   12:8 34:18 36:1,2
   38:12 66:23
higher   66:24
highest   7:12 92:23
   100:12
highlight   86:12
highly   40:7 41:22
   58:4

hills   51:4 61:21
   62:13 63:5 123:15
hinder   67:21
history   19:11,14,15
   19:21,25 20:3,3,4,5
   23:16 24:3,7,10,13
   25:6,9 31:21 36:6
   94:4,6,7,8 96:5,21
   96:25 97:3,4 98:20
   102:14 103:1
   107:13 125:2
hit   26:12 104:25
hits   28:19
hoffman   17:3,3,4
hold   14:14 17:22
   30:7 32:23 55:18
   61:9 93:1,13
   111:18 136:20
   138:25
home   28:6 51:3,4
   68:12 123:15
honest   38:22 84:7
   85:6 111:10 113:25
hope   41:11 71:15
   83:5 115:5 135:3
   147:2
hopeless   29:10 35:4
horrible   68:2
horribly   68:2
hospital   12:1
hospitalized   94:5
host   123:5,8,11,17
   123:21 124:4
hour   119:7,8
hourly   118:1,3,5,8
   118:25
hours   10:7 92:7,15
   116:17 117:25
   119:18 146:20,22
   146:22

house   44:10 52:7
   67:17 71:14 72:9
   83:24 113:14
   121:12,17 122:1,11
housecleaning   44:9
huh   88:14
human   125:22
   129:10,15
hundreds   78:24
hurt   34:15
hurting   34:14
husband   18:14
   22:22 27:20,21
   44:15 46:7 68:12
   68:13 77:6,22
   86:18 123:6
hypervigilance
   20:22 27:11 76:18
   85:23 111:1
hypervigilant   29:6

**i**

idea   8:21 9:5
identification   13:6
   13:23 14:19 32:19
   50:2 54:15 56:14
   60:12 65:24 73:19
   88:8
illness   96:6
imagine   26:1 41:10
   67:20 143:1,2
impact   25:16
impacted   26:24
   27:19 31:2 62:12
   90:22,23
impacting   47:6,13
   63:4
important   23:17
   24:12,15 31:16,21
   38:19 41:16 46:25
   76:2 86:12,22
   89:25 128:8,11

**importantly** 20:6
**impression** 129:21
**impressions** 113:19
  114:21 131:12
**improve** 9:11
**improves** 9:5,10
**inability** 21:1
**inaccurate** 114:14
**inauthentic** 39:12
  45:18 84:8,18,24
**incident** 21:7,24
  22:1 23:16 25:14
  26:7 42:1 47:1
  51:15 53:24 77:12
  77:13,15 81:15
  89:6 96:24 97:3,8
  104:17 106:2,16
  107:14 109:1,9,16
  113:11 122:15
  123:3 124:12,16
  127:8,8,15,15,16
  128:2,3,17,19
  129:3 131:6 133:16
  133:24 134:4
**incidents** 125:1,2,4
  128:5
**include** 101:6
  144:15
**included** 94:10
  95:24 96:9
**includes** 19:10
  20:16 34:10 99:23
  101:9 106:12
**including** 19:25
  20:25 97:20
**inconsistent** 40:25
  44:23 45:5 64:6
  70:1
**inconvenient**
  118:15

**increase** 136:14
**increased** 20:21
  27:9 77:4 95:24
  136:4
**increases** 136:8
**independence** 12:6
**independent**
  102:16
**index** 4:1,9
**indicate** 85:5
**indicated** 70:6
**indicates** 103:2
**indicating** 61:17
  100:8
**indication** 75:22
**individual** 12:16
  25:7 36:11,14,16
  46:17 70:24 83:21
  103:3 112:6 134:22
  136:6,25
**individually** 74:24
  75:3,6 89:24 138:9
**individuals** 7:5
  136:4,25
**information** 4:17
  19:24 33:10 43:25
  50:15 51:5 59:22
  76:1 89:11,16
  91:22 94:7 96:16
  145:12
**inherit** 24:19
**initial** 19:4 21:11
  36:6,8 62:6,7 63:11
  93:24 95:12,21
  96:22 102:13 104:3
**initialed** 148:6
**initially** 71:8
**initiated** 16:13
**injured** 124:21
**injuries** 107:24
  108:7

**injury** 105:13,23
  106:1
**ink** 148:6
**innocent** 124:22,25
**inputted** 50:14
**insensitive** 107:2
**inside** 27:22 52:8
  67:17
**insidious** 135:4
**insomnia** 76:18
  85:23
**instance** 96:11
**intake** 93:25 95:12
**intention** 121:22
**interacting** 63:6
**interaction** 112:21
**interactions** 91:3
  97:20,25 137:21,25
  138:21 139:3,9
**interest** 35:3 45:14
**interested** 5:25
  149:17
**interesting** 7:22
**interfere** 5:10
**interference** 5:9
**internally** 42:8,10
**internet** 112:8,16
**inventory** 141:4,7
  141:12,16,18,22
  142:6,14,16,25
**involved** 21:16
**ipad** 13:16
**irrelevant** 132:19
**isolation** 62:10
  63:21
**issue** 20:7 24:9 47:4
  52:20 53:19 109:22
  119:16
**issues** 12:17,20
  19:14 47:5 51:23
  69:12 111:1,3

121:17 122:15

**j**

**j** 3:14 150:5
**january** 65:19 66:4
  66:12 67:12 68:20
  70:23 73:8,12
  75:17,24 82:5
  129:25
**jerk** 117:18
**jerked** 116:24
**joanna** 1:21 2:17
  5:23 149:24
**job** 1:23 21:12
  41:22,23,24 118:9
  132:13 136:17
  151:3
**joy** 29:8
**judge** 81:5 82:3
**judgment** 69:6,7
  111:14,17 115:12
**july** 16:23 42:13,15
  43:11 44:23 45:17
  46:15,24 47:6,16
  48:14 50:25 51:1
  51:15 113:4 114:4
  114:7 115:2,8
**jumped** 22:18
  77:19
**jumping** 77:16
**june** 17:17 18:17
  20:12 21:25 24:3
  25:17 32:4 33:4,16
  34:1 36:8 41:15
  79:19 81:7 93:24
  95:11,21 96:3,22
  97:14 98:21 99:9
  102:14,19 103:2,7
  104:4 108:3 114:6
  114:7 115:2,8
  120:5,22 121:5
  129:1 138:18

**jury**  8:16 28:11

**k**

**k**  18:6
**kaiser**  5:20 6:23
  7:8 11:18 12:15
  15:17,21 33:9,22
  33:23 37:23 48:16
  49:9,21 50:11 53:7
  55:20 58:23 64:21
  65:12 66:6 73:7
  74:11 75:1,1,7,12
  75:13 79:14 83:20
  83:20 85:1 87:8
  92:14 93:8 97:13
  98:14 101:16
  107:21 116:23
  118:2,6,7,8,8,9
  119:1,6 126:25
  127:1 141:1 142:21
  142:22 146:6,8,9
  146:11,12,13,15,16
  146:23 147:1
**kaplan**  3:4
**keep**  53:8 56:7,9
  134:8 137:15
**kept**  33:9 55:21
  58:24 66:7 74:11
  79:14
**key**  42:6 62:1
**kicked**  105:1 106:4
  106:5
**kicking**  22:13,14
**kill**  23:6 28:17 78:1
  86:23
**killed**  26:19
**kind**  38:4 52:8
  94:14 109:21
  129:23 134:7
**knew**  17:22 84:14
**know**  8:12 14:6,7
  15:12,20 16:11,13

16:20,24 17:3
18:10 21:7 22:17
28:16,21 36:18
37:15,22 38:2
40:15 47:11 52:16
53:6 54:22 56:8
57:2 63:17 72:1,22
74:17,23 77:6,14
78:8,21 81:2 82:2
83:2,6,25 84:14,22
84:25 88:21 89:12
89:15 96:11,18
97:15,17,24 98:10
98:12 99:7,14,17
100:18,20,23 101:8
101:9,12,13,18,20
101:20,21 102:4,6
102:10 105:9 107:5
107:6 108:11,14,17
108:21 109:6
111:13 112:3,23
114:5,8,9 116:4
118:3,6,11 119:6
120:16,21 121:6,12
121:13,18,20,21
123:20,21,23 124:1
124:2 130:4,6,6,8
130:10 131:24
132:1,8 133:6
135:4,6,12,16,18
136:12 138:2,6
139:24 140:15
141:1,3,6,15,18,24
142:1,6,24 144:2
146:10,12,13,13
**knowledge**  16:20
33:12,18 48:21
50:19 55:22 58:25
65:12 66:8 69:24
74:12 79:15 87:13
144:10

**knows**  68:23

**l**

**lack**  111:2
**language**  86:20
  106:15 107:1,2
**large**  129:24
**largely**  8:19
**late**  92:17
**laundry**  44:9
**law**  3:6,15 10:22
  87:21
**lawsuit**  16:13
**lcsw**  151:2
**lead**  71:9
**leader**  56:24
**leading**  70:2,3,7,7
  70:10
**leandro**  12:1
**leave**  113:14 123:6
**leaving**  67:17
**led**  39:23 41:2
  45:23 47:25 57:23
  64:10 104:18
  111:24 124:3,5
**left**  118:20
**legal**  5:22,24 6:20
  15:17 84:17 102:25
  150:1
**length**  100:9
**letting**  32:23
**level**  7:12 34:18
  38:12 42:2 46:3,13
  63:7 77:3 80:24
  81:18,20 82:4,16
  92:23 112:20
**license**  9:22 10:22
  77:8 93:13,16,18
**licensed**  7:4,8 10:1
  10:4,5,13,20 11:1
  38:8,20 78:14
  144:10

**licensing**  10:18,21
**life**  9:7 26:8 29:8
  29:10,11 35:22
  40:9,14 42:4 46:4
  47:12 58:14 63:9
  67:12,21 69:13
  72:2,5,6 83:5 91:3
  112:19,22 126:2
  136:8
**lights**  51:17
**liked**  83:14,14 87:2
**likelihood**  80:16
**line**  41:9,9 47:22
  61:24 62:23 63:1
  66:14 103:8 106:2
  119:3 129:3 151:5
**linear**  69:4
**lines**  136:22
**listed**  95:21
**listening**  100:3
**lists**  94:19 100:4
**litsup**  150:14
**little**  35:3,7 89:10
  92:7 108:9 132:18
  138:24 139:4
**live**  16:6
**lived**  21:14 40:13
**lives**  24:19 83:10
**living**  16:3 29:11
**located**  6:22
**log**  53:8
**logged**  54:13
**logical**  124:22
**long**  7:7 24:16
  36:16,23 37:25
  53:5,5,6 88:19 92:2
  92:9,9 93:16 99:4
  117:3 130:5 143:25
**longer**  41:23 56:9
  80:15 116:4,5,12

**look** 14:11 29:9
   32:23 34:16 52:2
   64:20 71:20 86:16
   90:3 112:7,15
   126:22 127:1
   138:23 145:1
**looked** 27:23 28:8
   44:13 56:25
**looking** 15:9 20:23
   26:10,11 27:12
   36:23 43:20,20
   55:7 67:8,9 73:13
   76:11 82:4 97:18
   109:12,14,15,20,23
   110:1 111:25 115:9
   132:24 133:2
**looks** 8:21 43:17
   46:16 48:20 52:15
   55:11,13 65:18
   74:3 79:24 80:4
   82:21,21 146:19,19
**lose** 86:4
**loss** 47:9 76:25 86:4
**lost** 52:21 76:23
   130:17
**lot** 40:20 58:9 77:6
   77:11 78:17 82:22
   92:15 100:21
   116:19 121:21
   135:23 139:11
   145:4
**lots** 138:8 143:5
**love** 140:25
**loved** 127:13 128:1
**low** 21:3 27:18
   34:13 76:23 77:3
   86:3 96:1 111:2
**luck** 147:2

### m

**m** 3:5 142:5,5
**machine** 149:9
**madam** 61:6
   145:11
**magazine** 17:11,13
**magazines** 17:18
**main** 53:19 128:9
**maintain** 9:22
**major** 1:4 2:4 5:16
   6:4 8:6 18:8,9,10
   18:10,11,15,16
   20:11 25:20,25
   27:1 34:1,3,7 36:7
   38:11 39:5,12,24
   42:12 43:12,16
   45:5,18,24 46:15
   47:16,17,19,21
   48:2,3 49:18 50:9
   50:23 53:15 55:17
   57:11,17,21,24
   59:13 60:17,22,25
   61:13,18 62:18,20
   63:1 64:3,11 65:17
   66:12 68:17,20
   70:22 71:2,17 72:4
   72:21 73:9,12,24
   74:16,18 75:17
   79:11,19 80:2
   81:10,12,21 82:16
   82:17,25 83:16
   84:7 85:11 86:1,11
   89:6,22 90:25
   93:12,23 94:15
   95:15,24 96:23
   97:12 98:21 99:9
   99:24 100:15
   102:20 103:2,7
   104:3,5,19 105:19
   105:25 106:23
   108:10,24 109:6,16

   110:13,24 113:5,5
   113:10,15,16 120:6
   120:10,21 122:4,9
   122:14,18,23 124:1
   124:2,25 127:11,24
   128:20 129:6,7
   130:4,11 131:4,11
   132:23 133:15
   137:2,5 138:17
   142:17 143:16
   144:16 150:8 151:2
**major's** 32:4 40:24
   41:2 53:16 57:12
   62:19 66:4 67:12
   69:13 78:25 80:22
   81:11,18 85:9
   90:12,19 94:25
   102:15 107:13
   110:12 129:24
   139:15,19 140:13
**making** 30:18 68:8
   95:7 143:9 146:16
**male** 109:5,8
**males** 134:5
**man** 20:18,18
   22:12,13,23,24
   23:8 26:4,12 58:5
   104:23 109:14
   110:8,9 123:18,20
   123:21,25 124:13
   124:17 130:14
   131:7,11,21 133:3
   133:23 134:2
**man's** 123:15
**manning** 18:9,11
   18:12,13 39:5 89:6
   93:12 106:23
**manual** 104:11
**march** 1:13 2:16
   5:2,6 37:18 117:20

**maret** 7:17
**marital** 12:19
**mark** 64:18,19
**marked** 13:6,23
   14:19 32:19 42:16
   46:5,6 48:15 50:2
   54:15 56:14 60:9
   60:12 65:24 73:19
   88:8 113:3
**marks** 43:2,7
   103:19,24
**marriage** 44:17
   68:10,14
**married** 18:13,14
   135:22
**mase** 3:13 150:5
**maselaw.com**
   150:7
**massachusetts** 7:21
   10:10 11:15 12:9
   16:3
**massachussets** 7:19
**master's** 8:11 10:5
   92:25
**math** 137:16
**matter** 5:15 89:12
   128:4 131:22
**matters** 33:11
**mean** 7:14 22:1,4
   26:1 30:20 31:1,19
   31:19 34:8 38:25
   40:6,11 46:20
   49:12 59:16 62:5
   77:1 78:17 82:21
   83:12 84:2,24
   86:19 93:5 94:18
   97:2 101:2 110:8
   110:17 114:8,13
   131:15 133:6
   137:24 143:1

**meaning** 57:9
  61:22 69:2
**means** 21:1 35:19
  36:3 38:7 62:14
  67:19 68:22,23
  69:6,9 80:20
  100:20,24 101:3
  105:9 145:1
**meant** 22:11 84:25
  115:5 145:20
**measure** 129:17
**measurement**
  142:12
**measurements**
  100:19
**measures** 101:1,7
  101:10,22 102:8
  142:11,11
**mebane** 3:13 150:5
**med** 38:4,4,7
**media** 5:14 43:3,7
  103:12,24 120:2
  147:10
**medical** 20:5 41:20
  68:4 107:17,18,23
  108:2,19 137:3
**medically** 107:19
**medication** 24:25
  36:13,15 38:3,9
  46:17 51:10 70:25
  99:1,3 108:12
**medications** 38:6
  83:22 134:23
**meet** 18:15 38:21
  138:12
**meeting** 104:3
**meetings** 110:6
**meets** 37:6
**meister** 15:15
  87:23 88:17,20,25
  139:15

**members** 24:20
  63:7 102:24 138:7
**memory** 34:12
  48:12 69:8 89:15
  89:21 115:15
**men** 26:11 76:11
  108:25 109:12,16
  109:20,21,24 110:1
  132:24 134:10
**mental** 12:3 68:16
  68:19 69:11 98:14
  104:12 115:10
  136:4
**mentioned** 15:15
  25:10 27:2 62:4
  73:6 87:23 90:9
  94:10 107:20
  120:10 136:3 146:4
  146:10
**mere** 114:13
**merely** 124:6
**met** 15:22,22 18:7
  18:10,16 26:9
**methodology** 129:5
  129:9
**metrics** 100:22
**mezzanine** 2:14
**miami** 3:8,17 150:2
  150:6,14
**microphone** 30:5
  70:13,17 90:2
**microphones** 5:7
  5:10
**middle** 12:5
**mild** 32:6,8,12
  110:14,21
**miller** 3:20 5:21
**mind** 72:25 78:10
  80:8
**minding** 77:18

**mine** 50:18
**minute** 42:22 53:4
  103:12,13,15
  119:14 139:1
**minutes** 24:6,7
  42:20 88:23,24
  92:10 116:13
  118:20 140:18
**missed** 113:6
**misses** 84:23
**mixed** 108:22
**mom** 27:25
**moment** 14:14 21:5
  24:10
**monday** 37:6
**money** 58:9,10
  117:23 146:14
**month** 25:15 36:20
  50:25 131:5
**months** 21:20
  36:20,20,25 44:16
  74:20 76:24 80:9
  82:11 84:2,11,24
  139:5,6,7 144:3,4
**mood** 8:19 9:5,10
  18:2 20:25 27:15
  34:10 48:8 68:25
  76:22 86:2
**mother** 47:12
**move** 14:1,22 15:11
  31:8 40:22 58:11
  58:17 72:15 87:5
  98:13 116:9
**moved** 10:23 31:12
  48:9
**moving** 21:4 27:18
  35:11 113:3
**multiple** 57:8 135:5
**multiply** 78:20
**music** 8:6

| **n** |
| --- |

**n** 22:10
**nails** 63:10
**name** 5:21 6:20
  11:4 16:25 17:3,4,4
  18:8,14 94:1 99:15
  99:15 149:20
  151:25
**names** 7:14 16:20
  26:2
**nationwide** 10:16
**nature** 58:6,7
  106:13 127:7
  135:22
**near** 28:15,21,22
  33:10 48:18
**nearly** 34:23,24
  35:2,16,18 87:1
  94:23 100:7
**necessarily** 91:6
  115:4
**need** 10:4,5,8,19,19
  24:9 49:3 56:23
  96:17,19 143:25
  145:17,21,23 147:4
**needed** 9:21 36:24
  117:21
**negative** 8:22
**neither** 149:16
**nervous** 35:15
**nets** 123:13
**neuropsychologi...**
  93:9,10
**never** 9:6 15:22,22
  16:7 26:8,21,22
  40:9 62:11 114:8
  114:12 117:3 122:4
  122:9 133:2 138:2
  140:2 142:19
**new** 12:8 19:7
  24:13,18,21 38:21

137:14
news   26:18
nicely   63:11
nigger   22:11,20,21
22:22 23:6 40:5
77:20,22,23 78:1
86:17,18,19,24
105:2
night   76:16 85:21
92:18
nightmares   20:17
27:5 29:4 76:15
85:20 96:13 110:25
nights   37:7
nine   94:20 95:2
100:4 131:5
nineteen   7:9,10
10:15
non   9:19 58:17
nonresponsive   87:5
normal   33:9 46:3
55:21 58:24 66:7
74:11 79:14
normally   64:15
146:5
northampton   7:21
notate   75:21
note   4:17,18,19,22
4:23,24,25 5:7
33:14 34:16 41:15
41:17 42:15 43:11
43:18,18,21,23
44:21 46:19,24
47:10 48:14,14
50:8 51:5,20 52:13
55:11 60:8 61:2
63:9 65:9 66:3,13
73:25 74:8 75:2,5,8
79:10 85:19 86:10
87:8,15,17,20
89:15 96:3 102:14

102:17 103:1
109:12 110:3
111:23 113:5 114:4
114:15 115:8
122:23 124:12
130:8,12 131:4
138:23 139:13,14
noted   32:24 70:7
91:20 98:21 124:11
147:12 148:6
notes   4:21 18:11
22:4 33:3 37:3 49:2
49:8 59:4,5,12,13
59:14,22,24 67:18
68:9 74:24 75:19
76:9 82:4 89:7,9,11
89:18,20 90:4,6
109:17 110:13
122:13 123:14,14
129:4 134:11 137:4
138:24
notice   4:12,15 13:4
13:20 14:3,23 15:8
102:14 150:18
noticeable   125:24
noticed   35:12
97:19
notified   15:16
november   21:16
73:14,24 74:17
75:18,24 76:3
79:11,25 80:1,23
81:6,9,17,19 82:1,6
82:14 83:1 84:13
85:5,10,17 86:11
87:16,19,25 88:17
130:1,12,13 131:3
138:18,19 139:16
number   4:11 5:14
35:25 43:3,7 75:13
91:5 94:2 100:8

103:20,24 112:8
120:2 137:24 138:4
147:9
numbers   66:18,22
numerous   106:7

## o

o'clock   115:22
oakland   12:3,3,7
51:4 61:21 62:13
63:5 123:15
oath   6:12 149:7
object   38:14 74:22
76:6 80:6 106:18
106:18 107:4
108:13 119:3
144:13
objected   31:14
objecting   140:10
objection   23:20
25:19 29:16 30:3
30:21,23 31:8,10
31:11 38:15 39:6,7
39:13,18,21,25
40:22 41:4 44:25
45:7,20,25 47:7,18
48:4 49:5 51:24
53:18 57:13 58:11
58:15 59:7,15 60:2
62:21 64:7,14
67:15 69:14,19,20
69:25 78:7 79:5
80:18 81:1,13,22
82:18 83:18 84:9
85:14 86:14 90:16
90:20 91:17,24
95:5,6,7,9 101:24
102:9 105:21
109:18 110:4
112:11,17 114:2,24
120:15,19,25
121:19 126:19

131:14,23 132:11
133:5 135:1 136:1
136:16 140:5,9
143:17 144:17
obtain   9:17
obtained   8:5,10
obviously   25:14
48:21 49:3 50:19
98:4 124:9 132:2
133:7 146:8
occasion   24:3 80:1
occasionally   12:23
occurred   24:22
65:14 128:23
occurring   15:18
occurs   124:24
october   57:1 71:8
121:4,5,6
offending   127:8
offensive   40:7
104:24 106:15
107:1
offering   117:23
office   4:18,22,23
65:8 66:4 73:8
139:20,23 140:3
150:14
officer   26:19
official   15:21
oftentimes   24:8
49:21 96:15,17
oh   25:7 34:2 74:5
78:17 79:4 89:23
136:15 138:2
okay   6:15,25 7:3,7
7:10,17 8:4,8 9:13
9:25 10:13,25 11:3
11:13,17,22 12:10
12:14,25 13:12,17
14:1,4,9,11,17,22
15:3,5,11,19,25

[okay - patient]

16:9,18,23 17:7,15
17:20 18:3,7,18,23
19:3,6 20:11 21:10
21:23 22:7 23:24
24:2 25:10,16
26:25 28:11 29:12
30:10,10 32:15,22
32:24 33:1,8,18,21
33:25 34:5,9 36:5
36:10,16 37:1,15
37:21 38:3,19
39:23 41:19 42:14
42:21 43:9,14,24
43:24 44:22 45:4
45:17,23 46:14,19
46:23,23 47:5,15
47:25 48:14,18,21
48:25 49:16,23,23
50:1,4,7,11,14,19
50:22 51:21 52:15
52:23 53:11 54:1,7
54:12,23 55:1,15
55:20,25 56:6,16
56:18 57:10,16,20
58:23 59:11,19
60:8,14,16,19,21
60:24 61:4,12
63:24 64:10,25
65:7,7,11,16,20,22
65:23 66:6,11 67:2
68:19 70:19 71:2
71:24 72:20 73:11
73:15,18,18 74:7
74:10,15 75:8,15
75:25 78:13,25
79:8,13,18,22,24
80:4,13,22 81:17
82:14 85:9,16
87:15 88:3,10,15
88:19,25 90:9,12
91:9,20,25 92:20

92:23 94:14,25
95:15,20 96:8
97:24 98:10,10,20
99:12,23 100:10
101:6 102:13 103:6
103:14 104:2,17
105:19 107:1
108:12 109:15
110:6,11,23 113:3
116:24 119:9,10
120:16 121:16
122:4 124:11 125:5
129:5,12,22 130:17
130:19,22 132:9
133:14 136:20
137:12,17 139:4,13
139:18 140:2,10,13
142:1,24 143:13
144:5,5,15,20,24
145:10 146:18
147:1,3
**old** 44:12
**once** 18:3 53:9
82:11
**one's** 34:12,13,14
34:15 136:8
**ones** 56:4 127:14
128:1 143:3
**open** 14:7 118:12
**operates** 141:1
**opinion** 30:1,4,15
30:18 31:2 39:11
53:15 57:10 62:18
77:10,17 81:10,15
82:15 106:14
128:10,17 131:17
133:4 135:8,9
144:15
**opinions** 59:4,12,14
59:24 87:25 91:13
113:19 131:13,22

132:10 144:6,8
**opportunity** 42:11
92:5
**opposed** 49:12
**option** 94:15
**options** 94:24
**oral** 10:8
**order** 27:15 104:14
129:6 145:10,16
**ordering** 150:17
**organizing** 68:1
**oriented** 68:22,23
**original** 13:4
149:13 150:17
**originated** 128:5
**outcome** 5:25
**outlined** 41:6 85:18
**outrageous** 23:13
**outside** 26:7 37:23
38:9 51:14 52:10
63:6 67:20 74:25
75:1,6,12,13 76:8
76:19 83:20,24
99:1 118:8,9 127:1
**owe** 115:25
**owner** 51:3

**p**

**p.a.** 3:4,13 150:5
**p.m.** 2:15,16 5:3,6
43:3,4,5,7 103:20
103:21,22,24
119:23,24,25 120:2
146:21 147:10,12
**page** 63:24 150:13
151:5
**pages** 1:25 4:11
**paid** 118:7 140:15
146:15,23
**panicky** 51:13
85:24

**paperwork** 19:9,16
93:22,23,25 94:11
129:16
**part** 11:9 27:14
30:4 50:16 92:10
96:21 107:8 111:13
121:1 137:5
**participated** 37:15
**participation** 75:9
**particular** 41:17
43:21 78:11 93:11
127:2 128:14
**particularly** 24:8
26:19,20 29:20
76:2 86:19 96:18
125:24 133:20
135:5 143:2
**parties** 5:12
**parts** 44:21
**party** 5:24 51:2
53:21 61:21 62:13
63:5,8,15 122:24
123:4,6,8,14 124:3
124:10,13,17
133:23 149:18
**pass** 10:8,23
**passed** 74:15 75:25
122:20
**passenger** 22:11
**patient** 16:4,25
17:5 18:7 19:7,17
24:6,8,14 31:17
36:22 38:21,21
44:14 45:19 56:23
64:16 66:15 67:3,9
71:24 80:14 84:23
92:3 93:11,25 94:1
94:8,15,20 96:8,14
96:16 97:1 99:4,16
99:18,24 100:3,4
100:13 101:5 103:3

**[patient – plaintiffs]**                                                                 Page 171

107:9 111:7,9,12
112:6,15 114:17
116:2 117:14,22
119:14 125:9,10,14
125:17,23 126:7,12
126:17,21 127:2
128:13 129:7
132:14 135:6,19,24
136:10 137:21,24
140:19 142:22
**patient's** 31:18
97:7 99:21 125:11
132:17
**patients** 10:12
12:16,16 29:18
37:13 38:25 40:20
66:16 75:21 78:6
78:13,15,19,22,23
79:2 89:12 90:10
91:5,7 92:15
104:12 115:6 116:3
116:22 121:21
127:7 134:20 137:8
137:11,13,14,15,17
138:8,11 139:10,11
139:12 141:13
**pay** 30:22 117:10
117:15,23,24 118:1
118:3,4 146:24,25
**paying** 28:4 117:14
**payment** 140:17
146:16
**pays** 119:6 146:12
146:13
**pelaez** 3:14 4:6 6:5
6:5 23:20 25:19
29:16 30:3,21 31:8
31:12 38:14,17
39:6,9,13,21,25
40:22 41:4 42:20
44:25 45:7,20,25

47:7,18 48:4,25
49:10 51:24 52:18
53:2,18 54:19
57:13 58:11,17
59:7,15 60:2 62:21
64:7,14 67:15
69:14,19,22 70:3,5
70:11,15,19 72:15
74:22 76:6 78:7
79:5 80:6,18 81:1
81:13,22 82:18
83:18 84:9 85:14
86:14 87:5 90:16
90:20 91:10,12,17
91:24,25 92:1,4,10
92:18,22 95:8,10
100:11 102:3,12
103:14,18 104:1
105:24 106:9,25
107:11 108:5,16
109:25 110:5
112:14 113:2
114:16 115:7 116:6
118:10 119:3,16
120:4,20 121:15
122:3 127:4 130:22
130:23 131:19
132:4,21 133:13
134:15 136:11
140:6,12 141:21
143:9,17 144:5,13
144:17,21,23
145:19,20,22 146:7
147:5,7 150:5,9
**penalties** 151:22
**penalty** 148:4
**people** 8:12,23,25
9:3,11 23:10 26:2,8
26:11 27:13 35:12
35:21 37:7 40:15
44:5 76:11 77:7,8

83:9 86:16 97:20
107:6 112:21 122:7
**perfect** 33:2,25
**perform** 50:22
**performed** 93:11
115:9
**period** 16:21 80:9
80:15 99:4 130:5
**perjury** 148:4
151:22
**permanent** 80:17
80:20 83:6
**permanente** 6:23
7:8 11:18 12:15
15:17,21 33:9,22
33:23 48:16 49:9
50:11 55:20 58:23
65:12 66:6 73:8
74:11 79:14 85:1
97:13 98:14 107:21
146:23
**permanente's** 87:8
**person** 18:12 26:19
27:24,24 28:22
29:10 31:22 44:10
54:6 58:9 60:19
62:6 66:24 69:8
74:1 111:16 121:25
122:5 124:7 134:1
**personal** 16:14
**personality** 141:3,6
141:10,12,15
**personally** 40:4
61:20 139:2 140:3
**pertains** 149:12
**ph** 3:7
**ph.d.** 93:1,5
**phone** 16:5 23:4
49:19,21,22 50:23
52:25 77:25 87:20
94:2 139:14,21,23

139:24,25,25 140:2
**phones** 5:9
**photographs**
107:24 108:1,6
**phq** 99:14
**phq9** 34:20 64:17
64:22 66:15,23
67:2,8 81:2,4 82:6
82:20 99:8 100:13
100:18 101:6,21
102:6 142:11,18
**phrases** 77:8
**physical** 29:13,20
40:4 58:5 106:23
107:10,12
**physically** 42:7
49:20 124:21 133:2
**physician** 18:24
**pick** 5:7 123:7
**picked** 40:15
**place** 5:9,12 16:24
30:6 32:15 42:15
49:24 55:12 65:21
73:16 97:8 106:2
139:21 149:5
**places** 123:10
**plaintiff** 1:5 2:5,13
6:3 54:7,9
**plaintiff's** 13:3,19
14:2 15:7 32:16
33:2 42:16 43:10
48:15 49:24 50:7
55:2,4,9 56:1,19
58:19 60:9 65:7,21
66:2 73:6,17,22
74:10 79:9 86:9
87:7,22 88:13
92:11 113:4 116:17
117:4 137:1
**plaintiffs** 3:3

[plan - psyche]                                                    Page 172

**plan**  36:14 41:25
    46:14,16 56:25
    70:22 71:4 121:22
**plane**  44:5
**planned**  118:16
**plans**  68:1 134:25
**plays**  31:21
**please**  5:6,9 6:19
    7:10,16,23 9:25
    15:2,4 17:2 26:25
    31:10,11 32:17,18
    38:16 39:8 45:12
    45:12 50:1 56:2,5,7
    56:11,13 58:16
    60:14 65:20,22
    68:6 69:21 95:6
    100:10 119:10
    120:18 140:20
    141:20 150:11,13
    150:13
**pleasurable**  52:5
**pleasure**  21:1
    27:16 35:3
**plus**  10:7
**point**  15:14,15 25:8
    26:2 46:25 71:16
    72:20 75:16 86:21
    86:22 133:11
    136:15 142:17
**pointing**  44:12
**points**  28:16
**poland**  17:14
**police**  26:19
**polish**  17:10 18:4
**poor**  34:11,12 35:7
    76:22,23 83:3 86:2
    86:3
**poorly**  63:16 68:8
**positive**  67:4
    133:25

**possible**  100:12,15
    112:6,10,12,13,15
    112:18,19 113:1
    119:11
**possibly**  83:25
    84:18,19
**post**  12:19 20:15,16
    27:1,2,4,14 28:10
    28:12,13 29:2,3,14
    31:4 32:6 34:3,6
    36:12 37:5,7,14
    38:13 41:6 43:19
    44:4,24 45:2 46:18
    47:20 48:2 51:10
    51:23 52:1,3 53:16
    56:21 57:5,12,22
    57:24 61:18 62:19
    70:25 71:6 74:25
    75:10 76:15 78:16
    78:23 79:2 80:14
    80:16,23 81:11,18
    81:20 82:5 85:12
    85:20,25 90:24
    95:23 96:18 104:5
    104:15,18 105:6,10
    105:17 106:11
    107:7 110:14 112:7
    124:14,18 125:9,12
    125:15,16 126:12
    126:14,23 127:12
    127:25 134:12,17
    135:13,25 136:5
**postpone**  118:11
**pounds**  76:24
**power**  130:20
**practice**  8:3 10:7
    10:19 38:10 79:3
    93:13 99:2 119:2,7
**practitioner**  98:15
**predated**  122:15,20

**preferable**  37:25
**prefilled**  94:15
**premarked**  13:2
**prescribe**  38:9
**presence**  110:7
**present**  3:20 6:1
    96:5,6 112:23
**presentation**  39:3
    79:1 85:5,9 91:1
**presented**  21:7
    25:17 58:3,13
    128:15,23
**presenting**  19:11
    20:13 21:8 23:25
    24:1 46:2 84:8
**president**  26:15
    68:24 77:8
**pretty**  18:25 34:2
    82:21 89:7 99:3
    103:15 113:12
**previous**  25:6
    67:18 97:5
**previously**  16:4
    24:24 51:1 104:22
    108:9 126:1 140:22
**printed**  33:6
**prior**  12:2,2,4,5
    21:22 25:10,15,16
    51:15 97:14,15,21
    97:24 98:2,11,13
    98:22 110:18 149:7
**private**  5:8 119:1,7
**probability**  30:2,16
    59:6 91:15
**probably**  10:21
    22:5 64:20 68:13
    69:7 71:13 72:25
    78:19 84:13 90:4
    98:6 108:2,15
    109:3 122:6

**problem**  19:11
    20:13 21:9 23:25
    24:1,17,21 94:4
    121:12,24,25
**problems**  12:19,20
    19:22 21:2 29:7,7,8
    32:4,10 63:6 67:11
    96:1 102:25 110:15
    128:15
**proceed**  6:16 120:3
**proceeding**  130:18
**proceedings**  5:4
    149:4,6,8,14
**process**  69:4 129:2
**production**  150:21
**profession**  19:15
**professional**  10:3
    16:15,16 17:9 31:1
    39:11 53:15 57:10
    62:18 80:13 81:10
    82:15 111:13 116:2
    129:15
**profound**  91:4
**prognosis**  82:25
    83:11 134:24
    135:24 137:2,3,5,9
    144:6,16
**program**  9:18,19
**prolonged**  107:6
**pronged**  36:14
**protect**  87:2
**protective**  135:12
    135:14,15 136:13
    136:24
**proven**  101:4
**provide**  135:23
**provided**  16:9
    107:13
**provider**  98:9
**psyche**  62:15

[psychiatric - recommendations]                                                      Page 173

psychiatric  19:15
  19:22,22 20:3 24:3
  24:13 25:6 94:4
  97:4
psychiatrist  38:8
  38:10 71:21 72:17
  97:13,21 98:16
psychiatrists  97:25
psychological
  23:18 24:2,13 30:2
  30:16 32:4 40:5
  59:5,25 60:5 91:14
  101:1 141:10
psychologist  17:13
  30:19 93:4,5 97:13
  98:15 100:21
psychologists  93:8
  97:25 145:4
psychology  8:7
  12:11
psychosocial  19:14
psychotherapist
  74:19
psychotherapy  7:5
  8:13 18:21 19:7,12
  31:17 76:4 93:7
ptsd  37:23 75:11,13
  83:20 107:3 110:14
  110:21,24 120:7
  134:12,16,25
public  12:7 113:12
  113:13
publication  18:4
publications  17:7,9
  17:16
published  17:8,10
  17:19 18:5
purposes  84:17
  96:24 128:7
pushed  51:2,7
  53:21 83:24 122:24

123:4,12,17 124:4
  124:12,16 127:16
  128:3
put  13:15 51:10
  53:9 54:4,7,9 55:2
  55:3,25 60:10 88:5
  91:22 105:2 106:5
  121:2,2
putting  22:14
  59:22

**q**

qualified  141:11
  142:13
qualify  106:16
  107:3
quality  42:4 136:8
question  11:9,11,12
  23:22 30:14 31:5,6
  31:20 32:2 36:3
  41:12 49:1 58:1
  59:9,19,23 60:4
  61:3,5,7 63:18
  69:25 70:7 71:15
  71:22 78:18,18
  82:13 83:7,11
  85:19 96:4,17 98:7
  98:11 100:10
  101:25 105:22
  106:19,20 107:4
  108:13,15,19
  109:10 111:11
  114:3,17 115:1
  118:24 120:17
  121:13 125:13
  126:20 127:18,20
  130:24 131:1,18,25
  132:1,2,12,13,20
  133:9,10,14 134:6
  135:10 138:23
  146:2

questioning  116:18
  119:3
questionnaire
  95:15 99:16,18,19
  99:23 100:3
questionnaires
  95:1
questions  49:13
  89:5 91:11 92:6,12
  95:2 98:8 99:24
  110:12 116:13,18
  118:22 131:3 137:1
  143:15 144:6,20
quick  49:1 143:15
quit  21:12
quite  33:13 112:1
  124:22
quote  26:10 76:10
  109:12,23
quotes  86:16
quotient  67:3

**r**

r  18:6,6
race  123:22 134:1
racial  26:2,22,23
  29:12,20 58:6,6
  77:12 106:7,12,14
  125:25
racially  40:15
  104:24 107:1
raise  84:22
raised  25:2
rambling  69:2,5
rang  23:4
rank  53:22
rarely  68:12
reached  19:1
reaction  28:14
  32:13 110:14 124:7
read  19:9 22:4 36:9
  43:17 61:2,6,10

76:9 83:9 89:7 90:6
  105:11 108:2
  144:25 145:6,9
  148:4 150:13
  151:23
reading  19:10
  89:14 114:4 150:16
reads  63:9
ready  53:9
real  49:8
reality  9:8 52:14
really  24:9 25:22
  26:4,21 40:14 42:4
  59:8,19 67:20
  117:21 126:2,6,16
  132:12 133:21
reason  31:23 37:24
  57:18 93:19 111:9
  151:5
reasonable  30:1,16
  59:5,25 91:14
reasonably  59:13
  91:21
reasons  39:1 94:2
recall  17:15,20
  71:14 88:25 108:6
  122:12 133:17
  134:11
receive  18:20
received  19:23
  23:12 47:25 92:24
receiving  113:22
receptionist  119:13
recognize  9:1 128:8
recommend  134:23
recommendation
  125:17 143:16,19
  143:20,23
recommendations
  126:16 127:23
  128:4 134:20

[recommended - returned]                                    Page 174

recommended   84:4
  115:19 120:6,12,22
record   5:6,13 6:2
  6:20 14:16 33:8,22
  33:22 34:17 36:10
  38:1 43:3,4,6 48:16
  48:18 50:12 53:9
  55:21 58:24 61:10
  65:11 66:7,16
  71:20 72:23,24
  73:7 74:11 79:13
  87:11 88:16 103:18
  103:20,21,23 108:2
  117:7 119:20,21,22
  119:24 120:1 146:3
  146:22 147:10
  149:8,11
recorded   5:14
  33:10 55:21 66:8
recording   5:11
records   49:4,6,9
  57:1 71:5 91:21,22
  97:5,19 98:3,4,5
  107:23 120:10
  137:3,10 139:14
recount   133:15
  134:4
recounted   113:6
  131:5
recounting   107:14
  132:23
recounts   96:23
recovering   135:24
recovery   136:14
recurrent   20:17
  27:5 29:5 34:4,7
  35:19,20 76:17
  85:22
redneck   26:11
  76:10,11 109:12,14
  109:15,20,23 110:1

132:24 133:2
reference   100:19
  101:1 150:10
referral   54:4 56:20
  56:23 57:18 58:20
  121:2,3
referred   18:23 19:1
  36:13 38:4 51:25
  54:4 67:18 71:8
  76:9 102:7
referring   56:21
  89:20 95:9,11
refers   38:7
reflect   75:5
reflection   101:4
refreshing   89:21
regarding   50:9
  95:2,16 98:11
  122:19 144:15
regardless   128:11
regular   126:22
relate   126:7
related   5:24 19:20
  31:4,23,24 44:19
  47:1 48:10 104:19
relates   98:13
relation   98:1 126:6
relationship   27:20
  46:6 116:3
relationships   42:5
  77:5 86:6
relative   149:17
relatively   32:12
  40:13 82:3
relatives   37:10
relax   52:10
relaxation   52:5
relayed   97:1
relevance   132:22
relevant   16:14
  24:21 25:4 44:21

47:2,3 78:5,5 97:18
  109:22 126:4
religious   94:7
rely   96:25
relying   97:7 111:3
remained   46:16
remember   71:12
  71:13 88:21 89:14
  122:13 130:8 131:1
  133:20
remembering   69:9
  73:3 108:4
repeat   31:10,11
  100:10 120:17
  125:13 131:1
  134:14
rephrase   30:10,14
  60:3 61:5
replied   22:12
report   66:20 96:8
  102:7 126:1
reported   1:21
  20:18 38:2 67:12
  69:12 102:20 106:4
  122:24 124:10
  130:11
reporter   2:18 5:23
  13:7,24 14:11,13
  14:13,20 31:10
  32:20 38:15 39:7
  50:3 54:16 56:15
  58:15 60:13 61:6,8
  61:11 65:25 69:20
  70:9 73:20 88:9
  95:6 119:20 120:17
  134:14 141:20
  142:5 145:2,11,13
  145:17,20,23 146:3
  147:4 149:2
reporting   41:7 97:7

represented   117:3
republic   113:18,21
  114:11
requested   149:15
required   93:13
requires   10:6
  105:12
reread   123:13
respect   43:11
  115:25 117:16,17
respectable   41:22
respectfully   101:20
respecting   44:14
respond   95:1 99:25
  102:5 112:18
responded   95:17
  111:20
responds   96:14
response   27:9
  31:13 95:25 126:5
responses   20:22
  101:11 111:1,4
responsibilities
  28:5
responsibility
  116:22
responsive   31:13
  58:17
rest   23:15 83:4
restroom   103:16
result   26:6 41:25
  51:11,11 68:10
  113:11
results   69:11
resuming   117:5
retape   121:10
return   46:21
  130:12
returned   107:22
  131:4

[reunion - session]                                                                                           Page 175

| | | | |
|---|---|---|---|
| **reunion**  44:2 113:7 | **run**  12:20,22 37:11 | **scope**  38:10 99:2 | 71:20 78:22 79:3 |
| **reveal**  60:25 61:13 | **rush**  119:17,18 | **score**  34:18 64:22 | 83:15 91:7 107:23 |
| 68:20 | **s** | 100:12,13 | 108:1 110:18 143:2 |
| **review**  149:14 | **s**  72:19 142:5,5 | **scored**  34:18 | 144:2 |
| **rhetoric**  26:16 | **safe**  27:12 40:10,14 | 100:15 | **self**  19:1 34:13,13 |
| **richmond**  10:10 | 51:18 133:18 | **scores**  66:15 81:4 | 34:14,15 40:3 42:4 |
| 11:7,14,15 | **safety**  126:3 | **se**  129:9 | 66:20 106:4 |
| **right**  11:19 13:12 | **sake**  138:16 | **second**  17:22,25 | **send**  56:23 150:13 |
| 13:21 14:1,22 15:9 | **san**  1:12 2:14 5:2 | 18:2 32:23 34:5,6 | **sending**  38:5,11 |
| 15:11,20,24 25:12 | 5:20 6:23 12:1,5 | 54:11 55:18 56:11 | 127:7 |
| 32:25 33:19 43:14 | 41:21 68:5 | 61:8 62:9 80:7 | **sense**  25:20 40:14 |
| 46:23 48:22 49:16 | **saw**  26:18 49:18 | 103:18 136:20 | 68:12 86:25 109:11 |
| 50:16 55:3,9,9 60:8 | 54:5 60:17 65:16 | 138:25 | 111:21 123:10 |
| 66:2 73:2,6,9,22 | 73:12 79:19 80:25 | **secondary**  39:1 | 124:5,8 125:7 |
| 74:5,5 79:20,20,21 | 82:1,11 89:22 | **see**  12:16,16 15:14 | 126:2 128:22 |
| 79:22 87:13 88:12 | 107:16 108:3 | 18:25 20:23 21:25 | 129:10,13,14 132:2 |
| 89:24 90:10 92:13 | 131:16 | 25:5,5 37:2 38:3 | 132:5 133:8,11 |
| 97:2 98:10,18,25 | **saying**  22:21 29:3 | 40:2 41:7 42:12 | **sensitive**  5:7 50:16 |
| 99:2 100:17 104:7 | 30:17 34:20 51:18 | 46:4,8,22 49:20 | 50:17 |
| 108:23 110:1 | 64:23 75:22 86:23 | 52:17 54:1,5 65:18 | **sent**  14:3 |
| 111:25 112:13 | 96:3 100:5 114:12 | 66:13 67:21 71:7 | **separate**  25:11 |
| 116:18,21 117:22 | 133:21 136:23 | 71:18,19,20,21,24 | **september**  9:16 |
| 118:12,24 119:4 | **says**  8:19 38:3 | 71:25 73:25 74:1 | 49:20 50:8,23 |
| 120:8 124:15 | 46:19 52:21 63:24 | 80:7 84:1 86:22 | 53:14 54:2,6 55:13 |
| 126:25 130:24 | 66:14 74:3 75:10 | 89:12 90:9,18 | 55:14,16 58:21 |
| 131:9 138:1,11,13 | 75:12 103:5 109:17 | 92:15 97:9 103:7 | 60:16,22 61:1,14 |
| 138:13,15 139:5 | 123:14 | 105:1 106:10 108:8 | 62:17 64:3 65:9 |
| 140:11 143:19,23 | **scale**  142:10 | 111:7 119:14 | 121:3 122:23 |
| 144:22,25 145:3,4 | **scales**  129:16 | 133:11 136:15,19 | 124:11 |
| 145:5,24 | **scaring**  77:11 | 136:19 137:2,14,17 | **series**  99:24 |
| **rise**  26:16 | **scenarios**  9:21 | 138:3,7,8 | **serious**  21:17 |
| **risks**  108:17 | **schedule**  74:3 | **seeing**  13:21,21 | 105:13,23 106:1 |
| **robert**  18:13 | **scheduled**  4:19,24 | 25:15 26:16 72:17 | **seriously**  116:3 |
| **room**  2:14 6:1 | 4:25 55:16 71:17 | 74:19,23 75:3,6 | **service**  27:3,4 |
| 15:12,20 23:4,5 | 88:16 | 80:10 82:10,12 | 43:14 60:25 61:14 |
| 77:24 | **school**  7:12,17,18 | 84:11 97:21 108:6 | 68:17 87:9 89:21 |
| **root**  31:17 32:3,5 | 7:20,20 8:9 12:5,7 | 138:8 | 89:24 95:9 |
| **rothstein**  3:4 | 12:8 | **seeking**  94:3 | **services**  18:20,21 |
| **rough**  16:21 | **schools**  7:14 | **seen**  13:9,9,19 | **session**  19:4 22:16 |
| **rtc**  46:19,20 | **scola**  1:5 2:5 5:18 | 14:18,18 15:7 19:2 | 32:24,25 33:3,15 |
| | | 20:11 25:7 61:20 | 33:19,20 36:8 |

[session – spend]                                                                 Page 176

43:25 48:19,22,24
50:20 55:12 61:19
66:17,17 68:18
71:17 78:5 84:12
90:4 109:3,3 113:6
**sessions**  64:16
83:21 89:25 115:19
115:20 127:6
128:21
**set**  52:21 139:23,24
149:5
**seven**  17:25 94:19
138:20,24
**severe**  28:17 29:18
29:19 32:9,12 34:4
34:8,10,11,14,25
35:24 36:1 66:22
72:12 78:11 82:3,9
82:9,21,23 86:4
90:13,18 91:6 95:4
95:4,4,17 128:14
128:18 129:19
**severely**  26:24
27:19 31:2 62:16
63:22 121:23
**severity**  36:2 90:21
99:20 100:8
**sex**  27:22 44:16
45:14
**sexual**  29:1 105:14
126:13,21,23 127:2
127:5
**sexually**  29:1
**shame**  44:7
**share**  24:11
**she'd**  25:13 26:22
32:5 61:25 63:10
**she'll**  83:4
**sheet**  151:1
**ship**  20:19 23:5,7,9
23:12 25:1,11,14

25:22 26:4 29:23
48:1 53:20 57:6,15
57:15,21,23 58:9
58:10 77:12,19
86:24 107:15 109:1
128:2,10,16,18
**shoes**  84:1
**shorthand**  2:17
149:1,9
**shortly**  54:11
**show**  61:17 71:5
**showering**  77:2
82:22 86:5
**showers**  77:1
**sic**  41:15
**sick**  102:23
**sign**  144:25
**signature**  149:23
150:12
**signed**  150:13
**significant**  76:8
**significantly**  42:3
**signing**  147:7
150:16
**silence**  5:9
**similar**  89:7
**simply**  99:25
106:14
**sims**  142:1,2,4
**sincere**  84:21
**sincerely**  150:19
**sincerity**  91:1
**sir**  25:13 33:24
69:15 70:13 73:10
74:14 79:6 87:10
94:13 95:14 96:7
100:2 103:5 110:3
115:1 116:20 117:7
117:9,12 123:16
130:25 143:9,14

**sit**  40:20
**sitting**  40:19
129:11
**situation**  9:8 24:18
28:16,21,22 31:5
40:2 46:11 78:2
84:15 126:4
**six**  36:24 94:19
129:19 138:20
139:2,2,2 144:3,4
**skills**  8:2 37:13
**sleep**  34:11
**sleeping**  21:2 27:16
29:7 35:5,6
**sleepless**  95:25
**sleeplessness**  20:24
27:13 111:2
**slightly**  142:12
**slowly**  21:4 27:18
35:11
**slurs**  106:7,12,13
106:14
**small**  16:12 107:8
**smith**  7:20 8:8
**snaps**  30:6,6
**social**  7:4,8,21 8:9
8:11,12 10:2,4,6,14
11:1 12:11 28:9
38:8,20 78:15
92:25 93:4,14
102:14 103:1
135:18 136:7
144:10
**socially**  43:21
**solutions**  5:22,24
150:1
**somebody**  28:16,19
41:10 46:10 51:5
75:3,6 76:13
126:10 132:15
143:21,22

**somebody's**  67:21
**soon**  33:15 107:21
**sorry**  9:15 14:6
22:7 25:7 39:16
51:1 61:5,7 70:9
100:10 114:6
116:14 120:17
129:22 134:14
138:24 139:1
145:20
**sort**  9:17,18 27:25
43:20 69:3 124:6
**sounded**  44:17
**sounds**  86:24
138:10
**south**  3:7,16 150:2
150:6,14
**southern**  1:2 2:2
5:17
**speak**  70:12,16
72:20 75:16 88:19
**speaking**  35:11
95:13
**specialty**  30:18
**specific**  49:10
52:11 99:14 108:17
125:11 143:7
**specifically**  95:1
96:11 98:17 101:21
102:6 108:22 109:7
122:9 127:24 136:5
141:16
**specifics**  77:15
97:22 123:21
**speculating**  121:16
**speculative**  131:25
**speech**  69:2
**spelling**  18:4
**spells**  51:13
**spend**  134:9

spent 128:20
spoke 87:25 140:13
spoken 75:15
stable 27:24
stand 5:13 6:8 30:5
  32:18 42:25 43:2
  50:1 54:10 60:14
  65:22 67:2,6 68:6
  73:18 88:4 90:13
  103:17
standard 67:7
  94:18
stands 37:5 67:3,4
  91:5,6 99:14
stanford 7:25 8:15
stars 11:25,25
start 13:3 56:25
  57:2 63:9 80:10
  92:1 121:3
started 11:20 20:2
  22:13 27:10 29:6
  77:21 82:10
starting 7:11
startle 20:21 27:9
  95:25
startled 20:22
  76:16 85:21
startling 111:1
state 6:2,19 10:14
  10:17,18,19,20,20
  16:22 59:4,12,14
  93:14 148:11 149:2
  151:21
stated 91:13 99:19
statement 64:3,11
states 1:1 2:1 5:17
  10:25
status 49:5 63:24
  68:16,19 69:11
  102:15 115:10

stay 26:4
stayed 27:22
staying 35:5 52:8
  67:17 68:13
ste 3:16 150:6,14
stipulate 117:6
  118:10
stipulating 49:12
stipulation 49:7,7
stockton 12:9
stop 35:16
story 58:13
straight 69:4
  116:23
straightforward
  38:23
street 2:14
streets 40:10
strengths 9:9
stress 12:19 20:16
  20:16 27:1,2,4,14
  28:10,12,13 29:2,3
  29:15 31:4 32:6
  34:3,6 36:12 37:5,8
  37:14 38:13 41:6
  43:19 44:4,24 45:2
  46:18 47:21 48:3
  51:10,23 52:1,3
  53:17 56:22 57:5
  57:12,22,25 61:18
  62:19 70:25 71:6
  74:25 75:11 76:15
  78:16,23 79:2
  80:15,16,23 81:11
  81:18,20 82:5
  85:12,20,25 90:24
  96:19 104:5,15,18
  105:6,10,17 106:11
  107:7 110:14 112:7
  124:14,19 125:9,12
  125:15,16 126:12

126:14,23 127:13
  127:25 134:13,17
  135:13,25 136:6
stressor 21:15
strike 31:8,12
  40:22 58:11,17
  72:15 81:19 87:5
  124:2 127:21
  141:11
strong 27:24 44:13
  99:3 135:21
strongly 40:17
struck 91:1
structure 136:7
studied 7:24
studies 83:9
studying 8:1
  100:21
stunted 63:14
subject 151:23
subjective 43:24
  44:22 45:4 64:11
  129:21
subpoena 4:14 14:2
subpoenaed 98:4
subscribed 149:20
subsequent 7:22
  22:16 62:7 115:3
substance 151:24
substances 20:2
suffer 29:1
suffered 37:7
  127:14
suffering 63:12
  68:10 72:8 110:25
  111:5 126:11,13
sufficient 106:16
suggest 108:15
suggested 36:17
suggesting 70:5
  75:19 121:3

suggests 68:25 77:2
suicidal 66:25
suing 103:3,8 129:2
suite 150:1
sun 133:6
support 29:22
  85:16 136:18
supposed 146:14
sure 18:12,13,25
  19:18 24:12 27:12
  30:13,15,15,23
  31:19,20,20,25
  33:13 34:2 36:10
  38:24 39:17 42:21
  51:18 59:11,16
  61:6 72:22 74:2
  83:5 84:15 88:7
  91:10 100:12
  101:12,13 102:4
  105:9 107:16,20
  111:15 114:9,11
  122:22 123:13,23
  125:6,14 126:9
  127:18,20 130:7
  131:3 133:25 134:2
  134:16 135:2 136:5
  138:16 143:9 145:1
  145:6,9
surely 109:10
survivors 29:1
  126:24
suspended 93:18
suspending 117:5
swear 6:9
sweats 76:16 85:21
switches 51:17
symptom 28:8,9
  34:21 45:14,15
  51:12 76:25 86:7
  141:18,22

[symptoms - think]                                                                    Page 178

| | | | |
|---|---|---|---|
| **symptoms**  19:12,20 | 103:13,15,15 | 24:12 26:25 28:11 | **theory**  8:3,18 |
| 20:15 27:1,3 29:4 | 115:22 116:2,4,12 | 37:3,11,25 40:18 | 136:23 |
| 31:3,18,22,24 | 118:15 145:1,22 | 44:6 56:18 66:11 | **therapeutic**  8:2 |
| 34:10 35:2 37:13 | **taken**  2:13 15:13 | 92:16 97:22 99:13 | 12:8 |
| 38:23 39:3 40:24 | 15:25 107:24 | 110:21 116:7,24 | **therapist**  25:8 |
| 41:3,5,8 43:19 | 108:12 146:8 149:4 | 123:2 | 84:23 96:19 98:9 |
| 45:13 51:9 52:2,11 | 150:10,15 151:3 | **telling**  40:6 77:25 | 111:11 112:23 |
| 61:17 63:25 64:1,4 | **takes**  118:1 | 84:21 114:20 | 129:10 143:5 |
| 64:11,17,23 65:3,3 | **talk**  24:9 41:16 | **template**  137:7,7 | **therapists**  36:21 |
| 65:5 66:20 67:8,9 | 43:22 48:8 50:24 | **term**  35:24 100:23 | 97:16 104:11 |
| 68:11 72:12 75:10 | 51:22 52:3 57:6,6,8 | 100:25 | 125:22 134:21 |
| 76:15,21 78:25 | 60:9 75:21,23 89:3 | **terms**  8:2 19:14 | **therapy**  8:1,15,17 |
| 80:14,22 81:6 | 107:17 125:21 | 25:6 38:6 52:11 | 8:18,25 10:9,11 |
| 82:22 85:18,20,25 | 135:8 | 55:19 58:5 83:2 | 11:4,7,14 12:21 |
| 86:1 89:6 90:24 | **talked**  15:23 46:4 | 93:7 104:24 127:23 | 17:12 36:11,15,15 |
| 94:5,6,10,11,16,20 | 49:21 50:22 67:21 | 129:7 135:12,24 | 36:16,19,22 37:1,2 |
| 94:21,24 95:2,3,16 | 74:16 77:6,14 | 138:11 | 37:16 46:17 56:20 |
| 95:16,18,22,25 | 106:7 112:2 123:7 | **terribly**  123:5 | 58:20 70:24 75:1,9 |
| 96:6,9,18 99:21 | 140:17 | **terrified**  78:4 | 84:17 85:1 115:19 |
| 100:4 105:9 110:24 | **talking**  52:4 67:24 | **terrifying**  78:3 | 120:7,11,23 122:10 |
| 112:7,16 122:19 | 72:25 78:21 88:6 | **test**  99:15 101:3,9 | 127:6 134:22,22 |
| 124:14,18,23 | 112:3,4,20 118:7 | 102:6 141:10 142:1 | **thing**  55:19 91:11 |
| 125:12,15,19 | 121:7 128:20 | 142:14,17,19,25 | 94:8 111:15 |
| 126:11,14 127:12 | **talks**  77:4 | **testified**  6:13 | **things**  19:13 35:3 |
| 127:12,25 128:6,12 | **taped**  14:23 15:8 | **testify**  16:12 | 44:11 52:7,9 59:20 |
| **system**  12:7 33:24 | **target**  63:25 | 101:19 | 69:9 96:13 101:19 |
| 64:20 67:7 81:4 | **taught**  9:3 | **testifying**  149:7 | 112:3,4,22 113:23 |
| **systems**  10:19 | **team**  15:17 | **testimony**  16:5,9 | 114:20 135:22 |
| | **technique**  10:10 | 16:21 106:14 148:7 | 136:2,3 |
| **t** | **techniques**  9:3 52:2 | 149:11 | **think**  8:21 11:7,8 |
| | **ted**  65:2 | **testing**  93:9,11 | 11:11,11 15:17 |
| **t**  18:6 | **teleconference**  3:5 | 100:22 101:1 | 25:2,8 28:7 36:19 |
| **t.v.**  51:17 | 3:14 | **tests**  101:21 141:16 | 37:20 38:5 39:4 |
| **table**  51:3,7 53:21 | **telephone**  4:19,24 | **text**  66:14 | 41:16,20,20 42:6 |
| 122:25 123:4,9,17 | 4:25 15:23 51:21 | **thank**  6:8,22 41:14 | 44:6,20 46:12,24 |
| 124:4,13 127:17 | 55:16 73:23 74:1,4 | 53:12 70:20 91:9 | 47:3,8,8,12,19 |
| 128:3 | 74:6,17 76:3 79:10 | 119:15 145:25 | 48:11 49:10,12,13 |
| **tailor**  127:6 | 86:10 87:16 88:16 | 147:6 | 49:14 51:3 52:4 |
| **take**  5:12 9:20 | 89:1 | **thanks**  14:14 | 53:5,19,20 54:3,7 |
| 11:18 14:11 20:1 | **tell**  7:23 8:16 9:6 | 145:24 | 54:21 58:13 65:1,2 |
| 21:13 24:2 41:24 | 9:25 19:6 21:23 | | 65:4 67:3,4 68:10 |
| 42:22 53:4,7 54:11 | | | |
| 56:4 92:2 102:11 | | | |

[think - treat]                                                    Page 179

71:5 72:7,8,9 73:6
78:8,9,9 83:4,19,22
83:22,23 86:11,15
86:21 87:2,22
89:13,16,17 92:11
95:8 99:16 101:25
103:14 109:2,10,13
118:10,17,19,20
119:16,17 122:2,5
128:7,11,24 129:9
134:6,6,8 136:2,3,6
139:20,22 143:9,25
144:18 146:10,21
**thinking** 27:6
**thirteen** 78:21
**thirty** 92:10
**thought** 26:13
  36:4 69:4 76:1,13
  84:21 133:18
**thoughts** 8:20,22
  9:1,2,4,5 18:1
  20:17 27:5 29:5
  34:14 66:25 76:17
  85:22
**threat** 105:19
**threatened** 105:13
**threatens** 28:17
**three** 36:14 58:1
  68:22,23 94:19
  103:25 120:2
  138:20 139:1
  147:10
**ties** 136:7
**time** 13:22 14:17
  15:21 16:8,10,21
  18:7,16 21:15
  26:18 27:23 30:8
  33:10 39:1 42:11
  42:18 44:15 47:15
  48:18 49:18 52:8
  55:3,22 57:11

58:25 60:17 61:20
61:23 65:13,16
66:8 67:1,18 71:14
71:16 72:10,20
73:11 74:15 75:7
75:16,25 78:20
79:15,19 80:1,9
82:1,17 84:6 87:12
90:10 91:9 94:3
99:4 100:9 102:19
103:6,15 112:23,24
114:5,10,11,19
115:12,15,21,22
116:16,21 117:11
117:11,13,17
118:16 119:18
121:23 122:6
128:20,23 129:1
130:5,7 131:16
134:9 138:17 139:8
139:8,18 140:15,22
140:24 141:20
142:17 145:25
146:10,11,20,23,23
147:12 149:5
**timeframe** 113:20
**times** 58:2 68:22,23
  75:20 78:20 138:4
  138:5,10
**tired** 35:6
**title** 18:2
**titles** 17:20
**today** 15:13 20:6,7
  20:9,10 33:7 89:8
  117:21 118:17
  140:15,22 143:18
**today's** 147:8
**told** 15:21 23:6,7
  26:6 34:5 65:2
  79:23 86:25 89:17
  103:8 105:3 114:4

114:17 115:1,23
122:9 131:6 132:7
143:3
**tomorrow** 145:15
**tone** 40:19 111:18
**tonya** 15:15 87:23
  88:17 139:15
**tool** 142:12
**tools** 129:20 143:5
**top** 74:3 78:9 89:14
  108:3 130:9 136:18
  137:9 138:16
**topic** 69:3
**total** 12:10 137:24
  137:24 147:9
**totaled** 21:17
**totally** 131:24
  132:6
**tower** 150:1
**trace** 23:7 86:25
**track** 56:8 87:2
**tracked** 83:9
**tracks** 81:4
**trained** 112:25
**training** 7:22 9:13
  9:23 144:10
**transcribed** 149:9
**transcript** 145:11
  148:5 149:10,13,15
  150:11,13 151:4,23
**trauma** 23:14
  25:24 27:11 28:14
  28:15,15 29:14,18
  40:4,5 41:7 62:3,6
  62:7,8,9 63:4,12,19
  107:10,12 127:3,5
  128:12,14,18 129:6
  129:17 135:4
  141:18,22
**traumas** 25:23
  29:19 37:8,9 128:9

128:22,23 135:5
**traumatic** 12:19
  20:15,16 27:1,2,4
  27:14 28:10,12,13
  29:2,3,14 31:4 32:6
  34:3,6 36:12 37:5,8
  37:14 38:13 41:6
  43:19 44:4,24 45:2
  46:18 47:20 48:2
  51:8,10,23 52:1,3
  53:16 56:21 57:5
  57:12,22,24 58:4
  61:18 62:19 70:25
  71:6 74:25 75:10
  76:15 78:16,23
  79:2 80:14,16,23
  81:11,18,20 82:5
  85:12,20,25 90:24
  95:23 96:18 104:5
  104:15,17,18 105:6
  105:10,17 106:8,11
  106:16 107:7
  110:14 112:7
  124:14,18 125:9,12
  125:15,16 126:12
  126:14,23 127:12
  127:25 134:12,17
  135:13,25 136:5
**traumatization**
  62:4
**traumatized** 29:23
  62:1,1,2,5,9,14,14
**travel** 44:5 113:8
  113:11,16 114:1,5
  114:8,12,18,19
  115:2,5
**traveled** 114:13
  115:3
**treat** 23:1 80:2
  84:20 97:12 128:13

treatable 134:17
treated 78:6,13,15
  79:24 80:4 109:8
treater 97:7 111:10
treating 74:18 98:7
  114:20 125:9,14
  138:17
treatment 19:4
  33:19 36:7,14
  41:15 43:11 46:15
  46:24 47:20 49:2,8
  50:8,20 59:13 71:3
  71:4 72:18 83:17
  84:3 87:3 96:25
  98:12,13,18 113:23
  114:22 121:22
  125:10,16,20 126:6
  126:15,16 127:11
  127:23 128:4,15
  129:7,24 134:25
  137:5 143:19,20,21
  143:22 144:1
tried 94:3 114:25
  123:6
trigger 29:14
triggered 23:14
triggering 25:22
trip 23:15 113:20
  114:10
trips 68:1
trouble 35:4,6,9
  70:17 122:11
true 33:3 41:23
  43:10 50:7 55:15
  58:20 65:8 66:3
  73:7,23 87:8 88:15
  111:6,7 129:4
  135:3,4 148:7
  149:11 151:23
trump 26:14 77:7

trust 44:18 111:1
trusting 27:13
  76:18 85:23
trusts 44:16
trustworthy
  111:16,22
truthful 85:6 111:4
truthfulness
  101:11
try 52:10,21 83:16
  99:20 102:1
trying 34:15 39:1,2
  52:5,6 76:24 77:1
  83:23 92:16 97:6
  115:24 117:17
tuesday 1:13 2:16
  5:2
turn 42:9 119:4
turned 113:15
  131:20 133:1
twelve 36:24
twenty 12:13,14
  66:22 92:10
twice 17:11
two 7:1,24 8:14
  9:13 10:7 17:21
  22:4 26:2 34:22,23
  34:24 35:2,11
  36:20 42:20,22
  43:7 49:12 50:24
  51:14 58:1 66:21
  73:2 83:8 89:3 92:7
  92:14 94:19,21
  100:5 103:20
  116:17 119:18
  137:15 138:20
  139:1 143:15
  150:14
type 94:8 101:10,22
  108:11

typed 145:2
types 29:14 52:7
  129:20
typically 118:25

**u**

uh 88:14
ultimate 126:14
unable 35:17
  113:11 114:18
unacceptable
  116:14
unaware 140:24
uncomfortable
  110:2,7
undergo 120:12,23
underlying 63:3,19
undersigned 149:1
understand 19:18
  24:16 28:1 51:19
  59:8 92:8 95:12
  117:16 126:5
  127:20 131:15,25
understandable
  73:5
understanding
  107:12 113:10
  141:9
understood 33:13
  84:15
uneasiness 109:7
uneasy 110:2,7
unfortunate 124:7
unfortunately
  126:25
unhappy 46:7
unique 126:4
united 1:1 2:1 5:17
university 7:25
  41:21 68:4
unjust 124:6

unproductive
  35:17
unprotected 87:4
unprovoked 22:19
  77:17
unquote 26:10
  76:10
unrelated 31:23
  32:6
unsupported 58:7
upset 23:11 40:1
  53:23 89:10 112:2
upsetting 26:5 48:7
  53:22 67:23
use 42:23 99:4
  101:16 104:12,14
  142:18,18,21 143:3
  143:6,7
uses 77:8
usually 134:24
  137:6,7

**v**

v 104:8,10,14 105:7
  105:8,11 106:10,17
  107:3 151:2
vacation 113:17
valid 101:3,4,4
  132:17
validity 100:19,22
  100:25 101:6,10,17
  101:17,22 102:8
valium 98:25 99:3
  108:10,11,18,22
valley 12:4
vander 1:11 2:12
  4:3 5:15 6:7,11,19
  6:21 15:7 31:16
  32:16 38:19 39:16
  42:15 43:8,9 49:24
  52:16,17 53:14
  54:9 56:1,9,18

58:19 60:11,16
65:2,3,21 66:2
73:16,22 87:7
88:12 91:10 92:4
92:23 102:13
103:25 104:2 117:1
117:8 118:15,21,25
119:10,11,17,18
120:5,21 125:8
143:13 144:24
145:25 147:9 148:3
148:16 150:10
151:2
**vary** 126:16,17
**venues** 9:21
**verbal** 29:13
106:12 107:6
**verbally** 22:10
28:24 104:25
**veritext** 5:21,23
150:1,21
**veritext.com.**
150:14
**versus** 5:16
**veteran** 126:11
**victim** 26:22
126:13 127:2
**victims** 127:5
**victor** 3:14 6:5
42:19 52:16 69:24
118:19 119:9
145:21 147:4 150:5
**video** 1:11 2:12
5:14 14:23 15:8
52:15 53:1 54:11
103:19 130:17
145:16
**videographer** 3:20
5:5,22 6:8,15 13:13
13:13 14:5,6,10,16
14:25 15:3,5 30:5,8

32:15,18 42:14,17
42:25 43:2,6 49:23
50:1 52:19,20,24
53:6,12 54:8,10,13
54:23 55:1,5,25
56:3,6,11,16 60:10
60:14 65:20,22
68:6 70:12,16,20
73:16,18 88:4,10
90:2 103:11,12,17
103:19,23 119:22
120:1 121:9 147:6
147:8
**videotaped** 4:12,15
13:4,20
**videotaping** 5:11
**violated** 28:19
**violence** 105:14
**visit** 4:17,18,22,23
64:1 65:9 66:4
71:25 73:8 74:16
93:24 102:21
113:16
**visitation** 12:4
**visited** 129:1
**visiting** 130:1
**visits** 130:5
**voice** 23:5 40:19
77:25 111:18
**volume** 1:14 2:13
4:4 148:17
**volunteers** 96:16
**vomited** 26:13
76:13
**vpelaez** 150:7
**vs** 1:5 2:5 150:8

**w**

**w** 72:19
**waiting** 116:2
**waive** 145:4,5

**waived** 150:16
**walk** 40:10
**want** 9:7 14:25
16:25 17:1 21:8
24:11,16 39:17
42:19 44:4,6 45:9
56:3 58:2 79:8 88:4
101:19,20 102:1,11
116:25 117:15
119:9 123:23
132:13 138:5 145:1
145:6
**wanted** 44:1 48:8
71:10 72:9 84:15
127:20
**wanting** 86:4
**wary** 134:8
**washington** 7:18
**way** 10:12 20:1
25:16 26:8,21
28:19,22 33:14
36:21 40:8,19 42:7
43:22 46:1,3,11
48:9 49:11,14 56:7
58:3,13 59:11 60:4
63:8 66:24 70:4
71:10 75:4 84:8,16
84:18 90:22,23,23
96:15 102:5 103:8
111:18 118:7,17
120:23 125:21
126:7 129:25 132:8
**ways** 17:25 51:22
62:9 83:23
**we've** 13:2 59:3
**weak** 9:9
**websites** 112:9
**week** 117:20
137:15 138:4
**weekly** 37:6

**weeks** 34:22,23,24
35:3,11 51:14
66:21 94:21 100:5
138:4
**weight** 76:25 86:4,5
**went** 7:15,17,18,20
18:9 22:25 23:3
37:17,17 57:16
64:22 75:12,14
103:7 106:23 107:9
107:9,20 120:21
124:18 129:25
130:4 138:14
139:13
**west** 12:3
**whereof** 149:19
**whispering** 5:8
**white** 26:11,13
76:11 83:2 108:25
109:5,12,14,15,20
109:21,23 110:8,9
123:21 132:24
133:3,15,21 135:7
135:11
**wifi** 52:19,20 53:7
**willing** 49:7 118:1
118:4
**wisconsin** 16:4,24
**wish** 92:13
**wished** 89:17
**witness** 4:2 6:9
14:8 31:13 54:24
70:17 149:19
151:25
**witnessed** 132:16
**witnesses** 149:6
**woman** 22:18 28:4
77:16,19
**woman's** 22:20
77:20

[women - z]

**women** 133:16,21
**women's** 37:3
**wonders** 29:11
**word** 22:10 62:1
 111:18
**worded** 33:14
**words** 20:9 30:17
 40:18 62:11 126:10
**work** 6:25 7:1,21
 8:9,11,13 10:6
 12:12,17 28:3
 36:18,20,21 39:2
 41:23 42:2 56:8
 91:4 92:25 104:13
 109:22 132:14,14
 138:5 142:23 143:3
**worked** 8:14 12:7
 16:4 17:6 29:18
 85:2 102:16,20
**worker** 7:4,8 10:2
 10:4,14 11:1 38:9
 38:20 78:15 93:4
 93:14 144:11
**working** 8:2 10:12
 11:17 68:3
**works** 118:6
**world** 8:23 42:8
 44:18 116:21 126:3
 133:18,20
**worry** 30:9
**worrying** 35:17
**worse** 62:10
**worsening** 64:1,4
 64:12,23 65:4
**worth** 29:11 116:17
**worthless** 21:2
 27:17 76:23 86:3
**wrap** 140:20
**write** 109:23 137:8
 151:4

**written** 10:7 59:17
 60:6 66:18 114:14
 130:10
**wrong** 27:25
**wrote** 33:14 48:20
 51:9 55:13,19
 57:17 59:20 66:14
 68:13 74:9 89:23

| x |
|---|
| **x** 135:6 |

| y |
|---|

**y** 18:6 135:6
**yeah** 7:1,2 11:7,10
 13:1,5 17:10,17
 18:6,9 21:12 25:6,8
 31:19 32:25 37:19
 38:24 42:20,21
 43:13 44:20 48:20
 48:23 50:5,10,13
 50:16,17 52:3
 55:18 56:13 59:16
 61:8,16 64:24
 65:10 71:19 78:4
 79:23 80:7,8,10
 81:14 84:2 88:7,14
 91:1,4 94:18 96:7
 99:17 109:2 110:17
 113:13 123:5
 125:22,24 128:12
 129:20 131:1,9
 137:6,14 139:6
 144:19
**year** 8:8 9:13 11:19
 44:12 48:12 57:9
 72:25 73:1,1 76:13
 80:5,11,15 89:13
 102:16,21 108:4
 137:22 138:1,12,19
 138:21 139:4,6

**years** 7:9,10,24
 8:14 10:7 11:18
 12:10,14 16:2
 24:25 25:14 73:2
 78:14 98:22 108:11
 137:15
**yelled** 22:20
**yelling** 77:21
**york** 12:8
**young** 12:22

| z |
|---|
| **z** 135:6 |

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

**KAISER PERMANENTE**

The Permanente Medical Group
Kaiser Foundation Hospitals

Release of Medical Information
4131 Geary Blvd
San Francisco, CA 94118
415-833-3778

## INVOICE FOR RELEASE OF INFORMATION

Patient: Charlene Major  [5681291]

Requested By: Christopher M. Drury
Diamond Kaplan & Rothstein, P.A.
2665 South Bayshore Drive, PH 2B
Coconut Grove, Florida, 33133

Account Number:
Billing Date:  03/06/2019

Amount Due: $700.00

Release ID Number:                                    Invoice Number:

Details: Subpoena for Deposition for Edward C Vander Clute, LCSW received February 20th, 2019. Deposition took place 03/05/2019 from 02:00pm – 05:55pm. 3 hours 55 minutes.

|  |  |  |  |
|---|---|---|---|
| Paper Pages | : |  |  |
| Microfilm Pages | : |  |  |
| Other Media | : |  |  |
| Release Fee | : | $ | 0.00 |
| Additional Fee | : | $ |  |
| Details: *** |  |  |  |
| Postage | : | $ |  |
| Tax | : | $ | 0.00 |
| Total Fee | : | $ | 0.00 |
| Refund | : | $ | 0.00 |
| Write-Off | : | $ |  |
| Amount Paid | : | $ | 0.00 |
| Amount Overpaid | : | $ | 0.00 |
| Amount Due | : | $ | $700.00 |

Tax ID: 94-2728480

Comments: Subpoena for Deposition for Edward C Vander Clute, LCSW received February 20th, 2019. Deposition took place 03/05/2019 from 02:00pm – 05:55pm. 3 hours 55 minutes.

Please send remittance to:   TPMG Administration
350 St. Joseph's Ave # 140
San Francisco, CA 94115

Release ID Number: